**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **National Union Fire Insurance Company of Pittsburgh, Pa.,**<br><br>*Plaintiff*,<br><br>v.<br><br>**RealPage, Inc.,**<br><br>*Defendant.* | |
| **RealPage, Inc.,**<br><br>*Counter-Claimant*,<br><br>v.<br><br>**National Union Fire Insurance Company of Pittsburgh, Pa.,**<br><br>*Counter-Defendant.* | **Civil Action No.: 3:23-cv-00562-B**<br><br>**Judge: Honorable Jane J. Boyle** |

**JOINT APPENDIX FOR PARTIES' SUMMARY JUDGMENT MOTIONS**

Dated: September 29, 2023

Respectfully submitted,

**GORDON REES SCULLY MANSUKHANI, LLP**

/s/ *Saxon Guerriere*
Saxon Guerriere (SBN: 24078603)
Meagan P. VanderWeele (*pro hac vice*)
2200 Ross Avenue, Suite 3700
Dallas, Texas 75201
Tel.: (214) 231-4660
sguerriere@grsm.com
mvanderweele@grsm.com

*Attorneys for Plaintiff National Union Fire Insurance Company of Pittsburgh, Pa.*

*-and-*

**HAYNES AND BOONE, LLP**

*/s/ David Taubenfeld*
David Taubenfeld
Texas Bar No. 19679450
Storm Lineberger
Texas Bar No. 24122681
2801 N. Harwood Street, Suite 2300
Dallas, Texas 75201
Telephone:      (214) 651-5531
Telecopier:      (214) 651-5940
david.taubenfeld@haynesboone.com
storm.lineberger@haynesboone.com

*Attorneys for Defendant and Counter-Claimant*
*RealPage, Inc.*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument has been forwarded in accordance with the FEDERAL RULES OF CIVIL PROCEDURE to all Parties and Counsel of record in this lawsuit this 29th day of September, 2023.

*/s/ Meagan P. VanderWeele*
Meagan P. VanderWeele (*pro hac vice*)

| EXHIBIT | DESCRIPTION | APP |
|---|---|---|
| A | Joint Stipulation of Facts | App. 4 – App. 15 |
| A-1 | Commercial Crime Policy No. 01-317-15-74 (NUFIC000087 – NUFIC000154) | App. 16 – App. 84 |
| A-2 | January 4, 2019, National Union's Coverage Position Letter (NUFIC003059 – NUFIC003067) | App. 85 – App. 94 |
| A-3 | Forfeiture Complaint; *United States v. $480,966.69 in U.S. Currency Seized From Sun Trust Bank Account X4368* No. 3:20-cv-00155-B (N.D. Tex. July 13, 2020) (RP00019955 – RP00019968) | App. 95 – App. 109 |
| A-4 | RealPage's Petition for Remission Form (RP00000156 – RP00000165) | App. 110 – App. 120 |
| A-5 | September 25, 2020, National Union's Demand Letter (NUFIC003586 – NUFIC003588) | App. 121 – App. 124 |
| A-6 | May 11, 2022, National Union's Demand Letter (NUFIC000198 – NUFIC000199) | App. 125 – App. 127 |
| A-7 | September 30, 2022, RealPage's Response to Demand Letter (RP00000166 – RP00000167) | App. 128 – App. 130 |
| A-8 | June 6, 2022, RealPage's Response to Demand Letter (RP00000010 – RP00000011) | App. 131 – App. 133 |

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **National Union Fire Insurance Company of Pittsburgh, Pa.,** | |
| *Plaintiff*, | |
| **v.** | |
| **RealPage, Inc.,** | |
| *Defendant.* | **Civil Action No.: 3:23-cv-00562-B** |
| **RealPage, Inc.,** | **Judge: Honorable Jane J. Boyle** |
| *Counter-Claimant*, | |
| **v.** | |
| **National Union Fire Insurance Company of Pittsburgh, Pa.,** | |
| *Counter-Defendant.* | |

## JOINT STIPULATION OF UNDISPUTED FACTS

Plaintiff/Counter-Defendant, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union) and Defendant/Counter-Claimant, RealPage, Inc. ("RealPage") (collectively the "Parties") respectfully submit the following Joint Stipulation of Undisputed Facts:

1.       National Union is an insurance company formed under Pennsylvania law and is licensed by the Texas Department of Insurance to do business in Texas.

2.       RealPage is a corporation formed under Delaware law, has its principal place of business in Richardson, Texas, and regularly conducts business in the State of Texas.

App. 5

## I.  REALPAGE'S PAYMENT PROCESSING SERVICE

3.      RealPage provides software to the real estate industry. One of the services RealPage provides is the collection, management, and transfer of rent payments and other funds from residents to the owners of residential properties.

4.      In 2018, RealPage maintained and provided an online payment processing platform designed to manage the collection of rents from tenants and then the disbursement of those funds into landlord-clients' bank accounts.

5.      For this service, RealPage charged a transaction fee that would be assessed against the landlord-client's specified rent payment amount rather than as additional fee incurred by the tenant.

6.      Using an online platform maintained by RealPage, tenants and landlord-clients submitted bank account or credit information to RealPage.

7.      To facilitate its service, RealPage utilized third-party payment processor Stripe, Inc. ("Stripe") to collect and process the rent payments.

8.      RealPage transmitted instructions to Stripe, which included the information about the tenant's accounts, the landlord-clients' destination accounts, and the amounts due to each of the landlord-clients.

9.      Following the instructions provided by RealPage, Stripe directed Wells Fargo, Stripe's bank, to process an automated clearing house ("ACH") transfer that would pull money from the tenants' bank accounts and place these funds into a single Wells Fargo bank account owned by Stripe.

10.     Stripe is the account holder of its account at Wells Fargo, a "collective merchant bank account" that contains the funds related to transactions of various merchants utilizing Stripe, such as RealPage.

EXHIBIT A

11.     The funds pertaining to the various merchants, including RealPage, were commingled within Stripe's account.

12.     Stripe then directed Wells Fargo to complete a second ACH transfer to pay certain amounts of these commingled funds to certain landlord-clients' accounts as specified by the instructions provided by RealPage.

13.     As a separate step, Stripe also directed Wells Fargo to transfer to RealPage certain amounts of commingled funds equal to RealPage's transaction fees, placing those funds in RealPage's "parent account."

14.     RealPage's "parent account" was not itself a bank account but "an accounting feature" that allowed Stripe to earmark a certain amount of the commingled funds in its Wells Fargo account as fees to be paid to RealPage at a later time.

## II.     THE PHISHING ATTACK

15.     In May of 2018, hackers successfully deployed a phishing scheme and obtained RealPage's login credentials for the Stripe online payment processing platform.

16.     Upon obtaining RealPage's login credentials to the payment processing platform, the hackers altered the disbursement instructions to divert payments from Stripe's bank account that collected tenants' rent to accounts under the hackers' control.

17.      Effectuating this scheme, the hackers diverted more than $10 million in commingled funds from Stripe's bank account that had not yet been disbursed to the appropriate recipients into accounts under the hackers' control ("Stolen Funds").

18.     Among the Stolen Funds were transaction fees allocated for RealPage and rent payments intended for landlord-clients.

19.     RealPage and Stripe were alerted to the fraud and were able to reverse a portion of the diverted payments and freeze any ongoing transfers.

20.     Meanwhile, RealPage directly reimbursed over $9 million to its landlord-clients whose funds were stolen as a result of the phishing scheme.

21.     Ultimately, despite its efforts RealPage was unable to freeze or claw back more than $6 million of the Stolen Funds.

## III.     THE POLICY AND REALPAGE'S COVERAGE CLAIM

22.     Prior to the phishing scheme, RealPage obtained insurance through National Union. National Union issued Commercial Crime Policy No. 01-317-15-74 to RealPage, with a policy period of March 31, 2018, to March 31, 2019, and limits of $5 million per occurrence and subject to a $50,000 deductible (the "Policy").  A true and correct copy of the Policy is attached here as <u>Exhibit 1</u>.

23.     The Policy is a valid and enforceable written contract between National Union and RealPage.

24.     The Policy includes a Computer Fraud insuring agreement and a Funds Transfer Fraud insuring agreement.

25.     The Computer Fraud insuring agreement provides:

**A. Insuring Agreements**

Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place at any time which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period to Discover Loss Condition E.1.j.:

* * *

**6. Computer Fraud**

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":

a. To a person "other than a messenger" outside of those "premises"; or

b. To a place outside those "premises".

26.     The Funds Transfer Fraud insuring agreement provides:

## A. Insuring Agreements

Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place at any time which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period to Discover Loss Condition E.1.j.:

* * *

## 7. Funds Transfer Fraud

We will pay for loss of "funds" resulting directly from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account."

27.     The Policy contains an "ownership clause."  Condition P states:

The property covered under this policy is limited to property:

(1) That you own or lease; or

(2) That you hold for others whether or not you are legally liable for the loss of such property.

However, this policy is for your benefit only.  It provides no rights or benefits to any other person or organization.  Any claim for loss that is covered under this policy must be presented by you.

28.     The Policy contains the following Allocation of Recoveries Provision:

## t. Recoveries

(1) Any recoveries, whether effected before or after any payment under this policy, whether made by us or you, shall be applied net of the expense of such recovery:

(a) First, to you in satisfaction of your covered loss in excess of the amount paid under this policy;
(b) Second, to us in satisfaction of amounts paid in settlement of your claim;
(c) Third, to you in satisfaction of any Deductible Amount; and
(d) Fourth, to you in satisfaction of any loss not covered under this policy.

29.     Following the phishing scheme incident, RealPage sought coverage under the

Policy for $6,022,021.00 of Stolen Funds, which consisted of rent payments intended for landlord-

clients and transaction fees allocated for RealPage.

30. Following its investigation, National Union issued its preliminary coverage analysis in a letter dated January 4, 2019. A true and correct copy of is attached here as Exhibit 2.

31. National Union determined that "[RealPage] has sustained a direct covered loss of the funds it owned at the time of the diversion in the gross amount of $1,231,692.78, which represents the transaction fees earned from the landlord-clients. RealPage was entitled to only $1,067,560.73 of those fees under the Computer Fraud coverage part. (Ex. 2, at 7-8.)

32. National Union explained its position:

> [National Union] has determined that [RealPage] has sustained a direct covered loss of the funds it owned at the time of the diversion in the gross amount of $1,231,692.78, which represents the transaction fees earned from the [landlord-clients].
>
> However, Stripe, through its clearing account at Wells Fargo, obtained recovery in the amount of $925,855.14 from various financial institutions related to the Loss. [RealPage] has indicated to [National Union] that it cannot determine which recovery checks should be credited which [landlord-client] or [RealPage] ledger account balance in Stripe as the information is within purview of Stripe/Wells Fargo alone. Given [RealPage] does not own the Stripe clearing account and has stated in its December 18th submission that it cannot obtain this information, [National Union] proposes to use a pro-rata approach to apply the recovery against the confirmed gross loss amount.
>
> A pro-rata approach would apply $164,132.05 of recovery against the confirmed loss amount of $1,231,692.78 which would reduce [RealPage]'s confirmed loss amount at this time to $1,067,560.73. After application of the $50,000 deductible, the net amount under the pro-rata approach would be $1,017,560.73 for this portion of the claimed loss. It is [National Union's] position that if it is later determined that the actual recovery to [RealPage] exceeds the pro-rata amount of recovery [National Union] proposes then [RealPage] would refund the difference back to [National Union]. Conversely, if [RealPage] can demonstrate to [National Union] that less recovery should be apportioned to [RealPage's] stolen fee portion of its claim, [National Union] would cover that additional amount.

(*Id.*)

33. In that same letter, National Union denied coverage for the remaining amount of RealPage's claimed loss because RealPage did not own or hold the stolen rent payments that belonged to landlord-clients. (*Id.* at 7.)

34.     Pursuant to Section 542.057(a) of the Texas Insurance Code, on January 31, 2019, National Union paid RealPage $1,067,560.73 for partial coverage under the Policy.

## IV.     THE PRIOR COVERAGE ACTION

35.     Following National Union's determination that RealPage's loss was partially covered under the Policy, RealPage filed suit against National Union in the United States District Court for the Northern District of Texas for breach of contract, declaratory relief, and violations of the Texas Insurance Code.  *See RealPage Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.* (*RealPage I*), 521 F. Supp. 3d 645 (N.D. Tex. 2021) (Civil Action No. 3:19-CV-01350-B).

36.     This Court granted summary judgment to National Union on all counts on February 24, 2021.  *Id.* at 647.

37.     National Union argued and this Court agreed that RealPage's "business decision" to reimburse its landlord-clients for the stolen rent payments was a separate, indirect loss arising out of its later decision to replace the lost funds.  *See* Nat'l Union's Brief in Supp. of Opp'n to RealPage's Partial Mot. Summ. J. 18–19, *RealPage I*, 521 F. Supp. 3d 645 (N.D. Tex. 2021), ECF No. 95; *RealPage I*, 521 F. Supp. 3d at 659 ("[S]ince RealPage did not hold the funds, its loss resulted from its decision to reimburse its clients.  Accordingly, RealPage did not suffer a direct loss as required under the Policy.").

38.     This Court found that National Union's partial coverage was proper on the basis that RealPage never "held" the stolen landlord-client funds because those funds were deposited into Stripe's bank account at the time of their theft:

> In sum, funds that are maintained in a commingled account in a third party's name, at a third-party bank, which the insured can direct but not access, are not funds "held" by the insured.  The Court recognizes that RealPage might have intended to "hold" the client's funds.  Further, the Court acknowledges that the bad actors utilized RealPage credentials to obtain the funds.  Nevertheless, the Court's task is to interpret the Policy's language.  And here, based on the plain meaning of "hold," RealPage did not hold the funds.  RealPage could have contracted for a broader

EXHIBIT A

definition of covered property. But it did not. Accordingly, the Court concludes that the client funds are not covered property under the Policy and GRANTS summary judgment in favor of National Union and Beazley on RealPage's declaratory judgment, breach-of-contract, and anticipatory breach-of-contract claims.

*RealPage I*, 521 F. Supp. 3d at 659.

39.     RealPage appealed this Court's judgment to the Fifth Circuit Court of Appeals, and on December 22, 2021, the Fifth Circuit affirmed this Court's holding. *See RealPage, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.* (*RealPage II*), 21 F.4th 294, 299 (5th Cir. 2021).

40.     In its opinion, the Fifth Circuit determined that RealPage did not hold the stolen landlord-client funds at the time of the theft: "RealPage never possessed its property manager clients' funds that got caught in the phishers' net." *Id.*

41.     Both this Court and the Fifth Circuit found that National Union's partial coverage under the Policy was proper, and that National Union fulfilled its obligations under the Policy. *See RealPage I*, 521 F. Supp. 3d at 649; *RealPage II*, 21 F.4th at 299.

## V.     REALPAGE'S EFFORTS TO CLAIM FUNDS SEIZED BY THE U.S. SECRET SERVICE

42.     Shortly after RealPage discovered the phishing-theft scheme, its Executive Vice President, William Chaney contacted the Dallas Field Office of the United States Secret Service ("USSS") and reported that RealPage was a victim of a fraud scheme.

43.     The USSS launched an investigation, and ultimately seized funds in 35 bank accounts that received fraudulently obtained proceeds totaling approximately $2.9 million ("Seized Funds").

44.     Upon completion of the USSS' investigation, the United States filed a forfeiture complaint in this Court seeking, among other relief, public notice advising "[a]ll persons having any interest in or right against" the Seized Funds, an order condemning the Seized Funds, and a

EXHIBIT A

declaration and decree that the Seized Funds are forfeited to the United States. *See United States v. $480,966.69 in U.S. Currency Seized From Sun Trust Bank Account X4368*, No. 3:20-cv-00155-B (N.D. Tex. July 13, 2020). A true and correct copy of the forfeiture complaint is attached here as <u>Exhibit 3</u>.

45.   In August 2020, RealPage filed a form Petition for Remission of Forfeiture ("Petition") asserting its rights to the Seized Funds. A true and correct copy of RealPage's Petition is attached here as <u>Exhibit 4</u>.

46.   In its Petition, RealPage acknowledged that it had already recovered a portion of the Stolen Funds through other means as follows:

| Source of Recovery | Amount of Recovery |
|---|---|
| Financial Institutions | $3,544,529.00 |
| Manual checks representing monies seized by financial institutions | $925,855.00 |
| USSS Seizure Number 303-2018-007 | $33,621.04 |
| Insurance | $1,067,560.73 |

(Ex. 4, at 6.)

47.   In its Petition, as support for why it had "a valid, good faith, and legally recognizable interest" in the Seized Funds, RealPage represented that it "was a victim of a targeted phishing incident in which . . . bad actors fraudulently diverted over $10,000,000" of RealPage's landlord-clients' funds; and being responsible for those funds, RealPage "credited each of the affected [landlord-clients'] accounts with the full amount of the stolen funds owed to them promptly after detection of the fraudulent transfer"; and that "a portion of the stolen funds that cannot be distinctly identified represented transaction fees owed to RealPage by its clients." (*Id.* at 8.)

48.   Ultimately, the United States government remitted $2,908,130.53 of Seized Funds to RealPage.

49.     Through counsel, on September 25, 2020, and again on May 11, 2022, National Union issued demand letters to RealPage requesting reimbursement pursuant to the Policy's Allocation of Recoveries Provision.  True and correct copies of National Union's September 25, 2020 demand letter and National Union's May 11, 2022 demand letter are attached hereto as Exhibit 5 and Exhibit 6, respectively.

50.     Through counsel, on September 30, 2020 and June 6, 2022, RealPage responded to National Union's demand letters, declining to repay any of the amount demanded by National Union.  True and correct copies of RealPage's September 30, 2020 response letter and RealPage's June 6, 2022 response letter are attached here as Exhibit 7 and Exhibit 8, respectively.

51.     In its June 6, 2022 response letter, RealPage stated the following: "The amounts recovered were unbundled and not specifically identified as representing particular aspects of RealPage's loss."  (Ex. 8, at 1.)

Dated: September 21, 2023      Respectfully submitted,


**GORDON REES SCULLY MANSUKHANI, LLP**

*/s/ Meagan VanderWeele*_____
Saxon Guerriere (SBN: 24078603)
Meagan P. VanderWeele (*pro hac vice*)
2200 Ross Avenue, Suite 3700
Dallas, Texas 75201
Tel.: (214) 231-4660
sguerriere@grsm.com
mvanderweele@grsm.com

*Attorneys for Plaintiff and Counter-Defendant,
National Union Fire Insurance Company of
Pittsburgh, Pa.*

        *-and-*


**HAYNES AND BOONE, LLP**

*/s/ David Taubenfeld*_____
David Taubenfeld
Texas Bar No. 19679450
Storm Lineberger
Texas Bar No. 24122681
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Telephone:   (214) 651-5531
Telecopier:   (214) 651-5940
david.taubenfeld@haynesboone.com
storm.lineberger@haynesboone.com

*Attorneys for Defendant and Counter-Claimant
RealPage, Inc.*

EXHIBIT A

# EXHIBIT A-1

Policy Number: 01-317-15-74
Division No: 4
Insured Name: REALPAGE, INC.

Effective Date: March 31, 2018
Expiration Date: March 31, 2019

Underwriter Name: LAURA MOSS
Underwriter Phone # : 646-857-2368

Print date: Apr 4, 2018
Printed by: WILLIAM SMOKOWSKI
Phone # : 913-495-4000

| ALIAS | FORM NUMBER | DESCRIPTION |
|---|---|---|
| ☐ RTQD01 | | RISK TRANSFER |
| ☐ ENVPGE | LETTER | ENVELOPE PAGE |
| ☐ CLETR2 | LETTER | REGULAR BROKER COVER LETTER |
| ☐ COM001 | 91222 | POLICYHOLDER NOTICE |
| ☐ QD5001 | CRDS02 | COMMERCIAL CRIME POLICY DECLARATIONS |
| ☐ QP4907 | CR0022 | Commercial Crime Policy (Discovery Form) |
| ☐ MNSCPT | MNSCPT | OMNIBUS NAMED INSURED AND JOINT VENTURE COVERAGE |
| ☐ QE6694 | 95417 | ADDITIONAL NAMED INSURED |
| ☐ QG2212 | 120497 | EMPLOYEE DEFINITION AMENDED (REQUIRED TO BE BONDED BY ERISA) |
| ☐ MNSCPT | MNSCPT | CRIME ADVANTAGE  AMENDED |
| ☐ MNSCPT | MNSCPT | DEFINITION OF EMPLOYEE AMENDED |
| ☐ QE2348 | CR2541 | INCLUDE DESIGNATED PERSONS OR CLASSES OF PERSONS AS EMPLOYEES |
| ☐ QE2337 | CR2520 | ADD CREDIT, DEBIT OR CHARGE CARD FORGERY |
| ☐ QE5696 | CR2027 | PROVIDE VARYING DEDUCTIBLES |
| ☐ QE3468 | 120427 | FRISC OPTOUT CLAUSE (WITH CLAIMS EXPENSE COVERAGE IF OPT OUT) |
| ☐ QG2202 | 128543 | FRISC (MIDDLE MARKET ACCOUNTS) (ISO) SUPPLMENTAL LISTING FOR CLAUSE ENDTS |
| ☐ MNSCPT | MNSCPT | INCLUDE DESIGNATED PERSON REQUIRED |
| ☐ QE6716 | 95442 | PRIOR THEFT OR DISHONESTY |
| ☐ QE6699 | 95421 | CLIENTS  PROPERTY - SCHEDULED CLIENTS |
| ☐ MNSCPT | MNSCPT | LOSS REPORTING THRESHOLD - 50% |
| ☐ QE6839 | 115901 | PROTECTED INFORMATION EXCLUSION (CARVEBACK) |
| ☐ MNSCPT | 113024 | INDIRECT OR CONSEQUENTIAL LOSS EXCLUSION |
| ☐ QE3503 | CR2009 | AMEND TERRITORIAL LIMITS |
| ☐ QE4075 | 116956 | IMPERSONATION FRAUD COVERAGE (ISO) |
| ☐ QF1973 | 121261 | COMMERCIAL & GOVERNMENTAL CRIME LOSS PREVENTION SERVICES ENDORSEMENT |

**NUSFRM**

*Archive Copy*

App. 17

CONFIDENTIAL

EXHIBIT A-1

NUFIC000087

Policy Number: 01-317-15-74
Division No.     4
Insured Name: REALPAGE, INC.

Effective  Date: March 31, 2018
Expiration Date: March 31, 2019

Underwriter Name: LAURA MOSS
Underwriter Phone # : 646-857-2368

Print date:   Apr 4, 2018
Printed by: WILLIAM SMOKOWSKI
Phone # : 913-495-4000

| ALIAS | FORM NUMBER | DESCRIPTION |
|---|---|---|
| ☐ QE7215 | 99758 | NOTICE OF CLAIM (REPORTING BY E-MAIL) |
| ☐ QG2019 | 126991 | U.S. DEPARTMENT OF LABOR AMENDATORY (ERISA PLAN COVERAGE AMENDMENTS) |
| ☐ QE9155 | CR 02 47 | TEXAS CHANGES |
| ☐ QE9154 | CR 01 99 | TEXAS CHANGES - LEGAL ACTION AGAINST US |
| ☐ QF1994 | 119679 | ECONOMIC SANCTIONS ENDORSEMENT |
| ☐ QE2392 | 78859 | FORMS INDEX ENDORSEMENT |
| ☐ TX0003 | 94396 | TEXAS COMPLAINT NOTICE FOR ADMITTED PAPER CO. |

**NUSFRM**

*Archive Copy*

App. 18

CONFIDENTIAL

EXHIBIT A-1

NUFIC000068

**RiskTool for Crime Welcome Notice**

Congratulations on purchasing a Crime policy from AIG. We look forward to providing your company with the insurance coverage and access to risk management tools that will help you to prevent and control certain crime risks.

As an eligible Crime policyholder, you have access to **RiskTool for Crime,** an easy-to-use comprehensive web-based platform that helps to streamline the risk management process. The platform's content is customizable and can be tailored specifically to meet a number of risk management needs. With pre-populated training modules and sample policies, RiskTool for Crime can assist in raising awareness and creating procedures to help prevent human error from causing loss.

RiskTool for Crime is provided by RiskAnalytics, a leader in cyber security threat intelligence. These tools are exclusive to eligible AIG policyholders and are available at no additional cost. Go to: https://www.risktoolregistration.com to register. Enter your contact information and policy number, and a representative from RiskAnalytics will contact you or your broker within five business days to coordinate.

Your decision to purchase coverage through AIG has provided your organization with useful tools for managing your business. We thank you for choosing AIG and look forward to a continuing successful relationship. If you have any questions or would like additional information, please contact your broker, an AIG representative or email us at financiallines@aig.com.

American International Group, Inc. (AIG) is a leading international insurance organization serving customers in more than 130 countries and jurisdictions. AIG companies serve commercial, institutional, and individual customers through one of the most extensive worldwide property-casualty networks of any insurer. In addition, AIG companies are leading providers of life insurance and retirement services in the United States. AIG common stock is listed on the New York Stock Exchange and the Tokyo Stock Exchange.

Additional information about AIG can be found at www.aig.com
YouTube: www.youtube.com/aig
Twitter: @AIGInsurance
LinkedIn: http://www.linkedin.com/company/aig

AIG is the marketing name for the worldwide property-casualty, life and retirement, and general insurance operations of American International Group, Inc. For additional information, please visit our website at www.aig.com. All products and services are written or provided by subsidiaries or affiliates of American International Group, Inc. Products or services may not be available in all countries, and coverage is subject to actual policy language. Non-insurance products and services may be provided by independent third parties. Certain property-casualty coverages may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds, and insureds are therefore not protected by such funds.

© All rights reserved.

ArchivANCopy

CONFIDENTIAL

EXHIBIT A-1

NUFIC000089

| Account Name: | REALPAGE, INC. | | |
|---|---|---|---|

| Policy Number: | 01-317-15-74 | Policy Effective Date: | March 31, 2018 |
|---|---|---|---|
| Underwriter: | LAURA MOSS | Print Date: | Apr 4, 2018 |

| Initial Risk Transfer Assessment Date: | December 7, 2017 |
|---|---|

| Risk Assessment Date | Risk Transfer Qualification | Risk Assessment Date | Risk Transfer Qualification |
|---|---|---|---|
| 03/28/2018 | R1 | 03/28/2018 | R1 |
| 03/28/2018 | R1 | 04/02/2018 | R1 |
| 04/02/2018 | R1 | | |

**Risk Transfer Qualification Key:**

**R1** – Insurance Accounting – Safe Harbor applies to transaction, no Risk Transfer Worksheet necessary.
**R2** – Insurance Accounting – Risk Transfer Worksheet completed, approved, and in UW file
**R3** – Deposit Accounting – Risk Transfer Worksheet completed, approved, and in UW file
**R4** – Bifurcated Accounting (Insurance/Deposit) – Risk Transfer Worksheet completed, approved, and in UW file.
If it has been determined that a Risk Transfer Worksheet needs to be completed, please indicate below the individuals whom are required to sign the worksheet:

_____                _____
Underwriter                                                      Division President


_____
Chief Financial Officer

*Archive Copy*

EXHIBIT A-1

CONFIDENTIAL                                                            NUFIC000090



| Sanctions Due Diligence Checklist for Commercial Insureds | |
|---|---|

The AIG Property Casualty Economic Sanctions Standards require risk-based sanctions due diligence for commercial insureds. This assessment must be made prior to bind. These questions will assist you in completing due diligence pertaining to sanctions risk.
See the AIG PC Sanctions Web Page for guidance, including the following:
- RSAT contacts
- product line underwriting guidance
- de minimis application
- US sanctioned country program summary
(click here or type "sanctions" into the AIG Contact search box).

Insured: *REALPAGE, INC.*

Date: *March 28, 2018*

| | |
|---|---|
| During the course of your regular underwriting review, was there any evidence that would lead you to believe that the Commercial insured (including subsidiaries and branches) has sanctions exposure* in any of the countries / regions listed below?<br>Cuba<br>Iran<br>Myanmar<br>Sudan<br>Syria<br>North Korea<br>Belarus<br>Zimbabwe<br>Crimea region of Ukraine<br><br>For the purpose of this question, "exposure" means any of the following:<br><br>- insured is incorporated, domiciled or located in any of the above listed countries<br>-insured conducts business activity involving Cuba, Crimea region of Ukraine, Iran, Syria or Sudan (e.g. services, shipments, sales, supply channels, covered property).<br>- information obtained shows that insured board members or officers are domiciled in Cuba, Crimea region of Ukraine, Iran, Syria or Sudan, or that an insured is majority owned by individuals or entities incorporated, domiciled or located in Cuba, Crimea region of Ukraine, Iran, Syria, Sudan. This information must be screened and evaluated.<br><br>It is important to be alert to evidence of sanctions exposure during your regular underwriting review. Common underwriting sources that may contain information which would indicate a sanctions exposure are listed below:<br>Underwriting file/submission<br>Company website<br>Annual (or other) reports<br>Discussion with customer/broker<br>Schedules of covered property, routes, vessels, locations*<br><br>*Note: Endorsements, schedules, tax forms and other policy-related documents should not refer to sanctioned countries in a way that could suggest coverage, regardless of whether a sanctions exclusion is included in the policy.<br><br>*For AIG in Canada Underwriters please see the most current version of the local Economic Sanctions Guidelines issued by Compliance.* | YES ☐   NO ☐<br><br>All sanctions exposure must be escalated to the Regional Sanctions Assistance Team (RSAT)<br><br>US and Canada:<br>sanctions@aig.com<br><br>Asia Pacific:<br>sanctions.asiapacific@aig.com<br><br>Central:<br>sanctions.central@aig.com<br><br>Latin America:<br>sanctions.lacr@aig.com<br><br>Europe:<br>sanctions.europe@aig.com<br><br>Japan:<br>sanctions.fareast@aig.co.jp |

**BRANCH**

The material contained herein is proprietary to AIG and is intended for internal use only by employees of AIG. Unauthorized disclosure, dissemination, copying, or other use of this material without the express written permission of AIG is strictly prohibited.
Copyright © 2015 AIG. All rights reserved.

Archive Copy

App. 21

CONFIDENTIAL

EXHIBIT A-1

NUFIC000091

Acknowledgement By:       LAURA MOSS

Acknowledgement On:       March 28, 2018

Insured Name:             REALPAGE, INC.

Submission/Policy Number: 013171574

*Archive Copy*

CONFIDENTIAL

EXHIBIT A-1

NUFIC000092

**National Union Fire Insurance Company of Pittsburgh, Pa.**
80 Pine Street
New York, NY 10005

212- 458- 5000
http://www.aig.com



April 4, 2018

LAUREN DIPPEL
MARSH JCS INC.
540 WEST MADISON STREET
CHICAGO, IL 60661

RE: **REALPAGE, INC.**

Policy Number: **01- 317- 15- 74**
Product: Commercial Crime Policy Admitted CR0023 (05/06)
Policy Period: March 31, 2018 - March 31, 2019

Dear LAUREN

I am happy to deliver to you the original and copy(ies) of the policy and/ or endorsement(s) for the captioned account.

Please visit www.aig.com/business for additional information on AIG products and services.

If you have any questions, please feel free to contact me at the below listed number.

Very truly yours,

LAURA MOSS
Underwriter
646- 857- 2368
Laura.Moss@AIG.com

Enc.

1500137

***BRANCH*Archive Copy**

CONFIDENTIAL

EXHIBIT A-1

App. 23

NUFIC000093

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

91222 (9/10) *Archive Copy*

CONFIDENTIAL

NUFIC000094

**COMMERCIAL CRIME POLICY**
**DECLARATIONS**

In Return For The Payment Of The Premium, And Subject To All The Terms And Conditions Of This Policy, We Agree With You To Provide The Insurance As Stated In This Policy.

**Coverage Is Written:**

[X] Primary          [ ] Excess          [ ] Coindemnity          [ ] Concurrent

| | |
|---|---|
| **Company Name Area:** | *National Union Fire Insurance Company of Pittsburgh, Pa.* |
| **Producer Name Area:** | *MARSH JCS INC.*<br>*540 WEST MADISON STREET*<br>*CHICAGO, IL 60661* |
| **Named Insured:** | *REALPAGE, INC.* |
| | (including any Employee Welfare or Benefit Plans) |
| **Mailing Address:** | *2201 LAKESIDE BLVD.*<br>*RICHARDSON, TX 75082* |

| **Policy Period** | | |
|---|---|---|
| From: | *March 31, 2018* | |
| To: | *March 31, 2019* | 12:01 A.M. at your mailing address shown above. |

| Insurance Agreements | Limit of Insurance Per Occurrence | Deductible Amount Per Occurrence |
|---|---|---|
| 1. Employee Theft | *$5,000,000* | *$50,000* |
| 2. Forgery Or Alteration | *$5,000,000* | *$50,000* |
| 3. Inside The Premises - Theft Of Money And Securities | *$5,000,000* | *$50,000* |
| 4. Inside The Premises - Robbery Or Safe Burglary Of Other Property | *$5,000,000* | *$50,000* |
| 5. Outside The Premises | *$5,000,000* | *$50,000* |
| 6. Computer Fraud | *$5,000,000* | *$50,000* |
| 7. Funds Transfer Fraud | *$5,000,000* | *$50,000* |
| 8. Money Orders And Counterfeit Money | *$5,000,000* | *$1,000* |

Coverage is provided only if an amount is shown opposite an Insuring Agreement. If the amount is left blank or "Not Covered" is inserted, such Insuring Agreement and any other reference thereto in this policy is deleted.

*1500137*

*BRANCH*
*Archive Copy*

App. 25

COMMERCIAL CRIME POLICY
DECLARATIONS

CRIME AND FIDELITY
CR DS 02 08 07
POLICY NUMBER:
*01-317-15-74*
REPLACEMENT OF
POLICY NUMBER:
*01-346-54-33*

**If Added By Endorsement:**

| Insuring Agreement | Limit Of Insurance Per Occurrence | Deductible Amount Per Occurrence |
|---|---|---|
| *Clients' Property* | *$5,000,000* | *$50,000* |

**Endorsements Forming Part Of This Policy When Issued:**
*#1,#2,#3,#4,#5,#6,#7,#8,#9,#10,#11,#12,#13,#14,#15,#16,#17,#18,#19,#20,#21,#22,
#23,#24,#25*

**Cancellation Of Prior Insurance Issued By Us:**
By acceptance of this Policy you give us notice cancelling prior policy Nos. *01-346-54-33;* the cancellation to be effective at the time this Policy becomes effective.

Premium: *$22,549*

| Countersignature Of Authorized Representative |
|---|
| Name: |
| Title: |
| Signature: |
| Date: |

*1500137*

CR DS 02 08 07   © ISO Properties, Inc., 2006   Page 2 of 3   ☐
BRANCH Archive Copy

EXHIBIT A-1

App. 26

CONFIDENTIAL

NUFIC000096

CRIME AND FIDELITY
CR DS 02 08 07
POLICY NUMBER:
*01-317-15-74*
REPLACEMENT OF
POLICY NUMBER:
*01-346-54-33*

**COMMERCIAL CRIME POLICY
DECLARATIONS**

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President, Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the insurer.

_____
PRESIDENT

_____
SECRETARY

_____
AUTHORIZED REPRESENTATIVE

*1500137*

**BRANCH** *Archive Copy*

EXHIBIT A-1

CONFIDENTIAL

App. 27

NUFIC000097

# COMMERCIAL CRIME POLICY
## (DISCOVERY FORM)

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is or is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

### A. Insuring Agreements

Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place at any time which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss Condition **E.1.j.**:

#### 1. Employee Theft

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

For the purposes of this Insuring Agreement, "theft" shall also include forgery.

#### 2. Forgery Or Alteration

a. We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

(1) Made or drawn by or drawn upon you; or

(2) Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

For the purposes of this Insuring Agreement, a substitute check as defined in the Check Clearing for the 21st Century

Act shall be treated the same as the original it replaced.

b. If you are sued for refusing to pay any instrument covered in Paragraph **2.a.**, on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we will pay is in addition to the Limit of Insurance applicable to this Insuring Agreement.

#### 3. Inside The Premises - Theft Of Money And Securities

a. We will pay for loss of "money" and "securities" inside the "premises" or "banking premises":

(1) Resulting directly from "theft" committed by a person present inside such "premises" or "banking premises"; or

(2) Resulting directly from disappearance or destruction.

b. We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

c. We will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of or unlawful entry into those containers.

#### 4. Inside The Premises - Robbery Or Safe Burglary Of Other Property

a. We will pay for loss of or damage to "other property":

(1) Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or

(2) Inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".

App. 28

CONFIDENTIAL
EXHIBIT A-1
NUFIC000098

b. We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.

c. We will pay for loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

**5. Outside The Premises**

a. We will pay for loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

b. We will pay for loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

**6. Computer Fraud**

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":

a. To a person (other than a "messenger") outside those "premises"; or

b. To a place outside those "premises".

**7. Funds Transfer Fraud**

We will pay for loss of "funds" resulting directly from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

**8. Money Orders And Counterfeit Money**

We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

a. Money orders issued by any post office, express company or bank that are not paid upon presentation; or

b. "Counterfeit money" that is acquired during the regular course of business.

**B. Limit Of Insurance**

The most we will pay for all loss resulting directly from an "occurrence" is the applicable Limit of Insurance shown in the Declarations.

If any loss is covered under more than one Insuring Agreement or Coverage, the most we will pay for such loss shall not exceed the largest Limit of Insurance available under any one of those Insuring Agreements or Coverages.

**C. Deductible**

We will not pay for loss resulting directly from an "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.

**D. Exclusions**

1. This policy does not cover:

a. **Acts Committed By You, Your Partners Or Your Members**

Loss resulting from "theft" or any other dishonest act committed by:

(1) You; or

(2) Any of your partners or "members";

whether acting alone or in collusion with other persons.

b. **Acts Of Employees Learned Of By You Prior To The Policy Period**

Loss caused by an "employee" if the "employee" had also committed "theft" or any other dishonest act prior to the effective date of this policy and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the "employee", learned of that "theft" or dishonest act prior to the Policy Period shown in the Declarations.

c. **Acts Of Employees, Managers, Directors, Trustees Or Representatives**

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

(1) Whether acting alone or in collusion with other persons; or

**BRANCHve Copy** © ISO Properties, Inc., 2005 CR 00 22 05 06

App. 29

CONFIDENTIAL EXHIBIT A-1 NUFIC000099

**(2)** While performing services for you or otherwise;

except when covered under Insuring Agreement **A.1.**

**d. Confidential Information**

Loss resulting from:

**(1)** The unauthorized disclosure of your confidential information including, but not limited to, patents, trade secrets, processing methods or customer lists; or

**(2)** The unauthorized use or disclosure of confidential information of another person or entity which is held by you including, but not limited to, financial information, personal information, credit card information or similar non-public information.

**e. Governmental Action**

Loss resulting from seizure or destruction of property by order of governmental authority.

**f. Indirect Loss**

Loss that is an indirect result of an "occurrence" covered by this policy including, but not limited to, loss resulting from:

**(1)** Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property".

**(2)** Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this policy.

**(3)** Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this policy.

**g. Legal Fees, Costs And Expenses**

Fees, costs and expenses incurred by you which are related to any legal action, except when covered under Insuring Agreement **A.2.**

**h. Nuclear Hazard**

Loss or damage resulting from nuclear reaction or radiation, or

radioactive contamination, however caused.

**i. Pollution**

Loss or damage caused by or resulting from pollution. Pollution means the discharge, dispersal, seepage, migration, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**j. War And Military Action**

Loss or damage resulting from:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**2.** Insuring Agreement **A.1.** does not cover:

**a. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

**b. Trading**

Loss resulting from trading, whether in your name or in a genuine or fictitious account.

**c. Warehouse Receipts**

Loss resulting from the fraudu-

CONFIDENTIAL

NUFIC000100

lent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

3. Insuring Agreements **A.3.**, **A.4.** and **A.5.** do not cover:

a. **Accounting Or Arithmetical Errors Or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

b. **Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

c. **Fire**

Loss or damage resulting from fire, however caused, except:

(1) Loss of or damage to "money" and "securities"; and

(2) Loss from damage to a safe or vault.

d. **Money Operated Devices**

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

e. **Motor Vehicles Or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

f. **Transfer Or Surrender Of Property**

(1) Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "banking premises":

(a) On the basis of unauthorized instructions;

(b) As a result of a threat to do bodily harm to any person;

(c) As a result of a threat to do damage to any property;

(d) As a result of a threat to introduce a denial of service attack into your computer system;

(e) As a result of a threat to introduce a virus or other malicious instruction into your computer system which is designed to damage, destroy or corrupt data or computer programs stored within your computer system;

(f) As a result of a threat to contaminate, pollute or render substandard your products or goods; or

(g) As a result of a threat to disseminate, divulge or utilize:

(i) Your confidential information; or

(ii) Weaknesses in the source code within your computer system.

(2) But, this Exclusion does not apply under Insuring Agreement **A.5.** to loss of "money", "securities" or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

(a) Had no knowledge of any threat at the time the conveyance began; or

(b) Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

g. **Vandalism**

Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

h. **Voluntary Parting Of Title To Or Possession Of Property**

Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

4. Insuring Agreement **A.6.** does not cover:

a. **Credit Card Transactions**

Loss resulting from the use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

**BRANCH** ~~Archive Copy~~ © ISO Properties, Inc., 2005 CR 00 22 05 06

App. 31

CONFIDENTIAL EXHIBIT A-1 NUFIC000101

**b. Funds Transfer Fraud**

Loss resulting from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

**c. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(1) An inventory computation; or

(2) A profit and loss computation.

5. Insuring Agreement **A.7.** does not cover:

**COMPUTER FRAUD**

Loss resulting from the use of any computer to fraudulently cause a transfer of "money", "securities" or "other property".

**E. Conditions**

1. **Conditions Applicable To All Insuring Agreements**

   a. **Additional Premises Or Employees**

   If, while this policy is in force, you establish any additional "premises" or hire additional "employees", other than through consolidation or merger with, or purchase or acquisition of assets or liabilities of, another entity, such "premises" and "employees" shall automatically be covered under this policy. Notice to us of an increase in the number of "premises" or "employees" need not be given and no additional premium need be paid for the remainder of the Policy Period shown in the Declarations.

   b. **Cancellation Of Policy**

   (1) The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

   (2) We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   (a) 10 days before the effective date of cancellation

if we cancel for non-payment of premium; or

   (b) 30 days before the effective date of cancellation if we cancel for any other reason.

   (3) We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

   (4) Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

   (5) If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

   (6) If notice is mailed, proof of mailing will be sufficient proof of notice.

   c. **Changes**

   This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

   d. **Concealment, Misrepresentation Or Fraud**

   This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other Insured, at any time, intentionally conceal or misrepresent a material fact concerning:

   (1) This policy;

   (2) The property covered under this policy;

   (3) Your interest in the property covered under this policy; or

   (4) A claim under this policy.

   e. **Consolidation - Merger Or Acquisition**

   If you consolidate or merge with, or purchase or acquire the

App. 32

CONFIDENTIAL

EXHIBIT A-1

NUFIC000102

assets or liabilities of, another entity:

(1) You must give us written notice as soon as possible and obtain our written consent to extend the coverage provided by this policy to such consolidated or merged entity or such purchased or acquired assets or liabilities. We may condition our consent by requiring payment of an additional premium; but

(2) For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, the coverage provided by this policy shall apply to such consolidated or merged entity or such purchased or acquired assets or liabilities, provided that all "occurrences" causing or contributing to a loss involving such consolidation, merger or purchase or acquisition of assets or liabilities must take place after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities.

**f. Cooperation**

You must cooperate with us in all matters pertaining to this policy as stated in its terms and conditions.

**g. Duties In The Event Of Loss**

After you "discover" a loss or a situation that may result in loss of or damage to "money", "securities" or "other property" you must:

(1) Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under Insuring Agreement **A.1.** or **A.2.**) involves a violation of law, you must also notify the local law enforcement authorities.

(2) Submit to examination under oath at our request and give us a signed statement of your answers.

(3) Produce for our examination all pertinent records.

(4) Give us a detailed, sworn

proof of loss within 120 days.

(5) Cooperate with us in the investigation and settlement of any claim.

**h. Employee Benefit Plans**

(1) The "employee benefit plans" shown in the Declarations (hereafter referred to as Plan) are included as Insureds under Insuring Agreement **A.1.**

(2) If any Plan is insured jointly with any other entity under this policy, you or the Plan Administrator must select a Limit of Insurance for Insuring Agreement **A.1.** that is sufficient to provide a Limit of Insurance for each Plan that is at least equal to that required if each Plan were separately insured.

(3) With respect to loss sustained or "discovered" by any such Plan, Insuring Agreement **A.1.** is replaced by the following:

We will pay for loss of or damage to "funds" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

(4) If the first Named Insured is an entity other than a Plan, any payment we make for loss sustained by any Plan will be made to the Plan sustaining the loss.

(5) If two or more Plans are insured under this policy, any payment we make for loss:

(a) Sustained by two or more Plans; or

(b) Of commingled "funds" or "other property" of two or more Plans;

resulting directly from an "occurrence", will be made to each Plan sustaining loss in the proportion that the Limit of Insurance required for each Plan bears to the total Limit of Insurance of all Plans sustaining loss.

**BRANCH** *Archive Copy* © ISO Properties, Inc., 2005 CR 00 22 05 06

App. 33

CONFIDENTIAL EXHIBIT A-1 NUFIC000103

**(6)** The Deductible Amount appli cable to Insuring Agreement **A.1.** does not apply to loss sustained by any Plan.

**i. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the Policy Period shown in the Declarations and up to 3 years afterward.

**j. Extended Period To Discover Loss**

We will pay for loss that you sustained prior to the effective date of cancellation of this po- licy, which is "discovered" by you:

**(1)** No later than 60 days from the date of that cancellation. However, this extended peri- od to "discover" loss ter- minates immediately upon the effective date of any other insurance obtained by you, whether from us or another insurer, replacing in whole or in part the coverag e afforded under this policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(2)** No later than 1 year from the date of that cancellation with regard to any "em- ployee benefit plans".

**k. Inspections And Surveys**

**(1)** We have the right to:

**(a)** Make inspections and surveys at any time;

**(b)** Give you reports on the conditions we find; and

**(c)** Recommend changes.

**(2)** We are not obligated to make any inspections, sur- veys, reports or recommen- dations and any such ac- tions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspec- tions. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not war- rant that conditions:

**(a)** Are safe or healthful; or

**(b)** Comply with laws, regu- lations, codes or stand- ards.

**(3)** Paragraphs **k.(1)** and **k.(2)** apply not only to us, but also to any rating, advisory, rate service or similar or- ganization which makes in- surance inspections, surveys, reports or recommendations.

**l. Joint Insured**

**(1)** If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all pur- poses of this policy. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

**(2)** If any Insured, or partner, "member" or officer of that Insured has knowledge of any information relevant to this policy, that knowledge is considered knowledge of every Insured.

**(3)** An "employee" of any In- sured is considered to be an "employee" of every Insured.

**(4)** If this policy or any of its coverages is cancelled as to any Insured, loss sustained by that Insured is covered only if it is "discovered" by you:

**(a)** No later than 60 days from the date of that cancellation. However, this extended period to "discover" loss termin- ates immediately upon the effective date of any other insurance obtained by that Insured, whether from us or another insurer, replacing in whole or in part the coverage afforded under this policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(b)** No later than 1 year from the date of that cancel- lation with regard to any "employee benefit plans".

**(5)** We will not pay more for

App. 34

CONFIDENTIAL EXHIBIT A-1 NUFIC000104

loss sustained by more than one Insured than the amount we would pay if all such loss had been sustained by one Insured.

(6) Payment by us to the first Named Insured for loss sustained by any Insured, other than an "employee benefit plan", shall fully release us on account of such loss.

**m. Legal Action Against Us**

You may not bring any legal action against us involving loss:

(1) Unless you have complied with all the terms of this policy;

(2) Until 90 days after you have filed proof of loss with us; and

(3) Unless brought within 2 years from the date you "discovered" the loss.

If any limitation in this Condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**n. Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the Policy Period shown in the Declarations, the broadened coverage will immediately apply to this policy.

**o. Other Insurance**

If other valid and collectible insurance is available to you for loss covered under this policy, our obligations are limited as follows:

(1) **Primary Insurance**

When this policy is written as primary insurance, and:

(a) You have other insurance subject to the same terms and conditions as this policy, we will pay our share of the covered loss. Our share is the proportion that the applicable Limit of Insurance shown in the Declarations bears to the total limit of all insurance covering the same loss.

(b) You have other insurance covering the same loss other than that described in Paragraph (1)(a), we will only pay for the amount of loss that exceeds:

(i) The Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not; or

(ii) The Deductible Amount shown in the Declarations;

whichever is greater. Our payment for loss is subject to the terms and conditions of this policy.

(2) **Excess Insurance**

(a) When this policy is written excess over other insurance, we will only pay for the amount of loss that exceeds the Limit of Insurance and Deductible Amount of that other insurance, whether you can collect on it or not. Our payment for loss is subject to the terms and conditions of this policy.

(b) However, if loss covered under this policy is subject to a Deductible, we will reduce the Deductible Amount shown in the Declarations by the sum total of all such other insurance plus any Deductible Amount applicable to that other insurance.

**p. Ownership Of Property; Interests Covered**

The property covered under this policy is limited to property:

(1) That you own or lease; or

(2) That you hold for others whether or not you are legally liable for the loss of such property.

However, this policy is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this policy must be presented by you.

**BRANCH** *Archive Copy* © ISO Properties, Inc., 2005                    CR 00 22 05 06

App. 35

CONFIDENTIAL                    EXHIBIT A-1                    NUFIC000105

**q. Policy Bridge - Discovery Replacing Loss Sustained**

(1) If this policy replaces insurance that provided you with an extended period of time after cancellation in which to discover loss and which did not terminate at the time this policy became effective:

(a) We will not pay for any loss that occurred during the Policy Period of that prior insurance which is "discovered" by you during the extended period to "discover" loss, unless the amount of loss exceeds the Limit of Insurance and Deductible Amount of that prior insurance. In that case, we will pay for the excess loss subject to the terms and conditions of this policy.

(b) However, any payment we make for the excess loss will not be greater than the difference between the Limit of Insurance and Deductible Amount of that prior insurance and the Limit of Insurance shown in the Declarations. We will not apply the Deductible Amount shown in the Declarations to this excess loss.

(2) The Other Insurance Condition **E.1.o.** does not apply to this Condition.

**r. Premiums**

The first Named Insured shown in the Declarations:

(1) Is responsible for the payment of all premiums; and

(2) Will be the payee for any return premiums we pay.

**s. Records**

You must keep records of all property covered under this policy so we can verify the amount of any loss.

**t. Recoveries**

(1) Any recoveries, whether effected before or after any payment under this policy,

whether made by us or you, shall be applied net of the expense of such recovery:

(a) First, to you in satisfaction of your covered loss in excess of the amount paid under this policy;

(b) Second, to us in satisfaction of amounts paid in settlement of your claim;

(c) Third, to you in satisfaction of any Deductible Amount; and

(d) Fourth, to you in satisfaction of any loss not covered under this policy.

(2) Recoveries do not include any recovery:

(a) From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

(b) Of original "securities" after duplicates of them have been issued.

**u. Territory**

This policy covers loss that you sustain resulting directly from an "occurrence" taking place within the United States of America (including its territories and possessions), Puerto Rico and Canada.

**v. Transfer Of Your Rights And Duties Under This Policy**

(1) Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

(2) If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**w. Transfer Of Your Rights Of Recovery Against Others To Us**

App. 36

CONFIDENTIAL

EXHIBIT A-1

NUFIC000106

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

**x. Valuation - Settlement**

(1) The value of any loss for purposes of coverage under this policy shall be determined as follows:

(a) Loss of "money" but only up to and including its face value. We will, at your option, pay for loss of "money" issued by any country other than the United States of America:

(i) At face value in the "money" issued by that country; or

(ii) In the United States of America dollar equivalent determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was "discovered".

(b) Loss of "securities" but only up to and including their value at the close of business on the day the loss was "discovered". We may, at our option:

(i) Pay the market value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

(ii) Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

i. Market value of the "securities" at the close of business on the day the loss was "discovered"; or

ii. The Limit of Insurance applicable to the "securities".

(c) Loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay more than the least of the following:

(i) The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose;

(ii) The amount you actually spend that is necessary to repair or replace the lost or damaged property; or

(iii) The Limit of Insurance applicable to the lost or damaged property.

With regard to Paragraphs **x.(1)(c)(i)** through **x.(1)(c)(iii)**, we will not pay on a replacement cost basis for any loss or damage:

i. Until the lost or damaged property is actually repaired or replaced; and

ii. Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

(2) We will, at your option, settle loss or damage to property other than "money":

**BRANCHive Copy** © ISO Properties, Inc., 2005                CR 00 22 05 06

App. 37

CONFIDENTIAL                EXHIBIT A-1                NUFIC000107

(a) In the "money" of the country in which the loss or damage occurred; or

(b) In the United States of America dollar equivalent of the "money" of the country in which the loss or damage occurred determined by the rate of exchange published in *The Wall Street Journal* on the day the loss was "discovered".

(3) Any property that we pay for or replace becomes our property.

2. **Conditions Applicable To Insuring Agreement A.1.**

a. **Termination As To Any Employee**

This Insuring Agreement terminates as to any "employee":

(1) As soon as:

(a) You; or

(b) Any of your partners, "members", "managers", officers, directors or trustees not in collusion with the "employee";

learn of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you.

(2) On the date specified in a notice mailed to the first Named Insured. That date will be at least 30 days after the date of mailing.

We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

b. **Territory**

We will pay for loss caused by any "employee" while temporarily outside the territory specified in the Territory Condition **E.1.u.** for a period of not more than 90 consecutive days.

3. **Conditions Applicable To Insuring Agreement A.2.**

a. **Deductible Amount**

The Deductible Amount does not apply to legal expenses paid

under Insuring Agreement **A.2.**

b. **Electronic And Mechanical Signatures**

We will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

c. **Proof Of Loss**

You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

d. **Territory**

We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.u.** does not apply to Insuring Agreement **A.2.**

4. **Conditions Applicable To Insuring Agreements A.4. And A.5.**

a. **Armored Motor Vehicle Companies**

Under Insuring Agreement **A.5.**, we will only pay for the amount of loss you cannot recover:

(1) Under your contract with the armored motor vehicle company; and

(2) From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

b. **Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to:

(1) Precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

(2) Manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information in them.

5. **Conditions Applicable To Insuring Agreement A.6.**

a. **Special Limit Of Insurance For Specified Property**

App. 38

CONFIDENTIAL EXHIBIT A-1 NUFIC000108

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to manuscripts, drawings, or records of any kind, or the cost of reconstructing them or reproducing any information contained in them.

**b. Territory**

We will cover loss that you sustain resulting directly from an "occurrence" taking place anywhere in the world. Territory Condition **E.1.u.** does not apply to Insuring Agreement **A.6.**

**F. Definitions**

1. "Banking premises" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

2. "Counterfeit money" means an imitation of "money" that is intended to deceive and to be taken as genuine.

3. "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

4. "Discover" or "discovered" means the time when you first become aware of facts which would cause a reasonable person to assume that a loss of a type covered by this policy has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

   "Discover" or "discovered" also means the time when you first receive notice of an actual or potential claim in which it is alleged that you are liable to a third party under circumstances which, if true, would constitute a loss under this policy.

5. "Employee":

   a. "Employee" means:

      (1) Any natural person:

         (a) While in your service and for the first 30 days immediately after termination of service, unless such termination is due to "theft" or any other dishonest act committed

by the "employee";

(b) Who you compensate directly by salary, wages or commissions; and

(c) Who you have the right to direct and control while performing services for you;

(2) Any natural person who is furnished temporarily to you:

   (a) To substitute for a permanent "employee" as defined in Paragraph **a.(1)**, who is on leave; or

   (b) To meet seasonal or short-term work load conditions;

   while that person is subject to your direction and control and performing services for you, excluding, however, any such person while having care and custody of property outside the "premises";

(3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **a.(2)**;

(4) Any natural person who is:

   (a) A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan"; and

   (b) A director or trustee of yours while that person is engaged in handling "funds" or "other property" of any "employee benefit plan";

(5) Any natural person who is a former "employee", partner, "member", "manager", director or trustee retained as a consultant while performing services for you;

(6) Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property

**BRANCH** *Archive Copy* © ISO Properties, Inc., 2005 CR 00 22 05 06

App. 39

CONFIDENTIAL EXHIBIT A-1

NUFIC000109

outside the "premises";

(7) Any "employee" of an entity merged or consolidated with you prior to the effective date of this policy; or

(8) Any of your "managers", directors or trustees while:

(a) Performing acts within the scope of the usual duties of an "employee"; or

(b) Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general, directorial acts on your behalf.

b. "Employee" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in Paragraph **5.a.**

6. "Employee benefit plan" means any welfare or pension benefit plan shown in the Declarations that you sponsor and which is subject to the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto.

7. "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

8. "Fraudulent instruction" means:

a. An electronic, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by you, but which was in fact fraudulently transmitted by someone else without your knowledge or consent;

b. A written instruction (other than those described in Insuring Agreement **A.2.**) issued by you, which was forged or altered by someone other than you without your knowledge or consent, or which purports to have been issued by you, but was in fact fraudulently issued without your

knowledge or consent; or

c. An electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by you which purports to have been transmitted by an "employee" but which was in fact fraudulently transmitted by someone else without your or the "employee's" knowledge or consent.

9. "Funds" means "money" and "securities".

10. "Manager" means a person serving in a directorial capacity for a limited liability company.

11. "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

12. "Messenger" means you, or a relative of yours, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

13. "Money" means:

a. Currency, coins and bank notes in current use and having a face value; and

b. Travelers checks, register checks and money orders held for sale to the public.

14. "Occurrence" means:

a. Under Insuring Agreement **A.1.**:

(1) An individual act;

(2) The combined total of all separate acts whether or not related;

(3) A series of acts whether or not related;

committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, before such Policy Period or both.

b. Under Insuring Agreement **A.2.**:

(1) An individual act;

(2) The combined total of all separate acts whether or not related; or

(3) A series of acts whether or not related;

committed by a person act- ing alone or in collusion with other

App. 40

CONFIDENTIAL EXHIBIT A-1 NUFIC000110

persons, involving one or more instruments, during the Policy Period shown in the Declarations, before such Policy Period or both.

c. Under All Other Insuring Agreements:

    (1) An individual act or event;

    (2) The combined total of all separate acts or events whether or not related; or

    (3) A series of acts or events whether or not related;

    committed by a person acting alone or in collusion with other persons, or not committed by any person, during the Policy Period shown in the Declarations, before such Policy Period or both.

15. "Other property" means any tangible property other than "money" and "securities" that has intrinsic value. "Other property" does not include computer programs, electronic data or any property specifically excluded under this policy.

16. "Premises" means the interior of that portion of any building you occupy in conducting your business.

17. "Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

    a. Caused or threatened to cause that person bodily harm; or

    b. Committed an obviously unlawful act witnessed by that person.

18. "Safe burglary" means the unlawful taking of:

    a. Property from within a locked safe or vault by a person unlawfully entering the safe or

vault as evidenced by marks of forcible entry upon its exterior; or

    b. A safe or vault from inside the "premises".

19. "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

    a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

    b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

    but does not include "money".

20. "Theft" means the unlawful taking of property to the deprivation of the Insured.

21. "Transfer account" means an account maintained by you at a financial institution from which you can initiate the transfer, payment or delivery of "funds":

    a. By means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

    b. By means of written instructions (other than those described in Insuring Agreement A.2.) establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

22. "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

**BRANCH** *Five Copy* © ISO Properties, Inc., 2005 CR 00 22 05 06

App. 41

CONFIDENTIAL EXHIBIT A-1 NUFIC000111

This endorsement, effective *12:01 am    March 31, 2018*        forms a part of
policy number   *01-317-15-74*
issued to   *REALPAGE, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**OMNIBUS NAMED INSURED AND JOINT VENTURE COVERAGE**

This endorsement modifies insurance provided under the following:

**COMMERCIAL CRIME POLICY**

1. The Item of the  DECLARATIONS entitled NAMED INSURED is  amended by addition of
the following:

    and any subsidiary company or corporation now existing or hereinafter constituted,
    created or acquired by the  Named Insured and in  which the Insured has  a majority
    interest, subject to Clause **E. Conditions, Consolidation - Merger or Acquisition**.

2. If the Named Insured's interest in a Joint Venture is 50% or less, coverage is restricted
to the Named Insured's interest only unless:

    a. The Insured has the largest ownership of any Joint Venture partner; and
    b. The Insured is contractually obligated to manage and supervise the
       operation; and
    c. The Insured's policies and procedures are established and adhered to for operation of
       the Joint Venture.

    If all three conditions apply, then the Joint Venture will be covered 100%.

    ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

MNSCPT        ***BRANCH        END 1***
              ***Archive Copy***

CONFIDENTIAL              EXHIBIT A-1                    NUFIC000112

This endorsement, effective 12:01 am      March 31, 2018      forms a part of
policy number    01-317-15-74
issued to REALPAGE, INC.

by      National Union Fire Insurance Company of Pittsburgh, Pa.

## ADDITIONAL NAMED INSURED

This endorsement modifies insurance provided under the following:

### COMMERCIAL CRIME POLICY
### GOVERNMENT CRIME POLICY

Schedule

The following Insured(s) is/are added as Named Insured(s):

NAMED INSURED

| |
|---|
| Any employee benefit plan sponsored by the Named Insured (s) now existing or hereafter created or acquired and whether or not required to be bonded under the Employee Retirement Income Security Act of 1974. |

No Limit of Insurance during any period will be cumulative with any other amount applicable to the same coverage during any other period.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
**END 002**

App. 43

CONFIDENTIAL                    EXHIBIT A-1                    NUFIC000113

This endorsement, effective at *12:01 am   March 31, 2018*      forms a part of
Policy number *01-317-15-74*
Issued to: *REALPAGE, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name:   *Commercial Crime Policy Admitted CR0023 (05/06)*

### EMPLOYEE DEFINITION AMENDED
### (REQUIRED TO BE BONDED BY ERISA)

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

### COMMERCIAL CRIME POLICY

### PROVISIONS:

1.    "Employee" as defined in Section F. Definitions of the Policy is hereby modified to include the following which is added to the definition:

Employee also includes any one or more natural persons while in the service of any "employee benefit plan" as fiduciary, trustee, administrator, officer or employee and any other natural person required to be bonded by Title 1 of the Employee Retirement Income Security Act of 1974 (including any amendments or revisions thereto.)

2.    Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, limitations, conditions, or provisions of the attached policy/bond other than as above stated.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© American International Group, Inc.  All rights reserved.

### *END 003*

App. 44

EXHIBIT A-1

This endorsement, effective *12:01 am*    *March 31, 2018*    forms a part of
policy number   *01-317-15-74*
issued to   *REALPAGE, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### CRIME ADVANTAGE AMENDED

This endorsement modifies insurance provided under the following:

### COMMERCIAL CRIME POLICY

**1. E. Conditions, Conditions Applicable To Insuring Agreement A.1., Termination As To Any Employee**, section (2) is deleted in its entirety and replaced with the following:

(2) On the date specified in a notice mailed to the first Named Insured.   That date will be at least 90 days after the date of mailing.

We will mail or deliver notice our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

**2. E. Conditions, Conditions Applicable To All Insuring Agreements, Cancellation Of Policy** , section (2) is deleted in its entirety and replaced with the following:

(2) We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:
   (a) 10 days before the effective date of cancellation if we cancel for non-payment of premium; or
   (b) 90 days before the effective date of cancellation if we cancel for any other reason.

**3. E.   Conditions   1.   Conditions   Applicable   To   All   Insuring   Agreements** e. **Consolidation-Merger Or Acquisition**, is deleted in its entirety and replaced with the following:

(a) If through consolidation, merger or purchase or acquisition of assets or liabilities of another entity your total assets do not increase by more than 15%, then this policy shall automatically apply as respects such new consolidated or merged entity, such purchased or acquired assets or liabilities attributable to the transaction and no notice shall be required;

(b) If such consolidation, merger or purchase or acquisition of assets or liabilities of another entity are more than 15% then this policy shall automatically apply as respects such new consolidated or merged entity, such purchased or acquired assets or liabilities attributable to the transaction for a period of ninety (90) days from the date of such consolidation, merger or purchase or acquisition of assets or liabilities or until the end of the policy period, which ever ends or occurs first. Provided, however, that with respect to sub-paragraph (b) above, the Insured shall report such new consolidated or merged entity, such purchased or acquired

MNSCPT    ***BRANCH*** *Archive Copy* ***END 4***

CONFIDENTIAL

EXHIBIT A-1

App. 45

NUFIC000115

This endorsement, effective *12:01 am*    *March 31, 2018*    forms a part of
policy number   *01-317-15-74*
issued to   *REALPAGE, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

assets or liabilities in writing to the Insurer within said ninety (90) day period; and
for coverage to be extended beyond said ninety (90) day period, we may condition
our consent by requiring payment of an additional premium.

**4. F. Definitions, "Employee," a. (1)(a)** is deleted in its entirety and replaced with the
following:

(a)    While in your service and for the first 90 days immediately after termination
of service, unless such termination is due to "theft" or any other dishonest
act committed by the "employee";

**5. F. Definitions, "Employee," a.** is amended by adding the following at the end thereof:

"Employee" is also deemed to include:

(a) Any of your directors, trustees or non-compensated officers while
performing acts within the scope of the usual duties of an "employee"

(b) Any of your directors or trustees who are members of any of your
elected or appointed committees to perform on your behalf specific, as
distinguished from general, directorial acts

(c) Students gaining work experience

(d) Any non-compensated natural person other than one who is a fund
solicitor, while performing service for you that are usual to the duties of
an "employee"

(e) Any of your part-time "employees"

(f) Any natural person, whether or not compensated, while performing
services for you as the chairman, or a member of any committee

6. With respect to a loss for which coverage is provided by this policy and which is
sustained partly during the period of other policies providing coverage for such loss
issued to you or to any predecessor in interest of yours and terminated or canceled or
allowed to expire as of the inception date of this policy, the amount of the deductible
that is applicable to the portion of the loss sustained during this Policy Period shall be
reduced, in whole or in part, by:

(a)    The amount of the loss which is sustained by you during the period of such
other policies if such loss is less than the amount of the deductible
applicable to that loss under such other policies, or

(b)    The amount of the deductible applicable to the loss sustained by you during
the period of such other policies if the applicable deductible is less than the
amount of the loss sustained during such period.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

MNSCPT    **BRANCH**        **END 4**
**Archive Copy**

App. 46

This endorsement, effective *12:01 am    March 31, 2018*    forms a part of
policy number  *01-317-15-74*
issued to  *REALPAGE, INC.*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

### DEFINITION OF EMPLOYEE AMENDED
### (CONSULTANTS)

This endorsement modifies insurance provided under the following:

**COMMERCIAL CRIME POLICY**

**and only applies to the Insuring Agreement(s) designated below:**

**INSURING AGREEMENT 1. EMPLOYEE THEFT**

**PROVISIONS:**

1.    Section F. **Definitions**, paragraph 5, definition of "Employee" is hereby amended by adding the following:

"Employee" also means a Consultant as defined below, but only while:

(a)    a consultancy agreement is in effect between the Insured and such Consultant or between the Insured and such Consultant's company or firm;

(b)    such Consultant is performing acts within the scope of such consultancy agreement; and

(c)    such Consultant is under the supervision, direction and control of the Insured.

2.    As used herein, "Consultant" means a professional consultant under contract, either directly or through such Consultant's company of firm, with the Insured to provide solely consulting services to the Insured. "Consultant" does not include any individual or entity providing services to the Insured pursuant to any contract, whether verbal, written, express or implied, to provide services to the Insured, in whole or in part, other than consulting services.

3.    Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, limitations or provisions of the attached policy other than as above stated.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

MNSCPT    **BRANCH         END 5**
**Archive Copy**

CONFIDENTIAL                    EXHIBIT A-1                    NUFIC000117

**CRIME AND FIDELITY**
**CR 25 41 08 07**

This endorsement, effective *12:01 am*    *March 31, 2018*    forms a part of
policy number   *01-317-15-74*
issued to *REALPAGE, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**INCLUDE DESIGNATED PERSONS OR CLASSES
OF PERSONS AS EMPLOYEES**

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

and applies to the Employee Theft Insuring Agreement:

**SCHEDULE**

| Persons Or Classes Of Persons |
|---|
| *an Employee of the Insured on military leave of absence.* |
|  |
|  |
|  |
|  |
|  |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The definition of "employee" is amended to
include any natural person or group of
persons named or described in the Schedule.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

***END 006***

App. 48

CONFIDENTIAL
EXHIBIT A-1
NUFIC000118

**CRIME AND FIDELITY**
**CR 25 20 08 07**

This endorsement, effective *12:01 am*    *March 31, 2018*    forms a part of
policy number    *01-317-15-74*
issued to *REALPAGE, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ADD CREDIT, DEBIT OR CHARGE CARD FORGERY**

This endorsement modifies insurance provided under the following:

    COMMERCIAL CRIME COVERAGE FORM
    COMMERCIAL CRIME POLICY
    EMPLOYEE THEFT AND FORGERY POLICY
    GOVERNMENT CRIME COVERAGE FORM
    GOVERNMENT CRIME POLICY

and applies to the Forgery Or Alteration Insuring Agreement:

**SCHEDULE**

| Limit Of Insurance | Covered Instruments |
|---|---|
| *$5,000,000* | [X] Includes written instruments required in conjunction with any credit, debit or charge card issued to you or any "employee" for business purposes. |
| | [ ] Limited to written instruments required in conjunction with any credit, debit or charge card issued to you or any "employee" for business purposes. |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

1. Covered Instruments either includes or is limited to, whichever is indicated as applicable in the Schedule, written instruments required in conjunction with any credit, debit or charge card issued to you or any "employee" for business purposes.

2. The most we will pay in any one "occurrence" is the Limit of Insurance shown in the Schedule.

3. The following exclusion is added to Section **D.**:

    The Forgery Or Alteration Insuring Agreement does not apply to:

    **NON-COMPLIANCE WITH CREDIT, DEBIT OR CHARGE CARD ISSUER'S REQUIREMENTS**

    Loss arising from any credit, debit or charge card if you have not complied fully with the provisions, conditions or other terms under which the card was issued.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**END 007**

App. 49

CONFIDENTIAL                    EXHIBIT A-1                    NUFIC000119

**CRIME AND FIDELITY**
**CR 20 27 08 07**

This endorsement, effective *12:01 am*     *March 31, 2018*     forms a part of
policy number   *01-317-15-74*
issued to *REALPAGE, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**PROVIDE VARYING DEDUCTIBLES**

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

**SCHEDULE**

| Insuring Agreement:<br>*Credit Card* | Deductible<br>Amount |
|---|---|
| Group 1. Named Insured(s):<br>*All Named Insureds* | *$1,000*<br>*$0* |
| Group 2. Named Insured(s): | *$0*<br>*$0* |
| **Insuring Agreement:** | Deductible<br>Amount |
| Group 1. Named Insured(s): | *$0*<br>*$0* |
| Group 2. Named Insured(s): | *$0*<br>*$0* |
| **Insuring Agreement:** | Deductible<br>Amount |
| Group 1. Named Insured(s): | *$0*<br>*$0* |
| Group 2. Named Insured(s): | *$0*<br>*$0* |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

*END 008*

App. 50

CONFIDENTIAL                 EXHIBIT A-1

NUFIC000120

The following is added to Section **C. Deductible:**

a. The Deductible Amount(s) shown in the Schedule for the corresponding Insuring Agreement(s) apply to each of the Insureds listed within each group.

b. In the event of a loss involving two or more Insureds with different deductibles, the highest Deductible Amount applicable to any of the Insureds involved in the loss shall apply.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

*END 008*

**BRANCHive Copy** © ISO Properties, Inc.,2006          CR 20 27 08 07  □

CONFIDENTIAL                    EXHIBIT A-1                    NUFIC000121

This endorsement, effective at *12:01 am    March 31, 2018*     forms a part of
Policy number *01-317-15-74*
Issued to: *REALPAGE, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *Commercial Crime Policy Admitted CR0023 (05/06)*

### FRISC OPTIONAL -
### (WITH CLAIMS EXPENSE COVERAGE IF OPT OUT)

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME POLICY

It is agreed that:

1. Condition E.1.g **"Duties in the Event of Loss"** is deleted in its entirety and replaced with the following:

   #### g. **Duties in the Event of Loss**

   After you "discover" a loss or a situation that may result in loss of or damage to "money", "securities" or "other property" you must:

   - give notarized written notice to us of loss or damage, and of your election to apply either Loss Settlement Clause 1 or Loss Settlement Clause 2, as set forth below, to such loss or damage, no later than 90 days after knowledge or discovery;

   - give notice to the police if loss results from dissolution; and

   - provide all requested information and documents and cooperate with us in all matters pertaining to loss.

   This policy shall apply pursuant to the election of either Loss Settlement Clause 1 or Loss Settlement Clause 2 set forth in the written notice given by the first Named Insured shown in the Declarations. If the first Named Insured fails to make such election, this policy shall apply as if the first Named Insured had elected to apply Loss Settlement Clause 2 to such loss.

   1) LOSS SETTLEMENT CLAUSE 1: Election of the Fidelity Research & Investigative Settlement Clause (FRISC)

      An independent Investigative Specialist will investigate the facts and determine the quantum of loss. The first Named Insured and we shall jointly task and budget the Investigative Specialist regarding the scope and cost of the investigation to be performed. The report issued by the Investigative Specialist will be definitive as respects the facts and the quantum of loss and shall be provided to both you and us.

© All rights reserved.

*END 009*

App. 52

CONFIDENTIAL                    EXHIBIT A-1                    NUFIC000122

After a joint review of the investigative report, if the first Named Insured and we cannot agree upon the settlement of loss, we, at the first Named Insured's request, will submit the dispute to mediation and/or arbitration (if applicable). The rules of the American Arbitration Association shall apply to this proceeding except for the selection of the mediator and/or arbitrator.

Upon receipt and acceptance of written notification by us, the first Named Insured shall choose an Investigative Specialist and a Mediator and/or Arbitrator from the attached endorsement, provided the choice does not present a clear conflict of interest. We and the first Named Insured will share equally the cost of the Investigative Specialist. The Deductible Amount is not applicable to the cost of the Investigative Specialist and the expense paid by us will be a part of, and not in addition to, the limit of liability.

We may amend the listing of Investigative Specialists, Mediators and/or Arbitrators. However, no changes shall be made to the listing attached to this policy during the policy period, unless the amendments are at the first Named Insured's request.

2) LOSS SETTLEMENT CLAUSE 2: Waiver of FRISC

(a) You shall be required to meet the following conditions in presenting loss or damage to us: (i) you shall have given notarized written to us no later than 90 days after knowledge or discovery of the loss; ii) you shall have given notice to the police if the loss results from dissolution; (iii) you shall file a detailed proof of loss, duly sworn to, with us within 180 days after knowledge or discovery of the loss; and (iv) you shall provide all requested information and documents and cooperate with us in all matters pertaining to the loss.

Upon our request, you shall submit to examination by us, subscribe the same, under oath if required, and produce for our examination all pertinent records, all at such reasonable times and places as we shall designate, and shall cooperate with us in all matters pertaining to the loss or the claim.

(b) Claims Expense: Coverage under the attached policy is extended to include reasonable expenses (excluding the cost of services rendered by your employees) incurred by you for producing and certifying particulars or details of your business required by us in order to arrive at a loss payable under this policy ("Claims Expense Coverage"). If no loss is established hereunder, then you will bear all such expenses.

The limit of liability for all Claims Expense Coverage provided hereunder shall be *$50,000* and shall be part of and not in addition to the Limit of Insurance under the policy. There shall be no coverage hereunder for any expenses arising out of any legal dispute, suit or arbitration with us. The Claims Expense Coverage afforded hereunder shall be subject to a deductible of *$2,500*.

© All rights reserved.

*END 009*

App. 53

CONFIDENTIAL                           EXHIBIT A-1                           NUFIC000123

(c) No action shall lie against us unless, as a condition precedent thereto: (i) you have complied with all the terms and conditions of this policy; (ii) 90 days have elapsed after the date the required proof of loss was filed with us; and (iii) such action is commenced within two years after knowledge or discovery of the loss.

If any limitation is prohibited by any law, the limitation shall be deemed to be amended to comply with the minimum period of limitation permitted by law.

Any dispute between the you and us involving the amount or valuation of loss will not be submitted to mediation or arbitration for resolution.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, limitations, conditions, or provisions of the attached Policy other than as above stated.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved

*END 009*

120427 (9/15)     *Ar BRANCh Copy*     Page 3 of 3

App. 54

This endorsement, effective at *12:01 am   March 31, 2018*      forms a part of
Policy number *01-317-15-74*
Issued to: *REALPAGE, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name:   *Commercial Crime Policy Admitted CR0023 (05/06)*

### FIDELITY RESEARCH & INVESTIGATIVE SETTLEMENT CLAUSE (FRISC) LIST
### (SUPPLEMENTAL LISTING FOR "FRISC" CLAUSE ENDORSEMENT)
### (MIDDLE MARKET ACCOUNTS)

This endorsement modifies insurance provided under the following:

#### COMMERCIAL CRIME POLICY
#### GOVERNMENT CRIME POLICY

It is agreed that for the purposes of the Fidelity Research & Investigative Settlement
Clause ("FRISC") added to this policy, the following list shall apply:

#### FRISC LISTING:

| Names | Address | Telephone No. | Profession |
|---|---|---|---|
| **UNITED STATES** | | | |
| Aksman & Marron, CPA | 509 Stillwells Corner Road Freehold, NJ 07728 Attention: Eileen Marron | (732) 462-8080 | Accountants |
| Carranza & Associates | 3625 N.W. 82nd Avenue Building 2, Suite 306 Miami, FL 33166 Attention: Luis O. Carranza | (305) 463-7978 | Accountants |
| Friedman LLP | 1700 Broadway New York, NY 10019 Attention: Harry Steinmetz | (212) 842-7670 | Accountants |
| Hagen, Streiff, Newton & Oshiro LLP (Various locations in US) | 1325 4th Avenue, Suite 1705 Seattle, WA 98101 Attention: Mark Newton And | (206) 447-3338 | Accountants |
| | 647 Putnam Pike Greenville, RI 02828 Attention: Peter Fogarty | (401) 949-8001 | Accountants |

© American International Group, Inc.  All rights reserved.

**END 010**

128543 (01/18)      **Archive Copy**      Page 1 of 5
                    **BRANCH**

EXHIBIT A-1

App. 55

| | | | |
|---|---|---|---|
| Kinsel Accountancy CPA's | 215 North Marengo Avenue, Suite 145 Pasadena, CA 91101 Attention: Stacy A. Kinsel | (818) 240-3300 | Accountants |
| Matson Driscoll & Damico LLP (Various locations in US) | 120 Broadway Suite 2830 New York, NY 10271 Attention: Martin Martinovic | (212) 943-4616 | Accountants |
| Meaden & Moore (Various locations in US) | Wall Street Plaza 88 Pine Street 14th Floor New York, NY 10005-1819 Attention: Michael Castillo | (212) 267-6500 | Accountants |
| RSM US LLP (fka McGladrey LLP) (Various locations in US) | 191 N. Wacker Drive Suite 1400 Chicago IL 60606 Attention: Richard J. Contorno | (312) 634-4995 | Accountants |
| RGL Forensics (Various locations in US) | 1422 Elbridge Payne Road Suite 240 Chesterfield, MO 63017 Attention: Randall H. Wilson | (636) 537-5589 | Accountants |
| Studler, Doyle & Co LLC | 1444 Farnsworth Avenue Suite 500 Aurora, IL 60505 Attention: D.M. Studler | (630) 820-5770 | Accountants |
| **CANADA** | | | |
| **Ontario:** | | | |
| LBC Meaden & Moore | 40 University Ave Suite 1003 Toronto, Ontario M5J 1T1 Attention: Phil Turner | (416) 496-1000 | Accountants |
| Matson Driscoll & Damico LLP (Various locations in Canada) | 4 King Street West Suite 1010 Toronto, ON M5H 1B6 Attention: Bradley J. Ebel & Rehana Moosa | (416) 366-4968 | Accountants |

© American International Group, Inc. All rights reserved.

**END 010**

App. 56

CONFIDENTIAL

EXHIBIT A-1

NUFIC000126

| Quebec: | | | |
|---|---|---|---|
| LBC Meaden & Moore (fka LBC Int'l Investigative Accounting) (Various offices in Canada) | 1440 St. Catherine Street West Suite 710 Montreal, Quebec H3G 1R8 Attention: Alexandra Kulovics | (514) 866-5431 | Accountants |
| **British Columbia:** | | | |
| James P. Blatchford Consulting | 1311 Howe Street Suite 200 Vancouver, BC V6Z 2P3 Attention: James Blatchford | (604) 691-1777 | Accountant |
| RSM US LLP (fka McGladrey LLP) | 191 N. Wacker Drive Suite 1400 Chicago IL 60606 Initial Contact: Rick Contorno | (312) 634-4995 | Accountant |
| **CARIBBEAN, CENTRAL & SOUTH AMERICA** | | | |
| ASL | Insurgentes Sur 1898 Piso 12, Of. 1237 Col. Florida, Mexico D.F. 01030 Initial Contact: David Ledger | 44 (20) 7357-7631 | Accountants |
| Carranza & Associates | 3625 N.W. 82nd Avenue Building 2, Suite 306 Miami, FL 33166 Attention: Luis O. Carranza | (305) 463-7978 | Accountants |
| Grant Thornton | 1717 Main Street Suite 1500 Dallas Texas 75201 Attention: Susanna Franco | (214) 561-2400 | Accountants |
| Matson Driscoll & Damico LLP | 2500 Weston Road Suite 105 Weston, FL 33331 Attention: Marcelo Fazio | (954) 907-4353 | Accountants |
| RSM US LLP (fka McGladrey LLP) | 191 N. Wacker Drive Suite 1400 Chicago IL 60606 Initial Contact: Rick Contorno | (312) 634-4995 | Accountants |

Ⓒ American International Group, Inc. All rights reserved.

**END 010**

BRIAN GOFF

EXHIBIT A-1

CONFIDENTIAL                                                NUFIC000127

| AFRICA, U.K., EUROPE & MIDDLE EAST | | | |
|---|---|---|---|
| ASL<br>(locations in London &<br>Dubai) | 31 Bury Street<br>London, UK EC3A 5AG<br>Attention: David Ledger | 44 (20) 7357-7631 | Adjusters &<br>Accountants |
| Crawford & Company<br>Adjusters (UK) Limited | Trinity Court<br>42 Trinity Square<br>London, UK EC3N 4TH<br>Attention: Paul Handy | 44 (20) 7625-4000 | Investigators |
| Meaden & Moore<br>International<br>(fka LBC Int'l<br>Investigative<br>Accounting)<br>(offices in London and<br>Paris) | Lloyds Avenue House<br>6 Lloyds Avenue<br>London, UK EC3N 3AX<br>Attention: Oliver Tiemann | 44 (20) 7680-1131 | Accountants |
| Grant Thornton<br>(forensic accountants in<br>the UK) | 1717 Main Street<br>Suite 1500<br>Dallas Texas 75201<br>Attention: Susanna Franco | (214) 561-2400 | Accountants |
| Matson Driscoll &<br>Damico LLP<br>(Offices in London and<br>Dubai) | Marlow House-1A Lloyds<br>Avenue<br>London, UK EC3N 3AA<br>Initial Contact: Martin<br>Martinovic (New York, NY) | (212) 943-4616 | Accountants |
| RGL Forensics<br>(forensic accountants in<br>the UK and<br>Germany) | 8th Floor, Dashwood<br>69 Old Broad Street<br>London, UK EC2M 1SQ GB<br>Attention: Anthony Levitt | 44 (20) 7065-7900 | Accountants |
| RSM US LLP (fka<br>McGladrey LLP) | 191 N. Wacker Drive<br>Suite 1400<br>Chicago IL 60606<br>Initial Contact:<br>Rick Contorno | (312) 634-4995 | Accountants |

© American International Group, Inc. All rights reserved.

**END 010**

**Archive Copy** Page 4 of 5

EXHIBIT A-1

NUFIC000128

| ASIA, AUSTRALIA & JAPAN | | | |
|---|---|---|---|
| RGL Forensics | Level 39, 2 Park Street<br>Sydney, NSW 2000<br>Australia<br>Attention Kimberly Dailey | 61 (02) 9268-0711 | Accountants |
| Crawford & Company<br>THG | Trinity Court<br>42 Trinity Square<br>London, UK EC3N 4TH<br>Attention: Paul Handy | 44 (20) 7625-4000 | Investigators |
| Kroll<br>(forensic accountants in<br>Shanghai) | Suite 1600<br>1628 JFK Boulevard<br>Philadelphia, PA 19103<br>Attention: John Slavik | (215) 568-8313 | Accountants |
| Grant Thornton<br>(forensic accountants in<br>Australia) | 1717 Main Street<br>Suite 1500<br>Dallas Texas 75201<br>Attention: Susana Franco | (214) 561-2300 | Accountants |
| Matson Driscoll &<br>Damico LLP<br>(Offices in Hong Kong,<br>Tokyo, Singapore,<br>Bangkok, Sydney and<br>Auckland) | Level 10 Challis house<br>4 Martin Place<br>Sydney, NSW 2000<br>Initial Contact:<br>Martin Martinovic<br>(New York, NY) | (212) 943-4616 | Accountants |
| RGL Forensics<br>(forensic accountants in<br>Australia, Japan<br>and Singapore) | Level 16, Bligh Chambers<br>25 Bligh Street<br>Sydney, NSW 2000<br>Attention: Ryan Carruth | 61 2 8488 6000 | Accountants |
| RSM US LLP (fka<br>McGladrey LLP) | 191 N. Wacker Drive<br>Suite 1400<br>Chicago IL 60606<br>Initial Contact:<br>Rick Contorno | (312) 634-4995 | Accountants |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© American International Group, Inc. All rights reserved.

**END 010**

App. 59

This endorsement, effective *12:01 am    March 31, 2018*    forms a part of
policy number   *01-317-15-74*
issued to   *REALPAGE, INC.*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

### INCLUDE DESIGNATED PERSON REQUIRED
### TO HAVE KNOWLEDGE OF LOSS
### (DISCOVERY FORM)

This endorsement modifies insurance provided under the Discovery Form version of the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

### SCHEDULE

**Position Of Designated Person(s):**

Internal Audit Department and/or Risk Management Department and/or General Counsel

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**1.** The Introductory Paragraph to Section **A. Insuring Agreements** is replaced by the following:

Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place at any time which is "discovered" by a "designated person" during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss Condition.

**2.** The introductory paragraph of the **Duties In The Event Of Loss** Condition is replaced by the following:

After a "designated person" "discovers" a loss or a situation that may result in loss of or damage to "money", "securities" or "other property" you must:

**3.** Under the Commercial Crime Coverage Form, Commercial Crime Policy and the Employee Theft And Forgery Policy, the **Extended Period To Discover Loss** Condition is replaced by the following:

CONFIDENTIAL    EXHIBIT A-1    NUFIC000130

This endorsement, effective *12:01 am*    *March 31, 2018*    forms a part of
policy number  *01-317-15-74*
issued to    *REALPAGE, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

We will pay for loss that you sustained prior to the effective date of cancellation of this
coverage form/policy which is "discovered" by a "designated person":
   **a.** No later than 60 days from the date of that cancellation. However, this extended
   period to "discover" loss terminates immediately upon the effective date of any
   other insurance obtained by you, whether from us or another insurer, replacing in
   whole or in part the coverage afforded under this coverage form/policy, whether
   or not such other insurance provides coverage for loss sustained prior to its
   effective date.
   **b.** No later than 1 year from the date of that cancellation with regard to any
   "employee benefit plans".

**4.** Under the Government Crime Coverage Form and Government Crime Policy, the
**Extended Period To Discover Loss** Condition is replaced by the following:
We will pay for loss that you sustained prior to the effective date of cancellation of this
coverage form/policy, which is "discovered" by a "designated person" no later than 60
days from the date of that cancellation.
However, this extended period to "discover" loss terminates immediately upon the
effective date of any other insurance obtained by you, whether from us or another
insurer, replacing in whole or in part the coverage afforded under this coverage
form/policy, whether or not such other insurance provides coverage for loss sustained
prior to its effective date.

**5.** Paragraph **(2)** of the **Joint Insured** Condition is replaced by the following:
   **(2)** Knowledge possessed or "discovery" made by a "designated person" of any
   Insured shall constitute knowledge or "discovery" by all Insureds for all purposes
   of this coverage form/policy.

**6.** Under the Commercial Crime Coverage Form, Commercial Crime Policy and the
Employee Theft And Forgery Policy, Paragraph **(4)** of the **Joint Insured** Condition is
replaced by the following:
   **(4)** If this coverage form/policy or any of its coverages is cancelled as to any Insured,
   loss sustained that Insured is covered only if it is "discovered" by a
   "designated person":

      **(a)** No later than 60 days from the date of that cancellation. However, this
      extended period to "discover" loss terminates immediately upon the
      effective date of any other insurance obtained by that Insured, whether
      from us or another insurer, replacing in whole or in part the coverage
      afforded under this coverage form/policy, whether or not such other
      insurance provides coverage for loss sustained prior to its effective date.
      **(b)** No later than 1 year from the date of that cancellation with regard to any
      "employee benefit plans".

MNSCPT    **BRANCH** *Archive Copy* **END 11**

CONFIDENTIAL    EXHIBIT A-1    NUFIC000131

App. 61

This endorsement, effective *12:01 am    March 31, 2018*    forms a part of
policy number  *01-317-15-74*
issued to   *REALPAGE, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**7.** Under the Government Crime  Coverage Form and Government  Crime Policy, Paragraph **(4)** of the **Joint Insured** Condition is replaced by the following:

> **(4)** If  this  coverage form/policy  or  any of  its  coverages  is cancelled  as  to any Insured, loss sustained by that Insured is covered only if it is "discovered" by  a "designated person" no later than 60 days from the date of that cancellation.

However, this  extended  period  to "discover"  loss  terminates immediately  upon  the effective date  of  any other  insurance  obtained by  that Insured, whether  from  us or another insurer, replacing in whole or in part  the coverage afforded under this coverage form/policy, whether or  not such other  insurance provides coverage  for loss sustained prior to its effective date.

**8.** Paragraph **(1)** of  the **Termination  As To  Any  Employee** Condition  is  replaced by  the following:

> **(1)** As soon as a "designated person"  not in collusion with such "employee" learns of "theft" or  any other  dishonest act  committed  by  the "employee"  whether before or after becoming employed by you.

**9.** In Section **F.** Definitions:

> a. The definition of "discover" or "discovered" is replaced by the following:
>
> "Discovery", "discover"  or  "discovered"  means  the  time when  a "designated person" first becomes aware  of facts which would  cause a reasonable  person to assume that a loss of  a type covered by this coverage  form/policy has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred,  even though the  exact amount or  details of loss  may not then be known.
> "Discovery", "discover"  or  "discovered" also  means  the  time when  a "designated person"  first  receives  notice  of an  actual  or  potential  claim  in which it  is alleged  that  you are  liable  to a  third party  under  circumstances, which, if true, would constitute a loss under this coverage form/policy.
>
> b. The following definition is added:
> "Designated person" means any individual set forth in Schedule above.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

MNSCPT    **BRANCH         END 11**
                 **Archive Copy**

CONFIDENTIAL                    EXHIBIT A-1                    NUFIC000132

This endorsement, effective *12:01 am*     *March 31, 2018*        forms a part of
policy number   *01-317-15-74*
issued to *REALPAGE, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### PRIOR THEFT OR DISHONESTY

This endorsement modifies insurance provided under the following:

### COMMERCIAL CRIME POLICY
### GOVERNMENT CRIME POLICY

**A.    Schedule\***

| Prior Theft or Dishonesty Amount: | *$25,000* |
|---|---|

*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

B.    E. **Conditions** is modified as follows:

The paragraph entitled **Termination As To Any Employee** is deleted in its entirety from:

-       **Conditions Applicable to Insuring Agreement A.1.**
        (with respect to the Commercial Crime Policy)

-       **Conditions Applicable to Insuring Agreement A.1. And A.2.**
        (with respect to the Government Crime Policy)

and replaced with the following:

#### Termination As To Any Employee

(1)    This Insuring Agreement is cancelled as to any "employee" immediately upon discovery by:
       (a)    You; or
       (b)    (with respect to the Commercial Crime Policy) Any of your partners, "members", "managers", officers, directors, or trustees not in collusion with the "employee";
              (with respect to the Government Crime Policy) Any of your officials or employees authorized to manage, govern or control your "employees" not in collusion with the "employee"

       of "theft" or any other dishonest act committed by the "employee"
              ▪      after becoming employed by you; or
              ▪      prior to becoming employed by you, provided that such conduct involved Loss of Money, Securities or other property valued at the amount specified in the schedule above or more.

(2)    The Insuring Agreement terminates as to any "employee" on the date specified in a notice mailed to the first Named Insured. The date will be at least 30 days after the date of mailing. We will mail or deliver our notice to the first named

© All rights reserved.
### *END 012*

95442 (8/07)   **BRANARchive Copy**        Page 1 of 2

CONFIDENTIAL                        EXHIBIT A-1                        NUFIC000133

Insured's last mailing address known to us. If notice is mailed proof of mailing will be sufficient proof of notice.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 012*

95442 (8/07) *BRANCHrchive Copy*

App. 64

CONFIDENTIAL

EXHIBIT A-1

NUFIC000134

This endorsement, effective *12:01 am*     *March 31, 2018*          forms a part of
policy number   *01-317-15-74*
issued to *REALPAGE, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### CLIENTS' PROPERTY - SCHEDULED CLIENTS

This endorsement modifies insurance provided under the following:

### COMMERCIAL CRIME POLICY

With regard to this Clients' Property - Scheduled Clients Endorsement, the provisions of the policy to which this endorsement is attached apply, unless modified by this endorsement.

A.   The following insuring agreement is added to Section **A. Insuring Agreements**:

We will pay for loss of or damage to "money," "securities" and "other property" sustained by your "client," named in the SCHEDULE below, resulting directly from "theft" committed by an identified "employee," acting alone or in collusion with other persons.

B.   Under Section **D. Exclusions** in the Commercial Crime Policy, the Acts of Employees, Managers, Directors, Trustees or Representatives Exclusion does not apply to this Insuring Agreement.

C.   Under Section **E. Conditions**:

1.   Paragraph (1) of the **Duties in the Event of Loss** Condition is replaced by the following:

Notify us as soon as possible.

2.   The **Ownership of Property; Interests Covered** Condition is replaced by the following:

The property covered under this Insuring Agreement is limited to property:

a.   that your "client" owns or leases; or
b.   that your "client" holds for others whether or not your "client" is legally liable for the loss of such property.

However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization, including your "client." Any claim for loss that is covered under this Insuring Agreement must be presented by you.

D.   Under Section **F. Definitions**:

1.   The following definitions are added:
a.   "Client" means any entity named in the SCHEDULE below.
b.   "Occurrence" means:
(1)   An individual act;
(2)   The combined total of all separate acts whether or not related; or
(3)   A series of acts whether or not related;
committed by an "employee", acting alone or in collusion with other

© All rights reserved.
### END 013

App. 65

CONFIDENTIAL        EXHIBIT A-1        NUFIC000135

persons, during the Policy Period shown in the Declarations, before such Policy Period or both.

2. The definition of "theft" is replaced by the following:

"Theft" means the unlawful taking of property to the deprivation of your "client."

It is further agreed that with respect to the coverage afforded pursuant to this endorsement, the most we will pay under this policy for loss is the Limit of Insurance shown in the below SCHEDULE for the respective named "client" and such loss shall also be subject to the applicable Deductible Amount shown in the SCHEDULE below:

SCHEDULE

| Name of "client" | Limit of Insurance | Deductible Amount |
|---|---|---|
| *All Clients of the Named Insured* | *$5,000,000* | *$50,000* |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.
**END 013**

CONFIDENTIAL

EXHIBIT A-1

App. 66

NUFIC000136

This endorsement, effective *12:01 am*  *March 31, 2018*  forms a part of
policy number *01-317-15-74*
issued to *REALPAGE, INC.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

### LOSS REPORTING THRESHOLD - 50%

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

The **Duties In The Event Of Loss** Condition is replaced by the following:

After you "discover" a loss or a situation that may result in loss of or damage to "money", "securities" or "other property" you must:

**(1)** Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under the Employee Theft Insuring Agreement or the Forgery Or Alteration Insuring Agreement) involves a violation of law, you must also notify the local law enforcement authorities.

**(2)** For losses covered under any Insuring Agreement, we will waive the requirement that you notify us as soon as possible if the amount of loss, in your best estimation, does not exceed the percentage of the deductible amount over which losses must be reported as shown in the Declarations, as amended herein in item (7) of this endorsement. If, however, you later determine that such loss does in fact exceed this percentage, then you shall notify us as soon as possible, not to exceed 15 days from the date such determination was made.

**(3)** Submit to examination under oath at our request and give us a signed statement of your answers.

**(4)** Produce for our examination all pertinent records.

**(5)** Give us a detailed sworn proof of loss within 120 days:

    **(a)** From the date you "discovered" the loss; or

    **(b)** From the date you determined that the loss exceeded the deductible amount as provided in Paragraph **(2).**

**(6)** Cooperate with us in the investigation and settlement of any claim.

**(7)** The Declarations page is hereby amended by adding the following to the end thereof:

**Auto Loss Threshold: 50%**

AUTHORIZED REPRESENTATIVE

© All rights reserved.

MNSCPT

**BRANCH**   **END 14**
*Archive Copy*

EXHIBIT A-1

CONFIDENTIAL  NUFIC000137

This endorsement, effective at *12:01 am    March 31, 2018*    forms a part of
Policy number *01-317-15-74*
Issued to: *REALPAGE, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*
Product Name: *Commercial Crime Policy Admitted CR0023 (05/06)*

### PROTECTED INFORMATION EXCLUSION
### (CARVEBACK)

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME POLICY

In consideration of the premium charged, it is hereby understood and agreed that this policy does not cover loss resulting directly or indirectly from the: (i) "theft," disappearance or destruction of; (ii) unauthorized use or disclosure of; (iii) unauthorized access to; or (iv) failure to protect any:

(1)  confidential or non-public; or

(2)  personal or personally identifiable;

information that any person or entity has a duty to protect under any law, rule or regulation, any agreement or any industry guideline or standard.

This exclusion shall not apply to loss of any money, securities or tangible property:

(a) owned by the Insured;

(b) held by the Insured in any capacity; or

(c) owned and held by someone else under circumstances which make the Insured responsible for the Property prior to the occurrence of the loss;

that was the subject of a theft, disappearance, damage or destruction resulting directly from the unauthorized use or disclosure of such information.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 015*

115901 (10/13)    *ArBRRANCHpy*    Page 1 of 1

CONFIDENTIAL    EXHIBIT A-1    NUFIC000138

App. 68

This endorsement, effective *12:01 am*    *March 31, 2018*        forms a part of
policy number   *01-317-15-74*
issued to    *REALPAGE, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

## INDIRECT OR CONSEQUENTIAL LOSS EXCLUSION

It is agreed that:

1.    Clause D.f. Indirect Loss Exclusion is deleted in its entirety and replaced with the
      following:

      f.    Indirect or Consequential Loss

            Loss that is an indirect or consequential result of an "occurrence", including
            but not limited to loss resulting from:

            (1)    Your inability to realize income that you would have realized had there
                   been no loss of or damage to "money", "securities" or "other
                   property".
            (2)    Payment of damages of any type for which you are legally liable.
            (3)    Payment of costs, fees or other expenses you incur in establishing
                   either the existence or the amount of loss under this policy.


   ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

113024 (10/12) **BRANCH**        **END 16**
        **Archive Copy**

App. 69

CONFIDENTIAL        EXHIBIT A-1        NUFIC000139

CRIME AND FIDELITY
CR 20 09 08 07

This endorsement, effective *12:01 am*    *March 31, 2018*    forms a part of
policy number   *01-317-15-74*
issued to *REALPAGE, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMEND TERRITORIAL LIMITS**

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

**SCHEDULE**

| Territory | |
|---|---|
| **Add** | **Delete** |
| *Worldwide* | |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

The Territory Condition is amended by
adding or deleting the territory shown in
the Schedule.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____

AUTHORIZED REPRESENTATIVE

**END 017**

CONFIDENTIAL    EXHIBIT A-1    NUFIC000140

ENDORSEMENT# *18*

This endorsement, effective at *12:01 am   March 31, 2018*   forms a part of
Policy number *01-317-15-74*
Issued to: *REALPAGE, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name: *Commercial Crime Policy Admitted CR0023 (05/06)*

### IMPERSONATION FRAUD COVERAGE

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**COMMERCIAL CRIME POLICY (DISCOVERY FORM)
COMMERCIALCRIME POLICY (LOSS SUSTAINED FORM)
GOVERNMENT CRIME POLICY (DISCOVERY FORM)
GOVERNMENT CRIME POLICY (LOSS SUSTAINED FORM)**

It is agreed that in consideration of the additional premium of *$0*, the policy is hereby
amended as follows:

1. Insuring Agreement "Funds Transfer Fraud" is amended by adding the following to the
end thereof:

Impersonation Fraud Coverage

We will also pay for loss of "funds" resulting directly from a "fraudulent instruction"
directing a financial institution to transfer, pay or deliver "funds" from your "transfer
account."

Notwithstanding the above requirement that the loss of "funds" result directly from a
"fraudulent instruction," we will also pay for the loss of "funds" resulting from your
receipt of a "fraudulent instruction" from a purported vendor, which advises you that
the vendor's bank account information has been changed and you suffer a loss of
"funds".

2. Solely with respect to Impersonation Fraud Coverage provided by this endorsement, in
Section F. Definitions, the definition of "Fraudulent Instruction" is deleted in its entirety
and replaced with the following:

"Fraudulent instruction" means an electronic, telegraphic, cable, teletype, telefacsimile,
telephone or written instruction communicated by you or your "employee" based upon
an instruction received and relied upon by you or your "employee" which was
transmitted:

a. by a purported director, officer, partner, member or sole proprietor of yours or by
another "employee"or   by an individual acting in collusion with such purported
director, officer, partner, member, sole proprietor or other "employee"but   which
was in fact fraudulently transmitted by someone else without your or your
"employee's" knowledge; or

© All rights reserved.

***END 018***

116956 (1/17)    ***ArcBiRéAlCGply***    Page 1 of 2

b. by a purported director, officer, partner, member, sole proprietor or employee of your "vendor" or "client"-or by an individual acting in collusion with such purported director, officer or employee-but which was in fact fraudulently transmitted by someone else without your or your "employee's" knowledge; provided, however, "fraudulent instruction" shall not include any such instruction transmitted by an actual director, officer, partner, member, sole proprietor or employee of your "vendor" or "client" who was acting in collusion with any third party in submitting such instruction.

3. Solely for purposes of this endorsement, the following definitions are added:

"Vendor" means any person, firm, company, corporation, organization, association or other entity that provides goods or services to you pursuant to a legitimate relationship that pre-exists the loss of "funds" that is the subject of the coverage provided by this endorsement.

"Client" means any person, firm, company, corporation, organization, association or other entity to whom you provide goods or services for a fee pursuant to a legitimate written contract that pre-exists the loss of "funds" that is the subject of the coverage provided by this endorsement.

4. Our total liability for coverage provided by this endorsement for all loss arising from a single act or series of related acts is *$250,000* ("Impersonation Fraud Limit"). All amounts paid by us pursuant to this endorsement will be part of, and not in addition to, the applicable Limit of Insurance shown in the Declarations.

5. Solely with respect to coverage provided by this endorsement, the applicable per occurrence Deductible Amount is *$50,000*.

6. Solely for purposes of this endorsement, the following exclusion shall apply:

The coverage afforded by this endorsement does not apply to any loss occurring prior to *February 28, 2016*.

7. The most we will pay for all loss resulting directly from an "occurrence" under this endorsement is the Impersonation Fraud Limit shown in Section 4 above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 018*

App. 72

CONFIDENTIAL                    EXHIBIT A-1                    NUFIC000142

This endorsement, effective at *12:01 am   March 31, 2018*   forms a part of
Policy number *01-317-15-74*
Issued to: *REALPAGE, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name: *Commercial Crime Policy Admitted CR0023 (05/06)*

## COMMERCIAL & GOVERNMENTAL CRIME LOSS PREVENTION SERVICES ENDORSEMENT

In consideration of your purchase of this policy, it is hereby understood and agreed that the **Named Insured** is eligible to subscribe to RiskTool for Crime.

RiskTool for Crime is a web-based platform that can assist in streamlining a company's risk management process. RiskTool for Crime is pre-populated with training modules to aid in educating staff on control protocols and preventing human error which might cause loss. The platform is also customizable and can be tailored to a business's individual risk management needs.

Register for RiskTool at the RiskAnalytics Loss Prevention Services site at

https://www.risktoolregistration.com/registration.html.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 019*

121261 (1/16)     ***ArcBiReANCOpy***     Page 1 of 1

App. 73

CONFIDENTIAL          EXHIBIT A-1          NUFIC000143

This endorsement, effective *12:01 am*    *March 31, 2018*    forms a part of
policy number   *01-317-15-74*
issued to *REALPAGE, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### NOTICE OF CLAIM
### (REPORTING BY E-MAIL)

In consideration of the premium charged, it is hereby understood and agreed as follows:

1.  *Email Reporting of Claims*: In addition to the postal address set forth for any Notice of Claim Reporting under this policy, such notice may also be given in writing pursuant to the policy's other terms and conditions to the Insurer by email at the following email address:

    c-claim@AIG.com

    Your email must reference the policy number for this policy. The date of the Insurer's receipt of the emailed notice shall constitute the date of notice.

    In addition to Notice of Claim Reporting via email, notice may also be given to the Insurer by mailing such notice to: AIG, Financial Lines Claims, P.O. Box 25947, Shawnee Mission, KS 66225 or faxing such notice to (866) 227-1750.

2.  *Definitions*: For this endorsement only, the following definitions shall apply:

    (a)  "Insurer" means the "Insurer," "Underwriter" or "Company" or other name specifically ascribed in this policy as the insurance company or underwriter for this policy.

    (b)  "Notice of Claim Reporting" means "notice of claim/circumstance," "notice of loss" or other reference in the policy designated for reporting of claims, loss or occurrences or situations that may give rise or result in loss under this policy.

    (c)  "Policy" means the policy, bond or other insurance product to which this endorsement is attached.

3.  This endorsement does not apply to any Kidnap & Ransom/Extortion Coverage Section, if any, provided by this policy.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.


AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 020*

99758 (8/08)    ***BRANCH**ive Copy*    Page 1 of 1

CONFIDENTIAL    EXHIBIT A-1    NUFIC000144

This endorsement, effective at *12:01 am   March 31, 2018*    forms a part of
Policy number *01-317-15-74*
Issued to: *REALPAGE, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name: *Commercial Crime Policy Admitted CR0023 (05/06)*

### U.S. DEPARTMENT OF LABOR AMENDATORY
### (ERISA PLAN COVERAGE AMENDMENTS)

This endorsement modifies insurance provided under the following:

### COMMERCIAL CRIME POLICY

In consideration of the premium charged, it is hereby understood as follows:

**I.**

With regard to coverage provided for "employee benefit plans", the provisions of the Coverage Form or Policy to which this endorsement is attached apply, unless modified by this endorsement.

**II.**

Section **D. Exclusions** is amended as follows:

1. In Section **D.1.,** paragraph **a. Acts Committed By You, Your Partners Or Your Members** is deleted in its entirety and replaced with the following:
   **a. Acts Committed By You, Your Partners Or Your Members**
   Loss resulting from "theft" or any other dishonest or fraudulent act committed by:
   **(1)** You; or
   (2) Any of your partners or "members"; whether acting alone or in collusion with other persons, except while handling "money", "securities" or "other property" of an "employee benefit plan".

2. In Section **D.1.,** paragraph **d. Confidential Information** is deleted in its entirety and replaced with the following:

   **d. Confidential Or Personal Information**
   Loss resulting from:
   (1) The disclosure or use of another person's or organization's confidential or personal information, except as provided in Paragraph **(2).**
   (2) The disclosure of your or an "employee benefit plan" participant's confidential or personal information. However, this Paragraph **(2)** does not apply to loss otherwise covered under Insuring Agreement **A.1.** that results directly from the use of your or an "employee benefit plan" participant's confidential or personal information.

© All rights reserved.

*END 021*

126991 (7/17)     ***ArchBRANGPy***     Page 1 of 2

App. 75

For the purposes of this exclusion, confidential or personal information includes, but is not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information, retirement or health savings account information or any other type of nonpublic information.

**3.** In Section **D.2.**, paragraphs **b. Trading** and **c. Warehouse Receipts** are deleted in their entirety.

### III.

In Section **E. Conditions**, paragraph **(3)** of Condition **h. Employee Benefit Plans** is replaced by the following:

**(3)** With respect to loss sustained or "discovered" by any such Plan, Insuring Agreement **A.1.** is replaced by the following:

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee" whether identified or not, sole proprietor, partner or "member" acting alone or in collusion with other persons while such "employee", sole proprietor, partner or "member" is handling "money", "securities" or "other property" of an "employee benefit plan".

### IV.

In Section **F. Definitions**, Paragraph **a.** of the definition of "occurrence" is deleted in its entirety and replaced by the following:

**a.** Under Insuring Agreement **A.1.**:
   **(1)** An individual act;
   **(2)** The combined total of all separate acts whether or not related; or
   **(3)** A series of acts whether or not related; committed by an "employee", sole proprietor, partner or "member" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, before such Policy Period or both.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 021*

App. 76

CONFIDENTIAL     EXHIBIT A-1     NUFIC000146

This endorsement, effective *12:01 am*    *March 31, 2018*    forms a part of
policy number    *01-317-15-74*
issued to *REALPAGE, INC.*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME POLICY
GOVERNMENT EMPLOYEE THEFT AND FORGERY POLICY
KIDNAP/RANSOM AND EXTORTION POLICY

**A.** The following is added to the **Cancellation Of Policy** Condition:

Under the provisions of the Texas Insurance Code, we may not cancel this policy solely because the policyholder is an elected official.

**B.** The following is added and supersedes any other provision to the contrary:

**Nonrenewal**

**1.** We may elect not to renew this policy except that, under the provisions of the Texas Insurance Code, we may not refuse to renew this policy solely because the policyholder is an elected official.

**2.** If we elect not to renew this policy, we will mail or deliver to the first Named Insured, at the last mailing address known to us, written notice of nonrenewal, stating the reason for nonrenewal, at least 30 days before the expiration date.

**C.** The following is added to Section **E. Conditions:**

**Claims Handling**

**1.** Within 15 days after we receive written notice of claim, we will:

**a.** Acknowledge receipt of the claim. If we do not acknowledge receipt of the claim in writing, we will keep a record of the date, method and content of the acknowledgment;

**b.** Begin any investigation of the claim; and

**c.** Request a signed, sworn proof of loss, specify the information you must provide and supply you with the necessary forms. We may request more information at a later date, if during the investigation of the claim such additional information is necessary.

**2.** We will notify you in writing as to whether:

**a.** The claim or part of the claim will be paid;

## END 022

App. 77

CONFIDENTIAL                    EXHIBIT A-1                    NUFIC000147

**b.** The claim or part of the claim has been denied, and inform you of the reasons for denial;

**c.** More information is necessary; or

**d.** We need additional time to reach a decision. If we need additional time, we will inform you of the reasons for such need.

We will provide notification, as described in **2.a.** through **2.d.,** within 15 business days after we receive the signed, sworn proof of loss and all information we requested.

If we have notified you that we need additional time to reach a decision, we must then either approve or deny the claim within 45 days of such notice.

**3.** We will pay for covered loss or damage within five business days after:

**a.** We have notified you that payment of the claim or part of the claim will be made and have reached agreement with you on the amount of loss; or

**b.** An award has been made.

However, if payment of the claim or part of the claim is conditioned on your compliance with any of the terms of this policy, we will make payment within five business days after the date you have complied with such terms.

**4.** The term "business day", as used in this endorsement, means a day other than Saturday, Sunday or a holiday recognized by the state of Texas.

**D.** The **Legal Action Against Us** Condition is replaced by the following:

**Legal Action Against Us**

**1.** You may not bring any legal action against us involving loss unless:

**a.** There has been full compliance with all of the terms of this policy; and

**b.** The action is brought within two years and one day from the date the cause of action first accrues. A cause of action accrues on the date of the initial breach of our contractual duties as alleged in the action.

**E.** Under the Government Crime Policy and the Government Employee Theft and Forgery Policy, Paragraph **(2)** of the **Cancellation Of Policy** Condition is replaced by the following:

**(2)** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, stating the reason for cancellation, at least 10 days before the effective date of cancellation.

**(a)** If this policy has been in effect for 90 days or less, we may cancel for any reason except, that under provisions of the Texas Insurance Code, we may not cancel this policy solely because the policyholder is an elected official.

**(b)** If this policy has been in effect for more than 90 days, we may cancel this policy if:

**(i)** The Named Insured does not pay any portion of the premium when due;

**(ii)** The Insured submits a fraudulent claim;

*END 022*

**BRANCH** ~~Archive Copy~~ © Insurance Services Office, Inc., 2010 CR 02 47 10 10 □

App. 78

CONFIDENTIAL EXHIBIT A-1

NUFIC000148

(iii) The Texas Department of Insurance determines that continuation of the policy would result in a violation of the Insurance Code or other law governing the business of insurance in the state; or

(iv) There is an increase in the hazard covered by the policy that is within the control of the Insured and that would produce an increase in the premium rate of the policy.

_____

AUTHORIZED REPRESENTATIVE

**END 022**

*Archive Copy*

App. 79

CONFIDENTIAL

EXHIBIT A-1

NUFIC000149

This endorsement, effective *12:01 am*     *March 31, 2018*     forms a part of
policy number   *01-317-15-74*
issued to *REALPAGE, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TEXAS CHANGES - LEGAL ACTION AGAINST US

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME COVERAGE FORM
GOVERNMENT CRIME COVERAGE FORM
KIDNAP/RANSOM AND EXTORTION COVERAGE FORM

The **Legal Action Against Us** Condition is replaced by the following:

**Legal Action Against Us**

You may not bring any legal action against us involving loss unless:

1. There has been full compliance with all of the terms of this insurance; and

2. The action is brought within two years and one day from the date the cause of action first accrues. A cause of action accrues on the date of the initial breach of our contractual duties as alleged in the action.

AUTHORIZED REPRESENTATIVE

**END 023**

CONFIDENTIAL      EXHIBIT A-1      NUFIC000150

This endorsement, effective at *12:01 am    March 31, 2018*      forms a part of
Policy number *01-317-15-74*
Issued to: *REALPAGE, INC.*

By: *National Union Fire Insurance Company of Pittsburgh, Pa.*

Product Name: *Commercial Crime Policy Admitted CR0023 (05/06)*

### ECONOMIC SANCTIONS ENDORSEMENT

*This endorsement modifies insurance provided under the following:*

Coverage shall only be provided and payment of loss under this policy shall only be made in full compliance with enforceable United Nations economic and trade sanctions and the trade and economic sanction laws or regulations of the European Union and the United States of America, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 024*

App. 81

CONFIDENTIAL                          EXHIBIT A-1                          NUFIC000151

This endorsement, effective *12:01 am*     *March 31, 2018*          forms a part of
policy number    *01-317-15-74*
issued to *REALPAGE, INC.*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| CRDS02 | 08/07 | COMMERCIAL CRIME POLICY DECLARATIONS |
| CR0022 | 05/06 | Commercial Crime Policy (Discovery Form) |
| MNSCPT | | OMNIBUS NAMED INSURED AND JOINT VENTURE COVERAGE |
| 95417 | 08/07 | ADDITIONAL NAMED INSURED |
| 120497 | 10/15 | EMPLOYEE DEFINITION AMENDED (REQUIRED TO BE BONDED BY ERISA) |
| MNSCPT | | CRIME ADVANTAGE  AMENDED |
| MNSCPT | | DEFINITION OF EMPLOYEE AMENDED |
| CR2541 | 08/07 | INCLUDE DESIGNATED PERSONS OR CLASSES OF PERSONS AS EMPLOYEES |
| CR2520 | 08/07 | ADD CREDIT, DEBIT OR CHARGE CARD FORGERY |
| CR2027 | 08/07 | PROVIDE VARYING DEDUCTIBLES |
| 120427 | 09/15 | FRISC OPTOUT CLAUSE (WITH CLAIMS EXPENSE COVERAGE IF OPT OUT) |
| 128543 | 01/18 | FRISC (MIDDLE MARKET ACCOUNTS) (ISO) SUPPLMENTAL LISTING FOR CLAUSE ENDTS |
| MNSCPT | | INCLUDE DESIGNATED PERSON REQUIRED |
| 95442 | 08/07 | PRIOR THEFT OR DISHONESTY |
| 95421 | 08/07 | CLIENTS  PROPERTY - SCHEDULED CLIENTS |
| MNSCPT | | LOSS REPORTING THRESHOLD - 50% |
| 115901 | 10/13 | PROTECTED INFORMATION EXCLUSION (CARVEBACK) |
| 113024 | 10/12 | INDIRECT OR CONSEQUENTIAL LOSS EXCLUSION |
| CR2009 | 08/07 | AMEND TERRITORIAL LIMITS |
| 116956 | 01/17 | IMPERSONATION FRAUD COVERAGE (ISO) |
| 121261 | 01/16 | COMMERCIAL & GOVERNMENTAL CRIME LOSS PREVENTION SERVICES ENDORSEMENT |
| 99758 | 08/08 | NOTICE OF CLAIM (REPORTING BY E-MAIL) |

© All rights reserved.

*Archive Copy*              ***END 025***

This endorsement, effective 12:01 am    March 31, 2018         forms a part of
policy number    01-317-15-74
issued to REALPAGE, INC.

by    National Union Fire Insurance Company of Pittsburgh, Pa.

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 126991 | 07/17 | U.S. DEPARTMENT OF LABOR AMENDATORY (ERISA PLAN COVERAGE AMENDMENTS) |
| CR 02 47 | 10/10 | TEXAS CHANGES |
| CR 01 99 | 10/10 | TEXAS CHANGES - LEGAL ACTION AGAINST US |
| 119679 | 09/15 | ECONOMIC SANCTIONS ENDORSEMENT |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |
| 94396 | 05/15 | TEXAS COMPLAINT NOTICE FOR ADMITTED PAPER CO. |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

CONFIDENTIAL                                                            NUFIC000153

## TEXAS NOTICE

| | |
|---|---|
| **IMPORTANT NOTICE** | **AVISO IMPORTANTE** |

To obtain information or make a complaint:

Para obtener información o para presentar una queja:

You may call the Company's toll-free telephone number for information or to make a complaint at:

Usted puede llamar al número de teléfono gratuito de la compania para obtener información o para presentar una queja al:

1-877-541-9748

1-877-541-9748

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at:

Usted puede comunicarse con el Departamento de Seguros de Texas para obtener información sobre companias, coberturas, derechos, o quejas al:

1-800-252-3439

1-800-252-3439

You may write the Texas Department of Insurance:

Usted puede escribir al Departamento de Seguros de Texas a:

P.O. Box 149104
Austin, TX 78714-9104
Fax:    (512) 490-1007

P.O. Box 149104
Austin, TX 78714-9104
Fax:    (512) 490-1007

Web:    http://www.tdi.texas.gov

Sitio web:    http://www.tdi.texas.gov

E-mail: ConsumerProtection@tdi.texas.gov

E-mail: ConsumerProtection@tdi.texas.gov

**PREMIUM OR CLAIM DISPUTES:**
Should you have a dispute concerning your premium or about a claim, you should contact the agent first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:**
Si tiene una disputa relacionada con su prima de seguro o con una reclamación, usted debe comunicarse con el agente primero. Si la disputa no es resuelta, usted puede comunicarse con el Departamento de Seguros de Texas.

**ATTACH THIS NOTICE TO YOUR POLICY:**
This notice is for information only and does not become a part of the attached document.

**ADJUNTE ESTE AVISO A SU PÓLIZA:**
Este aviso es solamente para propósitos informativos y no se convierte en parte o en condición del documento adjunto.

94396 (5/15)    *Archive Copy*

CONFIDENTIAL    EXHIBIT A-1    NUFIC000154

# EXHIBIT A-2



AIG Claims, Inc.
Financial Lines Claims
175 Water Street
New York, NY 10038
www.aig.com

Jodi Bass
Complex Claims Director
Financial Lines Claims

T 212 458 3964
F 866 638 9065
Jodi.Bass@aig.com

January 4, 2019

*__Via Email Only:__* Kristy.Ramundi@Realpage.com

Kristy Ramundi
Senior Vice President
Governance and Enterprise Risk Office
RealPage, Inc.
2201 Lakeside Blvd
Richardson, TX 75082

| | |
|---|---|
| **Insured:** | **Real Page, Inc.** |
| **Insurer:** | **National Union Fire Insurance Company of Pittsburgh, Pa.** |
| **Policy #:** | **01-317-15-74** |
| **Claim #:** | **1610196234US** |
| **Matter:** | **Stripe Matter** |

Dear Ms. Ramundi:

Thank you for the call with you and Bryan Hill on December 19, 2018. As discussed, AIG Claims, Inc. ("AIG Claims") is still awaiting to be provided certain information and documentation that may support and corroborate the Insured's claim. However, we wanted to provide a written response to the Insured and offer a partial settlement of the Insured's claim based upon the results of our review of the documents to date.

On or about May 8, 2018, AIG Claims was notified of the Insured's claim for a loss. On or about September 21, 2018, the Insured submitted a Proof of Loss to AIG Claims claiming a loss of $6,022,021.00 ("Loss"). AIG Claims, by email dated September 28, 2018, acknowledged receipt of the Insured's Proof of Loss ("POL"). RealPage's POL states the Loss is "a direct result of" "Computer/Funds Transfer Fraud".

We have reviewed the POL and the attached "Preliminary Measurement of Loss Report, date 09.19.2018" and the spreadsheet – "Measurement of Loss as of 2018.09.19". We have also reviewed additional information and documentation subsequently submitted by RealPage in response to AIG Claims' requests for additional information as well as the information provided via conference calls with the Insured.

App. 86

EXHIBIT A-2 NUFIC003059



Although we are still waiting for the Insured to provide certain information and documentation for the purpose of AIG Claims obtaining a better understanding of the arrangement between RealPage, its Clients (PMCs), and Stripe in order to make a coverage determination that may support and corroborate its claim which was discussed on our December 19[1] call[1], this letter will provide you with AIG Claims' preliminary view regarding coverage for a portion of the Loss described in the POL.

## I.    The Policy.[2]

National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") issued a Commercial Crime Policy to its named insured, RealPage, Inc. ("RealPage"), for the policy term commencing March 31, 2018 and expiring March 31, 2019 (the "Policy"). The Insured filed its POL under Insuring Agreement **A.6** for **Computer Fraud**/Insuring **Agreement A.**7 for **Funds Transfer Fraud**. Relevant Policy provisions to our analysis are cited below:

*    *    *

The Insuring Agreement **A.6** for **Computer Fraud** provides the following:

> We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":
>
> a.  To a person "other than a messenger" outside of those "premises"; or
> b.  To a place outside those "premises".

*    *    *

---

[1] We are in receipt of David G. Monk's December 28, 2018 letter in which he asks, "why the requested information is relevant to our pending claim and to what sections of the applicable insurance policies it relates." However, on our December 19, 2018 call with you and Bryan Hill, RealPage's CFO, we explained at length why we needed the information and documentation for our coverage analysis and for auditing purposes. For example, we have asked for the communications between RealPage and its Clients referred to as the Property Management Companies ("PMCs"), about the Loss. AIG Claims needs to corroborate what the Insured told its Clients (PMCs) about the Loss. Additionally, AIG Claims needs to confirm the facts and ownership of the diverted funds.

[2] Terms appearing in **bold** type are defined terms in the Policy. Because certain of the Policy provisions referred to herein are summarized, and other provisions not expressly referred to herein may be applicable, we recommend that the Insured read the Policy in its entirety.

2



**Condition (p.) provides:**

**E.     Conditions**

The Policy provides:

**p. Ownership Of Property; Interests Covered**

The property covered under this policy is limited to property:

(1) That you own or lease; or

(2) That you hold for others whether or not you are legally liable for the loss of such property.

However, this policy is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this policy must be presented by you.

\*        \*        \*

## II. Summary of the Claim and the Stripe Payment Platform Process

In its POL, the Insured describes the Loss occurred under the following circumstances:

On or about May 4th, 2018, RealPage was made aware of suspicious activity involving the settlement of funds for a client using a payment platform, Stripe that resulted in the diversion of funds intended for bank accounts owned by RealPage and its clients. A bad actor was able to gain unauthorized access to the Stripe payment platform through phishing activities occurring within RP's email, which was used to gain the Stripe credentials of a RP employee. The bad actor then used these credentials to manipulate bank routing and account numbers for certain Connected Accounts.

Accordingly, the Insured and AIG Claims have had several teleconferences for the purpose of getting an understanding of the arrangement between RealPage, its Clients (PMCs) and Stripe and the events and circumstances surrounding the Loss in order to make a coverage determination.

3

CONFIDENTIAL

EXHIBIT A-2



In AIG's Claim's December 14, 2018 correspondence, we asked the Insured to confirm our understanding of the arrangement between RealPage, its Clients (PMCs) and Stripe and the events and circumstances surrounding the Loss based on the information provided:

> While we are still waiting for the Insured to provide certain information and documentation, it is our understanding based on the information provided by the Insured to date that a renter pays his/her monthly rent through the portal that flows through the Stripe Platform Account and is credited by Stripe to the PMC's Connected Account's Balance based upon an algorithm developed from the PMC's payment instructions, less the transaction fees due to RealPage/Onsite. The transaction fees due to RealPage/Onsite are credited by Stripe into the RealPage/Onsite Connected Account's Balance. Please confirm our understanding.

In response to AIG Claims' request on December 14, 2018 for further clarification on the Stripe payment process, the Insured provided the following on December 18, 2018:

> A renter pays his/her monthly rent through the On-Site (RealPage) portal, and that portal transmits data to Stripe, and the Stripe platform facilitates a credit to the Platform Account. Subsequently, funds are appropriately partitioned to Connected Accounts based upon an algorithm developed from the PMC's payment instructions, less the transaction fees (for certain transactions) due to RealPage/On-Site. The transaction fees due to RealPage/On-Site are then returned to the Platform Account.

It is our understanding that RealPage acquired On-Site Manager, Inc. ("On-Site") prior to the claimed Loss. For purposes of this letter, our reference herein to On-Site will include the Insured, RealPage.

Based upon the terms and conditions of the On-Site Service Agreement, it is our understanding that the Insured's Clients (PMCs) are provided payment processing services of ACH transactions from their customers ("Payors"). In return, the PMC authorizes "funds to be pulled from settlement bank account for payment of transaction fees" due the Insured.

4

CONFIDENTIAL

EXHIBIT A-2

NUFIC003062



The Insured has a platform agreement with Stripe that allows RealPage's clients, the PMCs, to use Stripe for accepting payments. It also allows RealPage to manage certain aspects of the PMC's Stripe accounts, including initiating charges or refunds, handling of disputes, and other functions available through Stripe Connect[3], which is a service that allows the sharing of data to process online payments. Stripe Connect allows RealPage to help its "customers" administer their respective Stripe Account[4] The purpose of a Stripe Connected Account is to facilitate the acceptance of payment processing proceeds and the credit of the of the settlement proceeds into the designated bank account. Stripe has the right to deduct connect pricing and platform fees from amounts processed by Stripe for RealPage or any Connected Account. According to Stripe's website, "the platform account and a connected account are still just Stripe accounts, each with their own, separate account balance." Stripe maintains the account balance for each PMC account and the Insured's account.

Based upon the foregoing and the information and documentation provided by the Insured to date including the Insured's responses of December 10, 2018 and December 18, 2018, it is AIG Claims' understanding that:

- Stripe provided the Insured the Platform to use the Stripe Connect Services to process the PMCs' ACH transactions.
- The Stripe clearing account/Platform Account is owned by Stripe and held by Wells Fargo.
- All Settlement funds are held in the single clearing account/Platform Account at Wells Fargo pending disbursement of funds to a designated bank account.
- The Insured does not own the designated bank accounts of the PMCs.
- The Insured had some limited ability to make administrative changes to payment instructions in the Stripe Platform and had its own Stripe account balance in the Stripe account for its transaction fees.
- "Partition" of any monies in the Stripe clearing account/Platform Account prior to disbursement to the PMC's designated account was merely ledger entries noting the separate balances of each PMC and RP of their

---

[3] See the Stripe Connect Platform Agreement, dated March 23, 2015 (updated November 15, 2017). The Insured confirmed that the November 15, 2017 version was effective during the period of March to May 2018.
[4] See page 9 of Stripe September 14, 2015 ToS.

5

CONFIDENTIAL

EXHIBIT A-2

NUFIC003063



respective funds held in the clearing account/Platform Account

- RealPage does not own the Stripe clearing account/Platform Account held at Wells Fargo and does not have access to the Wells Fargo account statements directly.
- The PMCs authorized the Insured to manage and collect monies debited from the Payors' accounts and to credit each PMC's identified designated bank account[5] less any transactions fees.

During our call on December 19th, you confirmed that "funds are appropriately partitioned into Connected Accounts" as stated in your December 18th letter simply means separate ledger entries which note the amount of each PMC's funds in the Platform Account and are not a physical separation of the funds into distinct bank accounts. It is our understanding that all monies owned by the PMCs remain in the Platform Account until withdrawn based upon the algorithm to the PMC's own separate designated bank accounts, less any fees owed by the PMC's to RealPage.

**Preliminary Coverage Analysis**

Based on the POL and the information and documentation provided to date, the payments made through the On-Site portal by the Payors were processed through the Stripe clearing account at Wells Fargo. By using the credentials of a RealPage employee wrongfully obtained through a phishing email, the bad actor changed the Insured and PMC designated bank account information to divert the transfer of money from the Wells Fargo clearing account/Platform Account to the bad actor's accounts at various financial institutions. By using a computer, the bad actor logged onto the Stripe platform as a RealPage employee and manipulated the bank routing and accounts numbers for designated bank accounts to directly cause the transfer of money from the Stripe Wells Fargo Platform Account to the bad actor's bank accounts.

---

[5] In the Insured's POL, it refers to this as the PMC Destination Bank account.

6

CONFIDENTIAL

EXHIBIT A-2

NUFIC003064



**1. Portion of Claim related to PMCs' funds**

As to the portion of the Claim related to the loss of the PMC's funds which were diverted, AIG Claims is still waiting for the necessary information requested on November 30, 2018 and again on December 14, 2018 to verify the facts and the ownership of those funds. However, based on the information we have to date, it is AIG Claims' preliminary analysis that the Insured did not own or hold the amounts maintained in the Platform Account on behalf of the PMCs that were diverted by the bad actor less the transaction fees owed to the Insured. Although the Insured had the PMCs' authorization to manage and collect the monies paid by the Payors, it did not own those amounts. The Insured also never held the monies collected on behalf of the PMCs. Those monies were deposited directly by the Payors into the Platform Account owned by Stripe at Wells Fargo. Therefore, at this time it does not appear that for the PMC funds portion of the Insured's claim, it can satisfy Condition (p.) of the Policy.

Please note this analysis is based on the information provided to date. AIG Claims has been requesting further information and documentation in order to determine if such other information might help support the Insured's claim related to the PMCs' diverted funds and to verify the facts surrounding the funds and the ownership of those funds.

In that regard, we have included in the attachment hereto, our summary of outstanding documents and additional questions. AIG Claims needs this information to determine who owned the diverted funds pursuant to Condition (p.) as well as to continue its investigation of the facts and quantum surrounding the remainder of the Loss. We invite the Insured to provide any additional information or documentation in this regard.

**2. Portion of Claim related to RealPage's transaction fees**

Based upon the information provided to date, AIG Claims has determined that the amounts in the Platform Account representing the Insured's fees taken from the PMCs and intended for the Insured's Destination Account triggers coverage under Insuring Agreement **A.6** for **Computer Fraud** since it owned those funds. AIG Claims has determined that the Insured has sustained a direct covered loss

7



of the funds it owned at the time of the diversion in the gross amount of $1,231,692.78, which represents the transaction fees earned from the PMCs.

However, Stripe, through its clearing account at Wells Fargo, obtained recovery in the amount of $925,855.14 from various financial institutions related to the Loss. The Insured has indicated to AIG Claims that it cannot determine which recovery checks should credit which PMC or Insured ledger account balance in Stripe as the information is within the purview of Stripe/Wells Fargo alone. Given it does not own the Stripe clearing account and has stated in its December 18th submission that it cannot obtain this information, AIG Claims proposes to use a pro-rata approach to apply the recovery against the confirmed gross loss amount.

A pro-rata approach would apply $164,132.05[6] of recovery against the confirmed loss amount of $1,231,692.78 which would reduce the Insured's confirmed loss amount at this time to $1,067,560.73. After the application of the $50,000 deductible, the net amount under the pro-rata approach would be $1,017,560.73 for this portion of the claimed loss. It is AIG Claims' position that if it is later determined that the actual recovery to the Insured for its portion of the Loss that represents its stolen transaction fees exceeds the pro-rata amount of recovery AIG Claims proposes, then the Insured would refund the difference back to AIG Claims. Conversely, if the Insured can demonstrate to AIG Claims that less recovery should be apportioned to the Insured's stolen fee portion of its claim, AIG Claims would cover that additional amount.

Also, the Policy provides Claims Expense Coverage for $50,000 in investigatory and forensic investigation costs, subject to a $2,500 retention. The Insured retained Ankura to perform crime loss analysis services. In the Insured's December 18, 2018 submission to AIG Claims, it provided invoices from Ankura that substantiates the Insured has incurred more than $50,000 in investigatory and forensic investigation costs and has met the $2,500 deductible. Accordingly, in accordance with the Policy terms, the Insurer will pay the Insured $50,000 for Claims Expenses pursuant to Endorsement 9 of the Policy.

---

[6] Connected Accounts ($1,231,692.78), divided by total funds currently understood to have been diverted by the bad actor ($6,947,875.67), multiplied by the amount recovered via manual checks ($925,855.14), equals $164,132.05.

CONFIDENTIAL

EXHIBIT A-2

NUFIC003066



A proposed release for **$1,067,560.73** is attached for your review and signature. Please return it signed and notarized to me with the Insured's payment instructions.

We look forward to receiving the additional materials requested. AIG Claims reserves all rights.

Sincerely,

*Jodi Bass*

Jodi Bass
Complex Claims Director

Enclosures: Release and Request for Information.

cc:     Danny Downs, Danny.Downs@RealPage.com
        Bryan Hill, Bryan.Hill@RealPage.com
        David Monk, David.Monk@ RealPage.com
        David Yesh, David.M.Yesh@marsh.com
        Jason O'Brien, jobrien@wileyrein.com
        Lauren Levy, Lauren.Levy@aig.com
        Barbara Leone, Barbara.Leone@aig.com

9

App. 94

CONFIDENTIAL

EXHIBIT A-2

NUFIC003067

# EXHIBIT A-3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.

$480,966.69 IN UNITED STATES
CURRENCY SEIZED FROM SUN TRUST
BANK ACCOUNT X4368;

$370,667.67 IN UNITED STATES
CURRENCY SEIZED FROM TD BANK
ACCOUNT X8565;

$314,099.71 IN UNITED STATES
CURRENCY SEIZED FROM SUN TRUST
BANK ACCOUNT X3954;

$305,912.00 IN UNITED STATES
CURRENCY SEIZED FROM BANK OF
AMERICA BANK ACCOUNT X7246;

$219,270.37 IN UNITED STATES
CURRENCY SEIZED FROM CITIZENS
BANK ACCOUNT X8862;

$166,732.35 IN UNITED STATES
CURRENCY SEIZED FROM BANK OF
AMERICA BANK ACCOUNT X8025;

$160,198.23 IN UNITED STATES
CURRENCY SEIZED FROM BANK OF
AMERICA BANK ACCOUNT X0761;

$124,221.80 IN UNITED STATES
CURRENCY SEIZED FROM BANK OF
AMERICA BANK ACCOUNT X8449;

$119,985.00 IN UNITED STATES
CURRENCY SEIZED FROM CAPITAL

NO.  3:20-CV-

United States' Complaint for Forfeiture – Page 1

RP_0000228

App. 96

EXHIBIT A-3

RP00019955

ONE BANK ACCOUNT X5098;

$77,000.00 IN UNITED STATES
CURRENCY SEIZED FROM PNC BANK
ACCOUNT X7826;

$76,673.66 IN UNITED STATES
CURRENCY SEIZED FROM SUN TRUST
BANK ACCOUNT X9842;

$70,000.00 IN UNITED STATES
CURRENCY SEIZED FROM BANK OF
AMERICA BANK ACCOUNT X1666;

$58,279.03 IN UNITED STATES
CURRENCY SEIZED FROM TD BANK
ACCOUNT X1272;

$57,000.00 IN UNITED STATES
CURRENCY SEIZED FROM BB&T BANK
ACCOUNT X9903;

40,000.00 IN UNITED STATES
CURRENCY SEIZED FROM BANK OF
AMERICA BANK ACCOUNT X8191;

$32,987.44 IN UNITED STATES
CURRENCY SEIZED FROM WELLS
FARGO BANK ACCOUNT X1663;

$32,818.82 IN UNITED STATES
CURRENCY SEIZED FROM SUN TRUST
BANK ACCOUNT X0743;

$32,070.61 IN UNITED STATES
CURRENCY SEIZED FROM TD BANK
ACCOUNT X7642;

$26,342.90 IN UNITED STATES
CURRENCY SEIZED FROM BB&T BANK
ACCOUNT X0214;

$23,315.79 IN UNITED STATES
CURRENCY SEIZED FROM TD BANK

RP_0000229

EXHIBIT A-3

RP00019956

ACCOUNT X8536;

$20,447.00 IN UNITED STATES CURRENCY SEIZED FROM US BANK ACCOUNT X8495;

$18,000.00 IN UNITED STATES CURRENCY SEIZED FROM BANK OF AMERICA BANK ACCOUNT X5105;

$17,586.90 IN UNITED STATES CURRENCY SEIZED FROM BANK OF AMERICA BANK ACCOUNT X3750;

$15,892.24 IN UNITED STATES CURRENCY SEIZED FROM US BANK ACCOUNT X8495;

$12,233.00 IN UNITED STATES CURRENCY SEIZED FROM BANK OF AMERICA BANK ACCOUNT X1190;

$10,565.02 IN UNITED STATES CURRENCY SEIZED FROM SUN TRUST BANK ACCOUNT X2891;

$7,759.73 IN UNITED STATES CURRENCY SEIZED FROM BANK OF THE WEST BANK ACCOUNT X0053

$6,051.25 IN UNITED STATES CURRENCY SEIZED FROM SUN TRUST BANK ACCOUNT X7076;

$5,869.15 IN UNITED STATES CURRENCY SEIZED FROM BANK OF AMERIC BANK ACCOUNT X8214;

$2,705.00 IN UNITED STATES CURRENCY SEIZED FROM CHASE BANK ACCOUNT X6832;

$2,402.24 IN UNITED STATES CURRENCY SEIZED FROM SUN TRUST

RP_0000230

App. 98

EXHIBIT A-3

RP00019957

BANK ACCOUNT X8777;

$120.53 IN UNITED STATES CURRENCY
SEIZED FROM SUN TRUST BANK
ACCOUNT X6861;

$110.00 IN UNITED STATES CURRENCY
SEIZED FROM FIDELITY BANK
ACCOUNT X5336;

$21.33 IN UNITED STATES CURRENCY
SEIZED FROM WELLS FARGO BANK
ACCOUNT X6783; and

$8.08 IN UNITED STATES CURRENCY
SEIZED FROM BANK OF AMERICA
BANK ACCOUNT X0744;

*Defendants in rem.*

## UNITED STATES' COMPLAINT FOR FORFEITURE

The United States of America files this complaint *in rem* against the defendant

property, and in support states:

### I.      JURISDICTION AND VENUE

1.      This court has subject matter jurisdiction of this cause of action *in rem* by

virtue of the provisions of 28 U.S.C. §§ 1345 and 1355(a).  Venue is proper under 28

U.S.C. § 1355(b)(1) and 28 U.S.C. § 1395(b) because acts giving rise to the forfeiture

occurred in this district.

2.      The statutory bases for this suit are 18 U.S.C. § 981(a)(1)(C) and

18 U.S.C. § 981(a)(1)(A), 28 U.S.C. §§ 2461 and 2465, 18 U.S.C. § 983, and 28 U.S.C.

Rule G, Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture

Actions (Supplemental Rules).

United States' Complaint for Forfeiture – Page 4

## II.   DEFENDANT *IN REM*

3.   The defendant property consists of the following property that was seized:

   a.   $480,966.69 in United States currency seized from Sun Trust Bank
      Account X4368, in the name of Jackie Moore – E&J Trucking;

   b.   $370,667.67 in United States currency seized from TD Bank account
      X8565, in the name of Evelyn Ortiz;

   c.   $314,099.71 in United States currency seized from Sun Trust Bank
      account X3954, in the name of Monica Anne Moore;

   d.   $305,912.00 in United States currency seized from Bank of America
      Bank account X7246, in the name of Lisa Lofstrom;

   e.   $219,270.37 in United States currency seized from Citizens Bank
      account X8862, in the name of Stephanie Ann Contreras;

   f.   $166,732.35 in United States currency seized from Bank of America
      Bank account X8025, in the name of Susan Vaughan;

   g.   $160,198.23 in United States currency seized from Bank of America
      Bank account X0761, in the name of Richards Taylor Enterprises, LLC;

   h.   $124,221.80 in United States currency seized from Bank of America
      Bank account X8449, in the name of Sandra Jones;

   i.   $119,985.00 in United States currency seized from Capital One Bank
      account X5098, in the name of Davion Royal Enterprise;

   j.   $77,000.00 in United States currency seized from PNC Bank account
      X7826, in the name of The Tech-Edge Group, LLC – Patrick Akhamie;

RP_0000232

EXHIBIT A-3

RP00019959

k.  $76,673.66 in United States currency seized from Sun Trust Bank account X9842, in the name of Jackie Moore – E&J Trucking;

l.  $70,000.00 in United States currency seized from Bank of America Bank account X1666, in the name of Didal Enterprises, LLC;

m.  $58,279.03 in United States currency seized from TD Bank account X1272, in the name of Marven P. St. Cyr;

n.  $57,000.00 in United States currency seized from BB&T Bank account X9903, in the name of Valence Sales;

o.  40,000.00 in United States currency seized from Bank of America Bank account X8191, in the name of Castle Investments USA, Inc.;

p.  $32,987.44 in United States currency seized from Wells Fargo Bank account X1663, in the name of Yvonne Chao;

q.  $32,818.82 in United States currency seized from Sun Trust Bank account X0743, in the name of SDSG Construction LLC;

r.  $32,070.61 in United States currency seized from TD Bank account X7642, in the name of Carol Allen;

s.  $26,342.90 in United States currency seized from BB&T Bank account X0214, in the name of Sayaormas Trading Corp.;

t.  $23,315.79 in United States currency seized from TD Bank account X8536, in the name of Teresa S. Nicole Cobb;

u.  $20,447.00 in United States currency seized from US Bank account X8495, in the name of Renee Smyser;

RP_0000233

EXHIBIT A-3

RP00019960

v.   $18,000.00 in United States currency seized from Bank of America Bank account X5105, in the name of Dominique Souame;

w.   $17,586.90 in United States currency seized from Bank of America Bank account X3750, in the name of Patrick Hundley;

x.   $15,892.24 in United States currency seized from US Bank account X8495, in the name of Renee Smyser;

y.   $12,233.00 in United States currency seized from Bank of America Bank account X1190, in the name of Judy P. Weinmann;

z.   $10,565.02 in United States currency seized from Sun Trust Bank account X2891, in the name of Robina Seddiq;

aa.   $7,759.73 in United States currency seized from Bank of the West Bank account X0053, in the name of Lori Lane;

bb.   $6,051.25 in United States currency seized from Sun Trust Bank account X7076, in the name of PJ Tweeners, LLC – Yong Ki Bael;

cc.   $5,869.15 in United States currency seized from Bank of America Bank account X8214, in the name of Sky Home Investments, LLC;

dd.   $2,705.00 in United States currency seized from Chase Bank account X6832, in the name of Charles Granville;

ee.   $2,402.24 in United States currency seized from Sun Trust Bank account X8777, in the name of Links Global International – Daniel Edward Manibusan;

ff.   $120.53 in United States currency seized from Sun Trust Bank account

RP_0000234

App. 102

EXHIBIT A-3

RP00019961

X6861, in the name of Aurelia Loressa Zimmerman;

gg. $110.00 in United States currency seized from Fidelity Bank account X5336, in the name of Evelyn Ortiz;

hh. $21.33 in United States currency seized from Wells Fargo Bank account X6783, in the name of Robina Seddiq; and

ii. $8.08 in United States currency seized from Bank of America Bank account X0744, in the name of Paclite Equipment – Tia-Allyse Watson.

Notice of this complaint will be provided to the individuals and/or entities associated or affiliated with these seized financial accounts, as listed in the attached Notice Certification.

### III. FACTS AND BASIS FOR FORFEITURE

4. The defendant property is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) & (D) and 18 U.S.C. § 981(a)(1)(A) because it is property that was involved in and/or it constitutes or is derived from proceeds derived traceable to a conspiracy to violate 18 U.S.C. §§ 1344 and 1343, and 18 U.S.C. §§ 1956. This is shown by the Verification Affidavit in Support of the United States' Complaint for Forfeiture of United States Secret Service Special Agent Chris McIntyre, and incorporated as Plaintiff's Exhibit 1, filed in support of this Complaint.

### IV. RELIEF SOUGHT

THEREFORE, the United States requests the following:

A. Publication of notice of this forfeiture action be made by posting notice on

RP_0000235

EXHIBIT A-3

RP00019962

the official government internet site, www.forfeiture.gov, for at least 30 consecutive days, in accordance with Supplemental Rule G(4)(a).

B.    Direct notice of this forfeiture action be given to those persons who reasonably appear to be potential claimants in accordance with Supplemental Rule G(4)(b).

C.    All persons having any interest in or right against the defendant property be advised by the public notice or the direct notice to timely file in this court a verified claim identifying the interest or right to the defendant property as required by Supplemental Rule G(5)(a) and 18 U.S.C. § 983(a)(4)(A); and to file an answer to this Complaint for Forfeiture or motion under Fed. R. Civ. P. 12 in the manner required by the Supplemental Rule G(5)(b) and 18 U.S.C. § 983(a)(4)(B).

D.    At the conclusion of this proceeding, the defendant property be condemned by order and judgment of this court and declared and decreed to be forfeited to the United States of America in accordance with law.

E.    All costs and expenses incurred by the United States in obtaining the forfeiture of the defendant property be appropriately taxed against any person or entity who may file a verified claim and answer herein, and/or if more than one person or entity files a verified claim and answer herein be jointly taxed and prorated among them, as the court deems just and equitable.

F.    The United States have such other and further relief, at law or in equity, to which it may show itself justly entitled.

United States' Complaint for Forfeiture – Page 9

Respectfully submitted,

ERIN NEALY COX
UNITED STATES ATTORNEY

/s/ *Gregory S. Martin*
GREGORY S. MARTIN
Assistant United States Attorney
California Bar No. 294482
1100 Commerce Street, Third Floor
Dallas, Texas  75242-1699
Telephone: 214-659-8600
E-mail: gregory.martin2@usdoj.gov

ATTORNEY FOR PLAINTIFF

United States' Complaint for Forfeiture – Page 10

RP_0000237

App. 105

EXHIBIT A-3

RP00019964

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Verified Complaint for Forfeiture In Rem and Verification were mailed via certified mail, return receipt requested to potential claimants at the following addresses:

Patrick Hundley
2300 Benson Poole Road SE, Apt C17,
Snyrna, GA 30082

Richards Taylor Enterprises, LLC,
2520 John Bruce Avenue,
Orlando, FL 32811

Lisa Lofstrom
4376 Georgian Court, Apt A21
Liverpool, NY 13090

Sandra Jones
1256 Kloper Road
Juliet, GA 31046

Susan Vaughan
3503 Meadowood Drive
Murfreesboro, TN 37128

Judy P. Weinmann
1924 Belleau Village Lane
Chattanooga, TN 37421

Paclite Equipment Tia-Allyse Watson
10722 South Figoro Street,
Los Angeles, CA 90061

Dominique Souame
231 Tennessee Street, Apt. 4
Vallejo, CA 94590

Sky Home Investments, LLC
4377 NW 110th Avenue
Doral, FL 33178

RP_0000238

EXHIBIT A-3

RP00019965

Yvonne Chao
111 West Burnside Street
Portland, OR 97209

Robina Seddiq
9985 Hemlock Woods Lane
Burke, VA 22015

Sayaormas Trading Corp
4851 NW 103rd Avenue, Suite 55E
Sunrise, FL 33351

Charles Granville
787 Tulip Poplar Way
Lawrenceville, GA 30044

The Tech-Edge Group, LLC. - Patrick Akhamie
6800 Peachtree Industrial Blvd. Apt. A06
Atlanta, GA

Eveyln Ortiz
519 E 1st Street Apt. 803
Sanford, FL 32771

Marven P St Cyr
10457 Boynton Place Circle
Boynton Beach, FL 33437

Carol Allen
685 S. Sunny Avenue,
Boynton Beach, FL 33436

Teresa S Nicole Cobb
1014 Mount Holly St.
Baltimore, MD 21229

Evelyn Ortiz
519 E 1st Street Apt. 803
Sanford, FL 32771

Davion Royal Enterprise

RP_0000239

App. 107

EXHIBIT A-3

RP00019966

10-79 Dickens Street,,
Far Rockaway, NY 11691

Monica Anne Moore
9626 La Mesa Lane
Timberlake, NC 27583

PJ Tweeners, LLC - Yong Ki Bael
5752 Quiet Pine Circle, Apt. 105
Chester, VA 23831

Links Global International - Daniel Edward Manibusan
2602 Park Lake Lane
Peachtree Corners, GA 30092

Jackie Moore - E&J Trucking
19386 68th Street
Live Oak, FL 32060

Aurelia Loressa Zimmerman
611 South 6th Street
Wewahitchka, FL 32465

Robina Seddiq
9985 Hemlock Woods LN.,
Burke, VA 22015

SDSG Construstion LLC
1204 Brookhaven Circle NE
Brookhaven, GA 30319

Jackie Moore - E&J Trucking
19386 68th Street
Live Oak, FL 32060

Valence Sales
120 Dolphin Fleet Circle Apt. 101
Daytona Beach, FL 32119

Didal Enterprises, LLC
108 Winner Circle, Apt 305
Daytona Beach, FL 32114

RP_0000240

App. 108

EXHIBIT A-3

RP00019967

Castle Investments USA, Inc.
10633 Hammocks Blvd. Apt. 1034
Miami, FL 33196

Renee Smyser
17 Corbins Lane
Elksville, IL 62932

Renee Smyser
17 Corbins Lane
Elksville, IL 62932

Stephanie Ann Contreras
818 S. Marengo
Pasadena, CA 91106

Lori Lane
1002 Statice Ave
Sandy, UT 84094

on this 21st day of January, 2020.

/s/ Gregory S. Martin
GREGORY S. MARTIN
Assistant United States Attorney

RP_0000241

App. 109

RP00019968

# EXHIBIT A-4

 # PETITION FOR REMISSION/MITIGATION FORM

**Note**: There is no legal form or format required for filing a petition; this document is provided for your convenience. Please visit https://www.forfeiture.gov/FilingPetition.htm for more specific guidance on filing your petition with the appropriate seizing agency.

**Frivolous Petition Statement:** A petition containing false information may subject the petitioner to criminal prosecution under Title 18 United States Code Section 1001 and Title 18 United Sates Code Section 1621.

**Privacy Act Notice:** The Department of Justice is collecting this information for the purpose of processing your petition for remission and/or mitigation. Providing this information is voluntary; however, the information is necessary to process your application. Information collected is covered by Privacy Act System of Records Notice Department of Justice (DOJ), DOJ-002-DOJ Computer Systems Activity & Access Records, Federal Register (71 FR 29170). This information may be disclosed to contractors when necessary to accomplish an agency function, to law enforcement when there is a violation or potential violation of law, or in accordance with other published routine uses. For a complete list of routine uses, see the system records notice listed above.

App. 111

CONFIDENTIAL                    EXHIBIT A-4                    RP00000156

# SECTION I - CONTACT INFORMATION

| PETITIONER INFORMATION | |
|---|---|
| **Petitioner/Contact Name:** (Last, First)<br>Thornthwaite, Martin | |
| **Business/Institution Name:** (if applicable)<br>RealPage, Inc. | **Prisoner ID:** (if applicable) |
| **Address:** (Include Street, City, State, and Zip Code)<br>2201 Lakeside Boulevard<br>Richardson, TX 75082 | |
| **Social Security Number/Tax Identification Number:** (Enter N/A if you do not have one)<br>75-2788861 | |
| **Phone:** (optional) | **Email:** (optional) |

| ATTORNEY INFORMATION (if applicable) | |
|---|---|
| **Attorney Name:** (Last, First)<br>Fleishman, Barry | |
| **Attorney Title:**<br>Mr. | |
| **Firm Name:** (if applicable)<br>Pillsbury Winthrop Shaw Pittman LLP | |
| **Attorney Address:** (Include Street, City, State, and Zip Code)<br>1200 Seventeenth Street NW<br>Washington, DC 20036-3006 | |
| **Are you an attorney filing this petition on behalf of your client?**   ☒ Yes   ☐ No | |
| **Attorney Phone:** (optional)<br>2026638079 | **Attorney Email:** (optional)<br>barry.fleishman@pillsburylaw.com |

*If any of this information changes, you are responsible for notifying the agency of the new information.*

App. 112

CONFIDENTIAL                EXHIBIT A-4                RP00000157

# SECTION II - ASSET LIST

*You must identify your role for each asset in your petition. Please review the role definitions below.*

| ROLE INFORMATION (multiple roles may apply to each asset) | |
|---|---|
| **Owner** | *The person in whom primary title is vested or whose interest is manifested by the actual and beneficial use of the property, even though the title is vested in another. A victim of an offense, as defined in this section, may also be an owner if he or she has a present legally cognizable ownership interest in the property forfeited. A nominal owner of property will not be treated as its true owner if he or she is not its beneficial owner.* |
| **Victim** | *A person who has incurred a pecuniary loss as a direct result of the commission of the offense underlying a forfeiture. A drug user is not considered a victim of a drug trafficking offense under this definition. A victim does not include one who acquires a right to sue the perpetrator of the criminal offense for any loss by assignment, subrogation, inheritance or otherwise from the actual victim, unless that person has acquired an actual ownership interest in the forfeited property; provided however, that if a victim has received compensation from insurance or any other source with respect to a pecuniary loss, remission may be granted to the third party who provided the compensation, up to the amount of the victim's pecuniary loss.* |
| **Lienholder** | *A creditor whose claim or debt is secured by a specific right to obtain satisfaction against the particular property subject to forfeiture. A lien creditor qualifies as a lienholder if the lien:*<br><br>*(1) Was established by operation of law or contract;*<br><br>*(2) Was created as a result of an exchange of money, goods, or services; and*<br><br>*(3) Is perfected against the specific property forfeited for which remission or mitigation is sought (e.g., a real estate mortgage; a mechanic's lien).* |

*Identify the asset ID and asset description for each asset you are petitioning and indicate your role as a petitioner for each asset. You may select one or more roles.*

| # | Asset ID | Asset Description | Owner | Victim | Lienholder |
|---|---|---|---|---|---|
| 1 | 18-USS-000789 | $480,966.69 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | [X] | [X] | [ ] |
| 2 | 18-USS-000790 | $76,673.66 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | [X] | [X] | [ ] |
| 3 | 18-USS-000791 | $314,099.71 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | [X] | [X] | [ ] |
| 4 | 18-USS-000792 | $6,051.25 U.S. Currency, SN: ****<br>seized by the USA on April 19, 2018 in Dallas, TX. | [X] | [X] | [ ] |
| 5 | 18-USS-000793 | $2,402.24 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | [X] | [X] | [ ] |
| 6 | 18-USS-000794 | $120.53 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | [X] | [X] | [ ] |
| 7 | 18-USS-000795 | $10,565.02 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | [X] | [X] | [ ] |
| 8 | 18-USS-000796 | $32,818.82 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | [X] | [X] | [ ] |
| 9 | 18-USS-000797 | $370,677.67 U.S. Currency, SN: ****<br>seized by the USA on April 19, 2018 in Dallas, TX. | [X] | [X] | [ ] |
| 10 | 18-USS-000798 | $58,279.03 U.S. Currency, SN: ****<br>seized by the USA on May 1, 2018 in Dallas, TX. | [X] | [X] | [ ] |

App. 113

CONFIDENTIAL                    EXHIBIT A-4

RP00000158

| # | Asset ID | Asset Description | Owner | Victim | Lienholder |
|---|----------|------------------|-------|--------|------------|
| 11 | 18-USS-000799 | $32,070.61 U.S. Currency, SN: ****<br>seized by the USA on April 24, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 12 | 18-USS-000800 | $23,315.79 U.S. Currency, SN: ****<br>seized by the USA on April 24, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 13 | 18-USS-000803 | $305,912.00 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 14 | 18-USS-000804 | $166,732.35 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 15 | 18-USS-000805 | $160,198.23 U.S. Currency, SN: ****<br>seized by the USA on May 2, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 16 | 18-USS-000806 | $124,221.80 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 17 | 18-USS-000807 | $219,270.37 U.S. Currency, SN: ****<br>seized by the USA on April 30, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 18 | 18-USS-000808 | $32,987.44 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 19 | 18-USS-000809 | $20,447.00 U.S. Currency, SN: ****<br>seized by the USA on May 4, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 20 | 18-USS-000810 | $17,586.90 U.S. Currency, SN: ****<br>seized by the USA on May 1, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 21 | 18-USS-000811 | $119,985.00 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 22 | 18-USS-000812 | $77,000.00 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 23 | 18-USS-000813 | $70,000.00 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 24 | 18-USS-000814 | $57,000.00 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 25 | 18-USS-000815 | $40,000.00 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 26 | 18-USS-000816 | $26,342.90 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 27 | 18-USS-000817 | $18,000.00 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 28 | 18-USS-000818 | $15,892.24 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 29 | 18-USS-000819 | $12,233.00 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 30 | 18-USS-000820 | $7,759.73 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 31 | 18-USS-000821 | $5,869.15 U.S. Currency, SN: ****<br>seized by the USA on May 4, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 32 | 18-USS-000822 | $2,705.00 U.S. Currency, SN: ****<br>seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |

App. 114

CONFIDENTIAL

EXHIBIT A-4

RP00000159

## SECTION II - ASSET LIST

| # | Asset ID | Asset Description | Owner | Victim | Lienholder |
|---|----------|------------------|-------|--------|------------|
| 33 | 18-USS-000823 | $110.00 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 34 | 18-USS-000824 | $21.33 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |
| 35 | 18-USS-000825 | $8.08 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. | ☒ | ☒ | ☐ |

App. 115

EXHIBIT A-4

CONFIDENTIAL

RP00000160

# SECTION III - VICTIM PETITION

*If you are filing this petition as a victim, please fill out the information below. The information must apply to all of the assets you selected as a victim role in the previous section. If you are not filing as a victim for any assets, you may skip this section.*

**I am requesting remission of this forfeiture because I am a victim of the criminal offense underlying the forfeiture of this property or am the victim of a related offense and I have suffered a pecuniary loss as a result of that offense as described below:**

As background, RealPage, Inc. provides software and data analytics to the real estate industry. It also provides back office management services for owners and managers of various property types that assist those clients with property management, resident services and revenue management. One payment processing service that RealPage provides to its clients through a subsidiary is the collection of rental and other payments from residents and the transfer of those payments to clients. RealPage provided a web portal that residents at certain of its clients' properties could access to make their payments. In connection with these services, RealPage used a third-party software application as a tool to allocate and direct resident payments received through the RealPage web portal. On or about May 4, 2018, RealPage learned of suspicious activity involving the settlement of funds for a client using the third-party software application. RealPage's investigation determined that, through phishing, a bad actor(s) changed a RealPage employee's credentials for RealPage's account with the third-party software application and accessed the account. The bad actor used that access to manipulate bank routing and account numbers for several accounts and fraudulently divert more than $10 million in funds. Accordingly, RealPage was the victim of this computer crime. RealPage credited each of the affected clients' accounts with the full amount of the stolen funds owed to them promptly after detection of the fraudulent transfer. Additionally, a portion of the stolen funds represented transactional fees owed to RealPage by its clients. RealPage was able to recover some of the funds as a result of various financial institutions freezing accounts and issuing manual checks, as well as seizure by government authorities. RealPage has also had some recovery through its commercial crime insurance policy. However, RealPage has yet to recover nearly $5 million of the stolen funds.

**Please provide the total pecuniary loss claimed. This is the total amount you claim to have lost.**

RealPage's initial total pecuniary loss was $10,492,404. RealPage recovered some of those funds through various means, as noted in the Sources of Recovery. With respect to the assets claimed in the Asset List, RealPage's total pecuniary loss is $2,908,313.54.

**If you have recovered any of your losses, please list the details below. If you have more than two sources of recovery, please print multiple copies of this table to submit with the petition.**

| SOURCE(S) OF RECOVERY (if applicable) | |
|---|---|
| **Source of Recovery 1:** Financial institutions (FI) | **Amount of Recovery:** 3544529.00 United States Dollar |
| **Source of Recovery 2:** Manual checks representing monies seized by FIs | **Amount of Recovery:** 925855.00 United States Dollar |
| **Source of Recovery 3:** US Secret Service Seizure Number 303-2018-007 | **Amount of Recovery:** 33621.04 United States Dollar |
| **Source of Recovery 4:** Insurance | **Amount of Recovery:** 1067560.73 United States Dollar |

**In the space below, please list any documents you are including in support of your victim petition. If none are included, please explain why.**

* Verification and Affidavit in Support of Forfeiture Complaint - US_v_SunTrust_NDTX_Dkt1_1.pdf
* EDR_Wire_Details (RealPage initiated wires to its Clients following the loss) - EDR_Wire_Details (RealPage Initiated Wires).pdf
* Complaint in Cause No 3:20-CV-155-B, United States of America v. $480,966.69, et al., in the United States District Court for the Northern District of Texas (Dallas Division) (Doc. 1) - USOA_v_SunTrustBankLit_EDTX_Dkt1.pdf

App. 116

CONFIDENTIAL

EXHIBIT A-4

RP00000161

# SECTION IV - INTEREST IN PROPERTY

*Provide additional information for the assets where you have identified yourself as the owner and/or lienholder. If you are petitioning for multiple assets and the responses are not the same for each asset, please print out multiple copies of this page to submit with the petition and indicate which assets apply to each page. If you have documentation that supports your interest in the petitioned assets (bill of sale, retail installment agreements, contracts, titles or mortgages) please include copies of the documents with the submission of the petition.*

| INTEREST IN PROPERTY INFORMATION | |
|---|---|
| **Asset ID** | **Asset Description** |
| 18-USS-000789 | $480,966.69 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. |
| 18-USS-000790 | $76,673.66 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. |
| 18-USS-000791 | $314,099.71 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. |
| 18-USS-000792 | $6,051.25 U.S. Currency, SN: **** seized by the USA on April 19, 2018 Dallas, TX. |
| 18-USS-000793 | $2,402.24 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. |
| 18-USS-000794 | $120.53 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. |
| 18-USS-000795 | $10,565.02 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. |
| 18-USS-000796 | $32,818.82 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. |
| 18-USS-000797 | $370,677.67 U.S. Currency, SN: **** seized by the USA on April 19, 2018 in Dallas, TX. |
| 18-USS-000798 | $58,279.03 U.S. Currency, SN: **** seized by the USA on May 1, 2018 in Dallas, TX. |
| 18-USS-000799 | $32,070.61 U.S. Currency, SN: **** seized by the USA on April 24, 2018 in Dallas, TX. |
| 18-USS-000800 | $23,315.79 U.S. Currency, SN: **** seized by the USA on April 24, 2018 in Dallas, TX. |
| 18-USS-000803 | $305,912.00 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. |
| 18-USS-000804 | $166,732.35 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. |
| 18-USS-000805 | $160,198.23 U.S. Currency, SN: **** seized by the USA on May 2, 2018 in Dallas, TX. |
| 18-USS-000806 | $124,221.80 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. |
| 18-USS-000807 | $219,270.37 U.S. Currency, SN: **** seized by the USA on April 30, 2018 in Dallas, TX. |
| 18-USS-000808 | $32,987.44 U.S. Currency, SN: **** seized by the USA on May 3, 2018 in Dallas, TX. |
| 18-USS-000809 | $20,447.00 U.S. Currency, SN: **** seized by the USA on May 4, 2018 in Dallas, TX. |
| 18-USS-000810 | $17,586.90 U.S. Currency, SN: **** seized by the USA on May 1, 2018 in Dallas, TX. |

App. 117

CONFIDENTIAL                    EXHIBIT A-4

RP00000162

# SECTION IV - INTEREST IN PROPERTY

| INTEREST IN PROPERTY INFORMATION | |
|---|---|
| **Asset ID** | **Asset Description** |
| 18-USS-000811 | $119,985.00 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |
| 18-USS-000812 | $77,000.00 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |
| 18-USS-000813 | $70,000.00 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |
| 18-USS-000814 | $57,000.00 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |
| 18-USS-000815 | $40,000.00 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |
| 18-USS-000816 | $26,342.90 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |
| 18-USS-000817 | $18,000.00 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |
| 18-USS-000818 | $15,892.24 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |
| 18-USS-000819 | $12,233.00 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |
| 18-USS-000820 | $7,759.73 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |
| 18-USS-000821 | $5,869.15 U.S. Currency, SN: ****          seized by the USA  on May 4, 2018 in Dallas, TX. |
| 18-USS-000822 | $2,705.00 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |
| 18-USS-000823 | $110.00 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |
| 18-USS-000824 | $21.33 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |
| 18-USS-000825 | $8.08 U.S. Currency, SN: ****          seized by the USA  on May 3, 2018 in Dallas, TX. |

**In the space below, please explain why you have a valid, good faith, and legally recognizable interest in the asset(s) as an owner or lienholder:**

As described earlier, RealPage was the victim of a targeted phishing incident in which one or more unknown bad actors fraudulently diverted over $10,000,000 in funds that RealPage collected controlled and management for its clients. RealPage has a valid, good faith and legally recognizable interest in the assets. There were express agreements by residents and clients that RealPage would take control over the money to accomplish the transfer of rent payments from one party to another. Accordingly, RealPage was holding the funds for its clients when they were stolen, and had a responsibility to reimburse them for the funds that it had received from residents on the clients' behalf. In expectation of recovery, RealPage credited each of the affected clients' accounts with the full amount of the stolen funds owed to them promptly after detection of the fraudulent transfer. Additionally, a portion of the stolen funds that cannot be distinctly identified represented transactional fees owed to RealPage by its clients.

App. 118

CONFIDENTIAL                    EXHIBIT A-4

RP00000163

## <u>SECTION IV - INTEREST IN PROPERTY</u>

**Select the reason why you are petitioning for remission and/or mitigation of the asset(s)?**

[X] I am an innocent owner and I did not know of the conduct giving rise to the forfeiture OR I am an innocent owner and upon learning of the conduct giving rise to the forfeiture, I did all that reasonably could be expected under the circumstance to terminate such use of the property.

[ ] I was a bona fide purchaser or seller of the forfeited property for value, AND I did not know and was without cause to believe that the property was subject to forfeiture at the time I acquired my interest in the property.

[ ] None of the above. I am only seeking mitigation.

**In the space below, please explain the reason for filing a petition.**

On July 13, 2020, Judge Jane Boyle granted the United States' motion for final forfeiture judgment in the action Cause No. 3:20-CV-155-B, United States of America v. $480,966.69 X4368, et al., in the Northern District of Texas, Dallas Division (the "Forfeiture Action"). Accordingly, RealPage files the petition because it has a legal interest in the funds located in the forfeited bank accounts as explained in this petition.

**In the event that the ruling official determines that I do not qualify for remission of the property, I hereby request mitigation of the forfeiture to avoid extreme hardship.**

[ ] YES    [X] NO

**In support of my request, I would like the ruling official to consider the following extenuating circumstances:**

**In the space below, please list any documents you are including in support of your interest in the asset(s). If none are included, please explain why.**

* Verification Affidavit in Support of Forfeiture Complaint - USOA_v_SunTrustBankLit_EDTX_Dkt1.pdf
* EDR_Wire_Details (RealPage initiated wires to its Clients following the loss) - EDR_Wire_Details (RealPage Initiated Wires).pdf
* Complaint in Cause No 3:20-CV-155-B, United States of America v. $480,966.69, et al., in the United States District Court for the Northern District of Texas (Dallas Division) (Doc. 1) - US_v_SunTrust_NDTX_Dkt1_1.pdf

App. 119

CONFIDENTIAL

EXHIBIT A-4

RP00000164

# SECTION V - RECOVERY OF LOSS

Complete this section for the assets where you have identified yourself as the owner and/or lienholder <u>and</u> you have recovered all or a portion of your losses either via an insurance claim and/or via some other source of recovery. If you have more recovery of loss information than may fit on this page, print out multiple copies of this page to submit with the petition and indicate which assets apply to each page. If you have not received any recovery of your losses, then leave this section blank.

# SECTION VI - DECLARATION AND REPRESENTATION

*The following declaration should be completed by the petitioner. If the petitioner is represented by an attorney, the attorney may complete the declaration as long as the petitioner completes the sworn notice of representation.*

I attest and declare under penalty of perjury that my petition is not frivolous and the information provided in support of my petition is true and correct to the best of my knowledge and belief.

_____

**Signature**

_____

Fleishman, Barry

**Printed Name**

_____

**Date**

## Sworn Notice of Representation

*This section must be completed only by petitioners who are represented by an attorney and whose attorney has executed the declaration provided above.*

I have retained the above-named attorney who has authority to represent me in this matter. I have fully reviewed the foregoing petition and found that its contents are truthful and accurate in every respect. I declare under penalty of perjury that the foregoing information is true and correct.

_____

**Signature**

_____

Thornthwaite, Martin

**Printed Name**

_____

**Date**

A petition containing false information may subject the petitioner to criminal prosecution under Title 18 United States Code Section 1001 and Title 18 United States Code Section 1621.

**Attached Documents:**

206N-E71-A70-8A1                                Page 10                                08/28/2020

App. 120

# EXHIBIT A-5



DARIN L. BROOKS
PARTNER
D: 713.986.7228
DBROOKS@GRAYREED.COM

September 25, 2020

RealPage, Inc.
c/o Cortney C. Thomas                      *Via E-mail: cort@brownfoxlaw.com*
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225

c/o Barry J. Fleishman (pro hac vice)      *Via E-mail: barry.fleishman@pillsburylaw.com*
Tamara D. Bruno (pro hac vice)             *Via E-mail: tamara.bruno@pillsburylaw.com*
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, D.C. 20036-3006

> Re:    Civil Action No. 3:19-CV-1350-B; *RealPage, Inc. v. National Union Fire Insurance Company of Pittsburgh PA, et al.*; In the United States District Court for the Northern District of Texas, Dallas Division

Dear Counsel:

I am sending this letter on behalf of National Union Fire Insurance Company of Pittsburgh, Pa. (National Union) to demand repayment to National Union of the $1,067,560.73 that National Union paid to your client RealPage, Inc. If I should direct this letter elsewhere, then please let me know immediately.

Based on representations by RealPage, as recently as September 2, 2020, RealPage expects to receive soon a sum of approximately $2,908,313.54 in recoveries. The National Union policy at issue, Policy No. 01-317-15-74, speaks to allocation of such recoveries. Specifically, Condition T in the policy states, in relevant part:

> t.  **Recoveries**
>
> (1) Any recoveries, whether effected before or after any payment under this policy,

1300 POST OAK BOULEVARD, SUITE 2000 | HOUSTON, TEXAS 77056 | P: 713.986.7000 | F: 713.986.7100 | GRAYREED.COM
4851-7276-3850.1

App. 122

CONFIDENTIAL                        EXHIBIT A-5                        NUFIC003586

whether made by us or you,
shall be applied net of the
expense of such recovery:

(a) First, to you in satisfac-
tion of your covered loss
in excess of the amount
paid under this policy:

(b) Second, to us in satis-
faction of amounts paid
in settlement of your
claim;

As National Union has previously expressed, the amounts that RealPage continues to seek from National Union are not "covered loss" as required under Section t(1)(a) above and therefore RealPage cannot apply these recoveries to the amount of unpaid claimed losses. Instead, as required under Section t(1)(b), the recoveries must be reimbursed to National Union in satisfaction of the amounts it has paid towards your claim.

National Union requests that RealPage confirm it will reimburse National Union for $1,067,560.73 upon RealPage's receipt of the recoveries. Please respond with RealPage's confirmation by no later than October 5, 2020. If RealPage rejects this request or otherwise fails to respond by that date, then National Union will consider RealPage to either have breached, or to have anticipatorily repudiated, the National Union policy. National Union will then pursue all available options to it, include a counterclaim or other legal proceeding to recover those amounts, plus all other available damages and costs. Such other damages and costs include, but are not limited to, National Union's attorney's fees and expenses.

Please respond by the requested date. In the meantime, please do not hesitate to reach out to me with any questions.

Sincerely,

Darin L. Brooks

DLB:sr

**From:** Susan Reininger
**To:** cort@brownfoxlaw.com; barry.fleishman@pillsburylaw.com; tamara.bruno@pillsburylaw.com
**Cc:** Darin L. Brooks; Kristen W. Kelly
**Subject:** Correspondence (Civil Action No. 3:19-CV-1350-B; RealPage, Inc. v. National Union Fire Insurance Company of Pittsburgh PA, et al.; In the United States District Court for the Northern District of Texas, Dallas Division)
**Date:** Friday, September 25, 2020 8:44:06 AM
**Attachments:** 2020_09_25 Letter to RealPage.pdf

Good morning, counsel,

Please see attached correspondence sent on behalf of Mr. Darin Brooks.

Thank you.

Susan

**Susan Reininger**

**Legal Assistant**

Tel 713.730.5187 | Fax 713.730.5926 | sreininger@grayreed.com

1300 Post Oak Blvd., Suite 2000 | Houston, TX 77056

grayreed.com | Connect with me on LinkedIn





**CONFIDENTIALITY NOTICE:** This electronic transmission and any attachments constitute confidential information which is intended only for the named recipient(s) and may be legally privileged. If you have received this communication in error, please contact the sender immediately. Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication by anyone other than the named recipient(s) is strictly prohibited.

# EXHIBIT A-6



# GRAY REED

## ATTORNEYS & COUNSELORS

DARIN L. BROOKS
PARTNER
D: 713.986.7228
DBROOKS@GRAYREED.COM

May 11, 2022

RealPage, Inc.
c/o Barry J. Fleishman                    *Via E-mail: barry.fleishman@pillsburylaw.com*
Tamara D. Bruno                           *Via E-mail: tamara.bruno@pillsburylaw.com*
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, D.C. 20036-3006

> Re:  Renewed Demand for Repayment of Funds Previously Paid by National Union
> from Recoveries by RealPage

Dear Counsel:

I am reaching out again on behalf of National Union Fire Insurance Company of Pittsburgh, Pa. (National Union) to demand repayment to National Union of the $1,067,560.73 that National Union paid to your client, RealPage, Inc. If I should direct this letter elsewhere, then please let me know immediately.

As you know, on December 22, 2021, the Court issued an opinion and final judgment in Civil Action No. 3:19-CV-1350-B; *RealPage, Inc. v. National Union Fire Insurance Company of Pittsburgh PA, et al.*; In the United States District Court for the Northern District of Texas, Dallas Division. The Court confirmed that National Union properly denied coverage for the portion in dispute, and it resolved RealPage's claim against National Union. Yet, RealPage has failed to reimburse National Union for funds previously paid by National Union, as requested in my initial correspondence of September 25, 2020.

RealPage, Inc. previously confirmed receipt of approximately $2,908,313.54 in funds from government recovery actions following the incident underlying its claim. The National Union policy at issue speaks to allocation of such recoveries. Specifically, Condition T in the policy states, in relevant part:

> **t.  Recoveries**
>
> (1) Any recoveries, whether ef-
> fected before or after any
> payment under this policy,

CONFIDENTIAL

EXHIBIT A-6

NUFIC000198

> whether made by us or you, shall be applied net of the expense of such recovery:
>
> (a) First, to you in satisfaction of your covered loss in excess of the amount paid under this policy;
>
> (b) Second, to us in satisfaction of amounts paid in settlement of your claim;

As National Union previously expressed — and the Court now has confirmed — the amounts in dispute in the underlying claim that RealPage sought from National Union were not a "covered loss" as required under Section t(1)(a). RealPage, therefore, cannot apply these recoveries to the amount of unpaid claimed losses. Instead, as required under Section t(1)(b), RealPage must reimburse the recoveries to National Union in satisfaction of the amounts it has paid towards your claim.

Further, National Union has made clear that its reference in previous correspondence to RealPage of an "unconditional" tender of payment of undisputed portions of the claim was not a waiver of its recovery rights. The reference to the "unconditional" nature of the previous payment was solely related to the requirement under Texas law that payments for undisputed portions of a claim tendered by a carrier not be conditioned on an insured releasing its ongoing claim for the remaining amounts of the claim in dispute. Further, National Union's payment of the undisputed amounts does not waive its rights under the policy as to future events such as here where RealPage subsequently recovered funds from the bad actors.

National Union requests that RealPage confirm it will reimburse National Union for $1,067,560.73. Please respond with RealPage's confirmation by no later than May 31, 2022. If RealPage rejects this request or otherwise fails to respond by that date, National Union will consider RealPage in continued breach of the National Union policy. National Union will then pursue all available options to it, including legal proceedings to recover those amounts, plus all other available damages and costs. Such other damages and costs include, but are not limited to, National Union's attorney's fees and expenses.

Please respond by the requested date. In the meantime, please do not hesitate to reach out to me with any questions.

Sincerely,

Darin L. Brooks

DLB:ep

4853-6045-6990.4

# EXHIBIT A-7



Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW | Washington, DC 20036 | tel 202.663.8000 | fax 202.663.8007

Barry Fleishman
tel: +1.202.663.8079
barry.fleishman@pillsburylaw.com

September 30, 2020

Mr. Darin L. Brooks
Gray Reed & McGraw LLP
1300 Post Oak Blvd., Suite 200
Houston, Texas 77056
**Via Email: dbrooks@grayreed.com**

Re: Civil Action No. 3:19-CV-1350-B; *RealPage, Inc. v. National Union Fire Insurance Company of Pittsburgh PA, et al.*; In the United States District Court for the Northern District of Texas, Dallas Division

Dear Mr. Brooks:

We write in response to National Union Fire Insurance Company of Pittsburgh, Pa.'s ("National Union") demand to RealPage, Inc. ("RealPage") for repayment of $1,067,560.73 in covered loss under Policy No. 01 317 15 74 (the "Policy"), which National Union paid to RealPage in January 2019.

RealPage disagrees with National Union's view that it is permitted to seek repayment of this amount under the terms of the Policy. As acknowledged in your letter, coverage for RealPage's loss in excess of the amount paid under the Policy is still in dispute and will be determined in the pending above-referenced action. Moreover, even if National Union's interpretation of the Policy is correct, National Union tendered the January 2019 payment "unconditionally," and RealPage accepted receipt of the funds as an "unconditional partial payment." Accordingly, National Union's demand is both premature and inappropriate, and RealPage declines to repay any of the amount demanded by National Union. RealPage reserves all of its rights under the policies and law.

Best regards,

*/s/ Barry Fleishman*

Barry Fleishman

www.pillsburylaw.com

App. 129

RP00000166

Darin Brooks
September 30, 2020
Page 2


cc:     Kenneth C. Stone
        Trenton K. Patterson
        Michael Keeley
        John R. Riddle
        Cortney Thomas
        Tamara Bruno
        Elizabeth Dye

www.pillsburylaw.com

CONFIDENTIAL

EXHIBIT A-7

RP00000167

# EXHIBIT A-8



Pillsbury Winthrop Shaw Pittman LLP
Two Houston Center 909 Fannin, Suite 2000 | Houston, TX 77010-1018 | tel 713.276.7600 | fax 713.276.7673

Tamara D. Bruno
tel: +1.713.276.7608
tamara.bruno@pillsburylaw.com

June 6, 2022

VIA EMAIL TO:

Mr. Darin Brooks
Gray Reed
1300 Post Oak Boulevard, Suite 2000
Houston, Texas 77056
dbrooks@grayreed.com

Re:     Response to National Union's Renewed Reimbursement Demand

Dear Mr. Brooks:

We write in response to National Union Fire Insurance Company of Pittsburgh Pa's ("National Union") renewed demand of May 11, 2022 to RealPage, Inc. ("RealPage") for repayment of $1,067,560.73 in covered loss under Policy No. 01 317 15 74 (the "Policy"), which National Union paid to RealPage in January 2019.

First, there is not support for the conclusion that any of the additional recovery amount constitutes covered RealPage fee losses. The amounts recovered were unbundled and not specifically identified as representing particular aspects of RealPage's loss. Thus, the additional recovery can be entirely associated with uncovered loss, with respect to which Condition T of the Policy does not apply.

Further, even if National Union could show that any portion of the additional recovery was for covered losses, which it cannot, National Union has waived its right to any reimbursement. As stated in the January 4, 2019 letter from Jodi Bass at AIG to Kristy Ramundi at RealPage, National Union was aware of nearly a million dollars in recovery RealPage obtained *before* National Union paid the $1,067,560.73 in covered RealPage fee losses. Yet National Union did not apply that full recovery amount against the RealPage fee losses, instead agreeing to "unconditionally tender" its payment to RealPage. National Union thus knowingly waived its right to apply recoveries against that payment.

Finally, please note that RealPage has also incurred considerable expense in pursuing the recovery of its losses over more than two years.

App. 132

CONFIDENTIAL          EXHIBIT A-8          RP00000010

Accordingly, RealPage declines to repay any of the amount demanded by National Union and reserves all of its rights under the policies and law.

Respectfully,

Tamara D. Bruno

cc: David Monk (david.monk@realpage.com)
    Martin Thornthwaite (martin.thornthwaite@realpage.com)

App. 133

CONFIDENTIAL

EXHIBIT A-8

RP00000011