UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, | § § § § | |
| Plaintiff/Counter-Defendant, | § § | |
| v. | § § | CIVIL ACTION NO. 3:23-CV-0562-B |
| REALPAGE, INC. | § § | |
| Defendant/Counter-Plaintiff. | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Plaintiff and Counter-Defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union")'s Motion for Summary Judgment (Doc. 18) and Defendant and Counter-Plaintiff RealPage, Inc. ("RealPage")'s Motion for Summary Judgment (Doc. 20). For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** both Motions.

## I.

## BACKGROUND

This is an insurance dispute. RealPage maintains an online platform that helps residential property managers collect rent from tenants. Doc. 17, Jt. App'x, 6. For its services, RealPage charges a transaction fee to its landlord-clients. *Id.* RealPage utilized a third-party payment processing platform, Stripe, Inc. ("Stripe") to collect and process tenants' rent payments. *Id.* At its simplest, Stripe facilitated the transfer of funds between tenants, landlords, and RealPage: money would be taken from the tenants' bank accounts, placed into a single bank account maintained by

Stipe ("Stripe Account"), and then disbursed by Stripe to either the landlords as rent or to RealPage as transaction fees. *Id.* at 6–7.

In 2018, hackers diverted over $10 million from the Stripe Account ("Stolen Funds"), after successfully deploying a phishing scheme. *Id.* at 7. Approximately $9 million of the Stolen Funds were owed to landlords as rent, and roughly $1 million were owed to RealPage as transaction fees. *See id.* at 7–8. Following the theft, RealPage made the business decision to reimburse its landlord-clients for the rent payments that had been stolen in the phishing attack. *Id.* at 8.

Prior to the phishing scheme, RealPage obtained a Commercial Crime Insurance Policy (the "Policy") from National Union. *Id.* RealPage filed a proof of loss with National Union after the phishing incident, seeking coverage under the Policy for its stolen transaction fees ("Transaction Fee Loss") as well as for amounts it had paid to reimburse its landlord-clients ("Client Reimbursement Loss"). *Id.* at 9–10. In response, National Union concluded that RealPage was only entitled to coverage under the Policy for its Transaction Fee Loss, but not for its Client Reimbursement Loss. *Id.* at 10. Accordingly, National Union paid a total of $1,231,692.78 to RealPage in full satisfaction of RealPage's Transaction Fee Loss. *Id.* National Union made no other payments to RealPage. *Id.*

In 2019, RealPage brought suit against National Union, contesting its partial denial of coverage under the Policy. *See RealPage Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. (RealPage I)*, 521 F. Supp. 3d 645 (N.D. Tex. 2021) (Boyle, J). RealPage alleged that its Client Reimbursement Loss was covered under the terms of the Policy, and thus, National Union's denial of coverage as to that loss was wrongful. *Id.* at 650. This Court ultimately disagreed, reasoning that RealPage's "business decision" to reimburse its landlord-clients for the stolen rent payments (i.e., its Client Reimbursement Loss) was a separate, indirect loss and thus not covered under the Policy.

*See id.* at 659 ("[S]ince RealPage did not hold the funds, its loss resulted from its decision to reimburse its clients. Accordingly, RealPage did not suffer a direct loss as required under the Policy."). The Fifth Circuit affirmed this Court's holding. *See RealPage, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. (RealPage II)*, 21 F.4th 294, 299 (5th Cir. 2021). Both this Court and the Fifth Circuit found that National Union's partial coverage—i.e., only of RealPage's Transaction Fee Loss—was proper, and that National Union fulfilled its obligations under the Policy. *See RealPage I*, 521 F. Supp. 3d at 649; *RealPage II*, 21 F.4th at 299.

Meanwhile, the United States Secret Service (the "Secret Service") launched an investigation into the phishing scheme, which culminated in the seizure of approximately $2.9 million of the Stolen Funds ("Seized Funds"). Doc. 17, Jt. App'x, 12. The United States subsequently initiated a civil forfeiture action against the Seized Funds; RealPage filed a Petition in that action, claiming a right to the Seized Funds. *Id.* at 12–13. As support for why it had "a valid, good faith, and legally recognizable interest" in the Seized Funds, RealPage represented that it "was a victim of a targeted phishing incident in which . . . bad actors fraudulently diverted over $10,000,000" of RealPage's landlord-clients' funds; and being responsible for those funds, RealPage "credited each of the affected [landlord-clients'] accounts with the full amount of the stolen funds owed to them promptly after detection of the fraudulent transfer"; and that "a portion of the stolen funds that cannot be distinctly identified represented transaction fees owed to RealPage by its clients." *Id.* at 13 (alterations omitted). The United States ultimately remitted $2,908,130.53 of the Seized Funds to RealPage ("Remitted Funds"). *Id.*

On September 25, 2020, National Union requested that RealPage reimburse National Union for the $1,231,692.78 it paid out under the Policy. *Id.* at 14. National Union asserted that

it had a right to reimbursement under the Policy's Allocation of Recovery Provision ("ARP"), *id*., which provides:

> (1) Any recoveries, whether effected before or after any payment under this policy, whether made by us or you, shall be applied net of the expense of such recovery:
>> (a) First, to you in satisfaction of your covered loss in excess of the amount paid under this policy;
>> (b) Second, to us in satisfaction of amounts paid in settlement of your claim;
>> (c) Third, to you in satisfaction of any Deductible Amount; and
>> (d) Fourth, to you in satisfaction of any loss not covered under this policy
> (2) Recoveries do not include any recovery:
>> (a) From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or
>> (b) Of original "securities" after duplicates of them have been issued.

*Id*. at 36. National Union stated that the Remitted Funds constituted "recoveries," and thus were subject to the ARP. *Id*. at 14. And because RealPage's only covered loss—its Transaction Fee Loss—had been fully paid out by National Union, National Union contended that it was entitled to full reimbursement from the Remitted Funds. *Id*. RealPage declined to reimburse National Union with the Remitted Funds because, in RealPage's view, the ARP only applies to recoveries of losses covered by the Policy, and it was unclear whether the Remitted Funds constitute a recovery of its covered Transaction Fee Loss or its uncovered Client Reimbursement Loss. *Id*. at 14, 132.

Following RealPage's refusal to reimburse National Union, National Union initiated the present suit against RealPage for breach of contract. Doc. 1, Compl., 1. RealPage asserts counterclaims for violations of Chapter 541 of the Texas Insurance Code and also seeks a declaratory judgment interpreting the scope of the ARP. Doc. 5, Countercl., 7–15. The parties have since file cross-motions for summary judgment concerning each of these claims. Doc. 18, Nat'l Union Mot.; Doc. 20, RealPage Mot., 2. The Court considers the Motions below.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The summary-judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir. 1990). Usually, this requires the movant to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quotation marks omitted).

Once the summary-judgment movant has met this burden, the burden shifts to the non-movant to "go beyond the pleadings and designate specific facts" showing that a genuine issue exists. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (citations omitted). Instead, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original) (quotation marks omitted).

"[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary[-]judgment motion." *Scott v. Harris*, 550 U.S. 372,

378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (alterations incorporated) (quotations marks omitted). But the Court need not "sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citation and quotation marks omitted). If the non-movant is unable to make the required showing, the Court must grant summary judgment. *Little*, 37 F.3d at 1076.

## III.

## ANALYSIS

There are a total of three claims asserted in this case. National Union asserts a single claim for breach of contract against RealPage. RealPage asserts two counterclaims against National Union: the first is for a declaratory judgment interpreting the scope of the Policy's ARP, and the second is for violations of Chapter 541 of the Texas Insurance Code ("Chapter 541").

The parties have since filed cross-motions for summary judgment. National Union moves for summary judgment on all three claims asserted in this case; RealPage moves for summary judgment on its declaratory judgment claim and on National Union's breach of contract claim, but not its Chapter 541 claim.

The Court considers the parties' Motions below and ultimately concludes that (1) RealPage is entitled to summary judgment on its declaratory judgment claim; (2) neither party is entitled to summary judgment on National Union's breach of contract claim; and (3) National Union is entitled to summary judgment on RealPage's Chapter 541 claim.

A.    *Declaratory Judgment Claim*

The Court begins with RealPage's claim for declaratory judgment. RealPage's declaratory judgment claim concerns the scope of the Policy's ARP and its application to the facts of this case. Doc. 5, Cntrcl., ¶¶ 113–15. The ARP provides:

> Any recoveries, whether effected before or after any payment under this policy, whether made by us or you, shall be applied net of the expense of such recovery:
>> (a) First, to you in satisfaction of your covered loss in excess of the amount paid under this policy;
>> (b) Second, to us in satisfaction of amounts paid in settlement of your claim;
>> (c) Third, to you in satisfaction of any Deductible Amount; and
>> (d) Fourth, to you in satisfaction of any loss not covered under this policy

Doc. 17, Jt. App'x, 36. RealPage seeks a declaration that the ARP is unambiguous in that only "recoveries" of losses that are "contemplated and covered by the Policy" are subject to the ARP. Doc. 5, Cntrcl., ¶ 113. Alternatively, RealPage requests a declaratory judgment that the ARP is ambiguous as to as to whether recoveries of both covered and uncovered losses are subject to the ARP, that this ambiguity must be resolved in its favor, and that "the most reasonable interpretation of the [ARP] is being limited to those recoveries for [a] 'loss' contemplated and covered by the Policy." *Id*. ¶ 114. RealPage lastly seeks a declaration that the Remitted Funds constitute a recovery of its uncovered Client Reimbursement Loss—and thus fall outside the scope of the ARP—to the extent the Remitted Funds constitute rent payments that were initially stolen from RealPage's landlord-clients. *Id*. ¶¶ 115–16.

Both parties have moved for summary judgment on RealPage's declaratory judgment action. Doc. 19, Nat'l Union Mot. Br., 6; Doc. 20, RealPage Mot., 2. As RealPage's claim for declaratory judgment asks the Court to interpret the terms of the Policy, the issue before the Court is purely legal and fit for determination on summary judgment. *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) ("Contract interpretation is a purely legal issue.").

The Court concludes that that the ARP applies only to recoveries of losses that result from occurrences that are covered by the Policy and that the Remitted Funds are not subject to the ARP to the extent those funds consist of amounts stolen from RealPage's landlord-clients.

1.      The ARP is Limited to Recoveries of Covered Losses

RealPage first asks the Court for a declaration interpreting the scope of the ARP. *See* Doc. 5, Cntrcl., ¶ 113. The ARP provides that "any recoveries" are subject to the four priorities of allocation provided therein. Doc. 17, Jt. App'x, 36. RealPage argues that the phrase "any recoveries" means "any recoveries [of losses that are *contemplated and covered* by the Policy]." Doc. 21, RealPage Mot. Br., 12–14. National Union, on the other hand, argues that "any recoveries" means "any recoveries [of *any* losses]." Doc. 19, Nat'l Union Mot. Br., 14–18. The Court finds RealPage's interpretation more plausible and thus concludes that only recoveries of covered losses are subject to the ARP.

Because Texas law governs the parties' contract claims, the Court "employ[s] the principles of Texas contract construction in interpreting" the ARP. *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 562 (5th Cir. 2010). "Texas law provides that insurance policies are construed according to common principles governing the construction of contracts, and the interpretation of an insurance policy is a question of law for a court to determine." *Id.* When interpreting a contract, "[a] court's primary goal is to determine the contracting parties' intent as expressed by the policy's written language interpreted through the application of established rules of contract interpretation." *Certain Underwriters at Lloyd's of London v. Cardtronics, Inc.*, 438 S.W.3d 770, 776 (Tex. App.—Houston [1st Dist.] 2014, no pet.). "To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis omitted). That said, the inquiry should be limited to "the four corners of the policy to see what the policy states without considering what the parties allegedly meant." *Thompson v. Geico Ins. Agency, Inc.*, 527 S.W.3d 641, 644 (Tex. App.—Houston

[14h Dist.] 2017, no pet.). If the policy language is ambiguous, meaning it is "subject to two or more reasonable interpretations," *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995) (citations omitted), the Court "must adopt the interpretation favoring the insured." *Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co.*, 876 F.3d 119, 128 (5th Cir. 2017) (citation omitted).

In this case, the parties dispute the scope of the term "any recoveries" in the ARP. Because "any recoveries" is undefined, the Court looks to the common understanding of that term, starting with its dictionary definition. *See Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014). In the context of the ARP, the plain meaning of "recoveries" is "[a]n amount recovered, frequently contrasted with initial loss or expenditure." *Recovery*, OXFORD ENGLISH DICTIONARY (Rev. 2009 ed.); *see also Recovery*, MERRIAM-WEBSTER'S DICTIONARY (online ed.) (defining "recovery" as the "amount awarded by or collected as a result of a judgment or decree."); *Recovery*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "recovery" to mean "[t]he regaining or restoration of something lost or taken away."). And the term "any," when used with a "plural or mass noun" such as "recoveries," is commonly "used to refer to a number, however great or small, of (separable things), or a quantity or amount of (a substance, etc.), even the smallest." *Any*, OXFORD ENGLISH DICTIONARY (Rev. 2016 ed.); *Any*, MERRIAM-WEBSTER'S DICTIONARY (online ed.) (defining "any" to mean "one, some, or all indiscriminately of whatever quantity."). The foregoing indicates that the plain meaning of the term "any recoveries" is an amount received in restoration of a loss, no matter how small the amount.

Conceivably, this interpretation could support a reading of the ARP that subjects amounts received in restoration of *any* loss to allocation under the Policy. However, such an interpretation would lead to absurd results that would almost certainly be beyond the contemplation of the parties in drafting the ARP. *See Illinois Tool Works, Inc. v. Harris*, 194 S.W.3d 529, 536 (Tex. App.—

- 9 -

Houston [14th Dist.] 2006, no pet.) (explaining that Texas courts avoid interpretations of contracts that would lead to absurd results). For instance, amounts received in restoration of National Union's losses or of a third-party's losses might be subject to the ARP if "any recoveries" was interpreted literally. To avoid such absurd results, the term "any recoveries" in the ARP cannot be interpreted to mean amounts received in restoration of *any* loss; instead, it must be limited to amounts received in restoration of a *specific* kind of loss. But the question remains: recoveries of which specific losses are subject to the ARP? In light of ARP's place within a larger insurance policy and its plain text, the Court concludes that "any recoveries" means amounts received in restoration of a loss that results from an occurrence covered by the Policy.

In interpreting the scope of the ARP, the Court is guided by the Supreme Court of Texas's interpretation of a similarly-worded subrogation provision in *Fortis Benefits v. Cantu*, 234 S.W.3d 642 (2007). The subrogation provision at issue there provided, "Upon payment of benefits, [the insurance company] will be subrogated to *all* rights of recovery a Covered Person may have against *any* person or organization." *Fortis Benefits*, 234 S.W.3d at 650 (emphasis in original). While the language of this provision was potentially broad enough to permit "subrogation of claims *unrelated* to the policy," the Court rejected such an interpretation, explaining that it was required to "construe [the subrogation] provision in relation to the entire instrument to avoid an interpretation that renders the contract unreasonable, inequitable, and oppressive." *Id*. at 650 n.54 (emphasis added) (citations omitted). And given that the policy at issue in *Fortis* set forth the specific benefits that were to be provided by the insurance company, the Court concluded that "[t]he [subrogation] provision . . . gives [the insurance company] a subrogation right *only* on recoveries for claims that relate to benefits available under the contract." *Id*. (emphasis added).

Here too, the ARP broadly subject "any recoveries" to allocation. Doc. 17, Jt. App'x, 36. While this language could conceivably be read to give National Union a right to recoveries of losses "unrelated to the [P]olicy," the Court must interpret the ARP "in relation to the entire instrument to avoid an interpretation that renders the contract unreasonable, inequitable, and oppressive." *See Fortis Benefits*, 234 S.W.3d at 650 n.54. And in this case, a review of the various provisions of the Policy reveals that the parties were almost exclusively concerned with specific losses—namely, losses that result from "occurrences" that are covered by the Policy.

The Policy's opening provision states that it "applies to loss that [RealPage] sustain[s] resulting directly from an 'occurrence.'" *See* Doc. 17, App'x, 28. The Policy generally defines "occurrence" to mean "[a]n individual act or event . . . [or] a series of acts or events . . . committed . . . during the Policy Period . . . [or] before such Policy Period." *Id.* at 41. This broad definition of "occurrence" might suggest that the Policy applies to virtually *any* loss sustained by RealPage. *See id.* However, the Policy proceeds to lay out the specific "occurrences" that are covered by the Policy as well as those "occurrences" which are not covered. *See id.* at 28–32. For instance, the Policy provides that National Union "will pay for loss . . . resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the premises . . . [t]o a place outside [that] premises." *Id.* at 29 (quotations and alterations omitted). The "occurrence" in this example is "the use of any computer to fraudulently cause a transfer" of property to a place outside the premises. *See id.* at 29, 41. And because that "occurrence" is covered by the Policy, National Union is responsible for paying for loss that "result[s] directly" from the same. *See id.* at 29. Other "occurrences," however, are expressly excluded from the Policy. *See id.* at 29–32. For example, the Policy provides that National Union will not pay for "[l]oss that is an indirect result of an

'occurrence' covered by this policy," such as the "[p]ayment of damages of any type for which [RealPage] [is] legally liable." *Id.* at 30.

Thus, from the outset, the Policy makes a clear division between losses that result from occurrences that are covered by the Policy and all other types of losses. And after having made this distinction, the remainder of Policy almost exclusively addresses the parties' rights and responsibilities with respect to the former—i.e., losses that result from covered occurrences. *See id.* at 29, 32–41. The Policy limits the scope of the risk borne by National Union for such losses, first by providing National Union "will not pay for *loss resulting directly from a occurrence* unless the amount of loss exceeds the Deductible Amount," and then providing "the most [National Union] will pay for all *loss resulting directly from an occurrence* is the applicable Limit of Insurance." *Id.* at 29 (emphasis added). The Policy then sets forth various terms and conditions to coverage for losses that result from covered occurrences. *See id.* at 32–41. For instance, the Policy's "Duties in the Event of Loss" provision lays out RealPage's obligations when it "first becomes aware . . . that *a loss of a type covered by this policy* has been or will be incurred." *Id.* at 33, 39 (emphasis added). Similarly, the "Other Insurance Provision" provision limits National Union obligations under the Policy where RealPage obtains other insurance "for *loss covered under this policy*" *Id.* at 35 (emphasis added). The "Records" provision requires RealPage "to keep records of *all property covered under this policy* so [National Union] can verify the amount of any loss." *Id.* at 36 (emphasis added). And the "Valuation – Settlement" provision explains how the parties will determine "[t]he value of any loss for purposes of *coverage under this policy*." *Id.* at 37 (emphasis). To be sure, this is not an exhaustive list of all the various provisions in the Policy that either directly or implicitly address the parties' respective obligations in the event of a loss that results from a covered occurrence. But this list illustrates the point.

Given that most of the Policy's various provisions appear exclusively concerned with the parties' rights and duties with respect to specific losses—i.e., losses caused by occurrences covered by the Policy—it would follow that the ARP likewise is limited to the parties' obligations with respect to those same losses. *See Fortis Benefits*, 234 S.W.3d at 650 n.54. Otherwise, the ARP would seemingly stand alone in the Policy as the sole provision that *imposes* responsibilities on the parties with respect RealPage's uncovered losses.[1]  *See* Doc. 17, App'x, 28–41. The Court would expect clear indicator in the text of the ARP if the parties intended such a result. And here, there is none.

The ARP provides as follows:

> Any recoveries, whether effected before or after any payment under this policy, whether made by us or you, shall be applied net of the expense of such recovery:
> (a) First, to you in satisfaction of your covered loss in excess of the amount paid under this policy;
> (b) Second, to us in satisfaction of amounts paid in settlement of your claim;
> (c) Third, to you in satisfaction of any Deductible Amount; and
> (d) Fourth, to you in satisfaction of any loss not covered under this policy

*Id*. at 36. That recoveries of uncovered losses fall outside the scope of the ARP is apparent from the very first clause following "any recoveries"—"whether effected before or after any payment under this policy." *Id*. That clause presupposes, at the very least, the existence of an underlying obligation of payment under the Policy at the time the recovery is made. *See id*. Absent such an obligation at the time of recovery, National Union would presumably *never* make a payment under the Policy. And a recovery cannot be made "*before* . . . any payment under this policy" if no payment is *ever* to be made. *Id*. (emphasis added). Given that the ARP contemplates that National Union have an underlying duty to pay at the time the recovery is made, it follows that recoveries of losses for which National Union owes no duty of payment at all—i.e., uncovered losses—fall outside the

---

[1] The Court uses the term "uncovered loss" throughout this Order to refer only to loss that results from occurrences that are not covered by the Policy.

scope of the ARP. Instead, the better readings is that the only "recoveries" subject to the ARP are recoveries of those losses that triggered the duty to pay in the first instance—i.e., losses which result from covered occurrences.

The ARP's priorities of allocation similarly suggest that only recoveries of losses that result from covered occurrence fall within the scope of the ARP. The ARP provides "any recoveries" are first to be applied to RealPage's "covered loss in excess of the amount paid under this policy," second to reimburse National Union for amounts it paid under the Policy, third to the "Deductible Amount," and finally to "any loss not covered under this policy." *Id.* However, without a loss that results from a covered occurrence, the ARP's first three priorities are inoperative. Absent such a loss, any loss that may have been sustained by RealPage necessarily would be an uncovered loss. *See id.* at 29–32. And if RealPage had only sustained an uncovered loss, there would be no "covered loss in excess of the amount paid under this policy" because there would be no covered loss in the first instance; there would also be no "amounts paid [by National Union] in settlement of [RealPage's] claim" considering National Union is not obligated to pay for RealPage's uncovered losses; and there would be no "Deductible Amount" if RealPage had only sustained an uncovered loss because the deductible amount refers to the initial portion of—and consequently requires that there be—a loss from a covered occurrence. *See id.* at 29, 36. That the first three priorities are of no effect if RealPage only sustains an uncovered loss strongly suggests that recoveries of such loss are not subject to the ARP.

To be sure, the final priority in the ARP—"any loss not covered under Policy"—does not, like the first three priorities, inherently require that RealPage sustain a loss from covered occurrence. *See id.* For this reason, National Union argues that the final priority demonstrates the parties' intent to apply recoveries of RealPage's uncovered losses to the ARP. *See* Doc. 23, Nat'l

Union Resp. Br., 7. The Court, however, is not convinced. In the Court's view, the ARP's final priority—"any loss not covered under this policy"—simply accounts for situations where RealPage sustains a loss from a covered occurrence in excess of Policy limits.

The ARP appears to allocate recoveries to distinct portions of RealPage's losses. Solely with respect to RealPage, the ARP allocates recoveries to its "covered loss in excess of the amount paid under this policy," then to the "Deductible Amount," and finally to "any loss not covered under this policy." Doc. 17, Jt. App'x, 36. The term "covered loss" used in the first priority is not defined in the Policy. *See id.* at 39–41. Although "covered loss" could be interpreted to mean the *total loss* (i.e., the entire amount) that results from a covered occurrence,[2] the fact that the ARP treats "covered loss" as distinct from the "Deductible Amount" suggests that, for purposes of the ARP, "covered loss" means something different. *See id.* at 36 (giving higher priority to "covered loss in excess of the amount paid under this policy" than to "Deductible Amount"). As explained, under the Policy, National Union is not responsible for paying for a loss that results from a covered occurrence unless "the amount of [that] loss exceeds the Deductible Amount." *Id.* at 29. Thus, the term "covered loss" in the ARP cannot mean the *total loss* caused by a covered occurrence because the deductible amount is, by definition, a part of the loss caused by a covered occurrence. *Cf. In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017) ("The Court must read contractual provisions so none of the terms of the agreement are rendered meaningless or superfluous."). Moreover, the fact that "covered loss" does not encompass the deductible amount also suggests that the portion of a

---

[2] *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 494 (Tex. 2018) ("We use the phrase 'cover the loss' here to mean that the policy obligates the insurer to pay at least some of the benefits the insured is seeking. In a broad sense, a policy could provide 'coverage' for a loss and yet not obligate the insurer to pay any benefits because, for example, the amount of the loss is less than the policy's applicable deductible. In that sense, the loss may be said to fall within the policy's 'coverage,' but the insured is not entitled to benefits and the insurer does not breach the policy by failing to pay benefits.").

loss that exceeds Policy limits is likewise not considered part of the "covered loss." *See Coker*, 650 S.W.2d at 393 ("[C]ourts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."). This is because neither the deductible amount nor the portion of a loss that exceeds Policy limits falls within the scope of the risk borne by National Union under the Policy (i.e., RealPage is responsible for paying both). *See* Doc. 36, Jt. App'x, 29; *Coverage*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "coverage" as "the risks within the scope of an insurance policy."). As such, it appears that the term "covered loss" in the first priority is limited to a specific portion of a loss that results from a covered occurrence—specifically that portion that for which National Union is responsible for paying. The third priority—"Deductible Amount"—also addresses a distinct portion of a loss that results from a covered occurrence, namely that initial portion of the loss for which National Union is not responsible for paying. But what if RealPage sustain loss from a covered occurrence that exceeds Policy limits? The ARP also addresses this portion of the loss by giving fourth (and final) priority to "any loss not covered under this policy." *See* Doc. 17, Jt. App'x, 36. The Court thinks it far more likely that the ARP allocates recoveries to "any loss not covered under this policy" to account for the portion of RealPage's losses that exceed Policy limits than it is that the parties' intended to subject recoveries of any loss to the ARP, as National Union suggests. *See* Doc. 23, Nat'l Union Resp. Br., 7.

National Union lastly argues that the ARP's exclusionary provision supports subjecting recoveries of RealPage's uncovered losses to allocation. *Id.* at 9. The exclusionary provision clarifies that "[r]ecoveries do not include any recovery: (a) [f]rom insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or (b) [o]f original securities after duplicates of them have been issued." *See* Doc. 17, Jt. App'x, 36. National Union argues that a recovery of an

uncovered loss "is not one of those categories that is expressly excluded from the [ARP], thus demonstrating the parties' intent to include uncovered loss within the scope of that provision." Doc. 19, Nat'l Union Mot. Summ. J. Br., 15 (emphasis omitted). National Union's third argument invokes "the canon of *Expressio Unius Est Exclusio Alterius*, which provides that 'expressing one item of [an] associated group or series excludes another left unmentioned.'" *Baptist Mem'l Hosp.-Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 694 (5th Cir. 2020) (alteration in original) (quoting *N.L.R.B. v. Sw. Gen., Inc.*, 137 S. Ct. 929, 940 (2017)). However, "[t]his canon 'applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded.'" *Id.* (citing *Sw. Gen.*, 137 S. Ct. at 940). Here, no persuasive inference can be drawn from the failure to expressly exclude recoveries of uncovered losses from the ARP. This is because the failure to expressly exclude recoveries of uncovered losses is equally consistent with the notion that the parties already thought that such recoveries were excluded from the ARP in the first place. Indeed, the ARP does not expressly exclude a number of things which could conceivably be considered "recoveries," such as recoveries of National Union's losses. But the failure to expressly exclude recoveries of National Union's losses does not suggest an intent to include them as part of the ARP. In the same manner, the failure to expressly exclude recoveries of RealPage's uncovered losses does not strongly evince an intent to subject such recoveries to the ARP. *See Azar*, 956 F.3d at 694.

Based on the foregoing, the Court that concludes that the term "any recoveries" in the ARP is limited to recoveries of those losses that directly result from occurrences covered by the Policy, and therefore, that recoveries of RealPage's uncovered losses are not subject to allocation under the ARP. The Policy as a whole concerns the parties' rights and duties with respect to losses that result from covered occurrences, and the text of the ARP suggests that it is no different in

that regard. National Union's arguments to the contrary, while compelling, do not ultimately persuade the Court. As such, the Court **GRANTS** RealPage's Motion for Summary judgment as to its declaratory judgment claim. The Court **DENIES** National Union's Motion for Summary Judgment as to the same claim.

2. The Remitted Funds Are Recoveries of Uncovered Losses to the Extent They Contain Stolen Rent Payments

RealPage also asks the Court for a declaration that the Remitted Funds are not subject to the ARP to the extent they consist of rent fees initially stolen from its landlord clients. Doc. 5, Cntrcl., ¶ 115. The Court agrees that any such funds recovered by RealPage would not be subject to the ARP.

Approximately $10 million was stolen from the Stripe Account. Doc. 17, Jt. App'x, 7. Of this $10 million, approximately $9 million was owed to RealPage's landlord-clients as rent payments, and the remainder was owed to RealPage as transaction fees for processing the payments between tenants and its landlord-clients. *See id.* 7–8. As RealPage did not own the $9 million in rent fees stolen from its clients, RealPage sustained a loss of roughly $1 million on the date of the theft. *See generally RealPage, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 21 F.4th 294 (5th Cir. 2021). The parties refer to this $1 million in stolen transaction fees as RealPage's "Transaction Fee Loss." *See, e.g.*, Doc. 21, RealPage Mot. Summ. J. Br., 5. Following the phishing incident, however, RealPage elected to reimburse $9 million to its clients for their losses. Doc. 17, Jt. App'x, 8. The parties refer to this $9 million reimbursement as RealPage's "Client Reimbursement Loss." *See, e.g.*, Doc 25, RealPage Resp. Br., 4. Thus, RealPage sustained a total loss of $10 million—a $1 million

Transaction Fee Loss and a $9 million Client Reimbursement Loss. *See, e.g.*, Doc. 21, RealPage Mot. Summ. J. Br., 5

The Remitted Funds consist of $2.9 million in Stolen Funds that was seized by the Secret Service and distributed to RealPage. Doc. 17, Jt. App'x, 12–13. However, because the phishing attack was executed on a single bank account that comingled the rent payments and transaction fees, it is unclear whether the Remitted Funds consist entirely of rent fees which were stolen from RealPage's landlord-clients or whether they also consist of transaction fees which were stolen from RealPage. *See id*. at 7–8, 118.

RealPage concedes that any portion of the Remitted Funds that represent stolen transaction fees would constitute a recovery of its Transaction Fee Loss, which was a loss that resulted from a covered occurrence (i.e., the phishing attack), and thus be subject to the ARP. *See* Doc. 21, RealPage Mot. Summ. J. Br., 2. However, RealPage contends that any portion of the Remitted Funds which represents rent fees would constitute a recovery of its Client Reimbursement Loss. *See* Doc. 25, RealPage Resp., 13–16. And, RealPage points out, this Court previously held that its Client Reimbursement Loss was an uncovered loss. *Id*. at 12. Therefore, the argument goes, because the ARP does not apply to recoveries of uncovered losses, and because any recovery of rent fees would be a recovery of its uncovered Client Reimbursement Loss, the Remitted Funds are not subject to the ARP—and thus need not be used to reimburse National Union—to the extent they consist of rent fees. Doc. 5, Cntrcl., ¶¶ 115–16.

National Union does not appear to dispute that the Remitted Funds would constitute a recovery of RealPage's uncovered Client Reimbursement Loss to the extent they consist of the stolen rent fees. *See* Doc. 23, Nat'l Union Resp., 15–18. National Union instead argues that the distinction made by RealPage is immaterial because recoveries of RealPage's uncovered losses are

subject to the ARP. *See id.* at 7, 16 n.5. The Court, however, has already determined that the ARP is limited to recoveries of losses that resulted from covered occurrences. *See supra* III.A.1.

As National Union does not contest that the Remitted Funds are recoveries of RealPage's uncovered, Client Reimbursement loss to the extent they constitute rent fees stolen from its landlord clients, the Court **GRANTS** RealPage's Motion for Summary Judgement on its claim for declaratory judgment that the Remitted Funds are not subject to the ARP to the extent they consist of stolen rent fees. The Court **DENIES** National Union's Motion as to the same claim.

B.      *Breach of Contract*

Having interpreted the scope of the ARP, the Court next turns to National Union's breach of contract claim against RealPage. According to National Union, the Remitted Funds, in their entirety, are subject to the ARP. *See* Doc. 19, Nat'l Union Mot. Summ. J. Br., 16, 18. As such, National Union argues that it is entitled to reimbursement from Remitted Funds. *See id.* at 15–16. National Union contends that because RealPage has not reimbursed National Union, RealPage is in breach of the Policy. *See id.* at 13.

Both parties have moved for summary judgment on National Union's breach of contract claim. Doc. 19, Nat'l Union Mot. Summ. J. Br., 6; Doc. 20, RealPage Mot. Summ. J., 2. As National Union bears the burden of proof on its contract claim at trial, it is only entitled to summary judgment if its "establish[es] beyond peradventure *all* of the essential elements of [that] claim." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986) (emphasis in original). Conversely, RealPage is entitled to summary judgment if it can show the absence of proof on any element of National Union's claim. *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 335 n.10 (5th Cir. 2017).

"Under Texas law, '[t]he essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach

of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'" *Roberts v. Overby-Seawell Co.*, No. 3:15-CV-1217-L, 2018 WL 1457306, at *7 (N.D. Tex. Mar. 23, 2018) (Lindsay, J.) (alteration in original) (quoting *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009)). Here, the first two elements are not in dispute. The parties agree that the Policy constitutes a valid contract and that National Union performed its obligations thereunder. Doc. 17, Jt. App'x, 8, 11–12. Thus, the Court need only determine whether genuine issues of fact exist with respect to the third and fourth elements of National Union's claim—breach and damages. The Court concludes that there are.

A party breaches a contract where he fails to perform when under an obligation to do so. *ExxonMobil Glob. Servs. Co. v. Gensym Corp. & Versata Enterprises*, 54 F. Supp. 3d 707, 711 (W.D. Tex. 2014) ("Breach is the failure, without legal excuse, to perform any promise that forms all or part of an agreement." (citations omitted)). Here, the ARP requires that amounts received in restoration of a loss that resulted from covered occurrence be applied first to RealPage in satisfaction of its "covered loss in excess of the amount paid under this policy" and then to National Union as reimbursement for amounts paid on the claim. Doc. 17, Jt. App'x, 36. There is no dispute that, prior to its receipt of the Remitted Funds, RealPage's "covered loss" had been fully satisfied by National Union and that National Union had not been reimbursed for the amounts it paid out under the Policy. *Id.* at 11–12, 14. Thus, under the ARP, National Union has next priority with respect to any recoveries of RealPage's losses to the extent such recoveries fall within the scope of the ARP. *Id.* at 36. The Court has already determined Remitted Funds are recoveries of RealPage's covered losses—and thus subject to the ARP—to the extent they represent stolen transaction fees, but not stolen rent fees. *See supra* III.A.2. As such, whether RealPage breached turns on whether the Remitted Funds *in fact* contain any stolen transaction fees.

- 21 -

Here, there is a genuine dispute as to whether any portion of the Remitted Funds consist of stolen transaction fees and thus whether RealPage is in breach. RealPage represented to the Secret Service that it had a right to the Remitted Funds for two reasons: (1) it had a right to the portion consisting of stolen rent payments because it had reimbursed its clients for those amounts; and (2) it had a right to "a portion of the stolen funds that cannot be distinctly identified [as] transactional fee[s] owed to RealPage by its clients." Doc. 17, Jt. App'x, 118. This evidence is inconclusive as to whether any portion of the Remitted Funds consist of stolen transaction fees. On the one hand, it is entirely possible that the entirety of the Remitted Funds in fact are stolen rent payments—National Union has not presented evidence on this point. On the other hand, however, RealPage represented that a portion of funds might consist of stolen transaction fees, and the Secret Service appears to have distributed the Remitted Funds to RealPage at least partly on this basis. *See id*. A trier of fact could reasonably conclude from this evidence that the Remitted Funds contain at least *some* stolen transaction fees, and thus constitute a recovery of RealPage's covered Transaction Fee Loss. *Baylor Cnty. Hosp. Dist. v. Burwell*, 163 F. Supp. 3d 372, 377 (N.D. Tex. 2016) (O'Connor, J.) ("A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." (citations omitted)). And as there is a genuine issue as to whether RealPage recovered its covered Transaction Fee Loss, there is also a genuine issue as to whether RealPage is in breach.

While RealPage argues that National Union failed to show exactly what portion of the Remitted Funds consist of such stolen transaction fees, Doc. 21, RealPage Mot. Summ. J. Br., 18–20, such a showing is not required to survive summary judgment. All National Union needed to do to was establish that there is a genuine issue as to whether *any* part of the Remitted Funds consist of stolen transaction fees. *See Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir.

1999). It has done so. Whether and the extent to which stolen transaction fees are contained within the Remitted Funds goes to determining RealPage's alleged breach and National Union's consequent damages, issues that are unresolved at this stage.

Because there is a genuine issue of fact as to whether RealPage is in receipt of any stolen transaction fees, there is also a genuine issue of fact as to whether RealPage has violated the ARP and thus breached the contract. As genuine issues of material fact remain, neither party is entitled to summary judgment on National Union's breach of contract claim. The Court thus **DENIES** both parties' summary-judgment motions on that claim.

C.    *Chapter 541 Claim*

Lastly, RealPage alleges that National Union violated various provisions of Chapter 541 of the Texas Insurance Code. Doc. 5, Countrcl., ¶¶ 117–122. National Union moves for summary judgment on RealPage's Chapter 541 claims, arguing in part that RealPage did not sustain any damage as a result of any alleged violation. The Court agrees with National Union.

Chapter 541 "authorizes a private action against an insurer that commits 'an unfair or deceptive act or practice in the business of insurance.'" *Ortiz v. State Farm Lloyds*, 589 S.W.3d 127, 133 (Tex. 2019). While the various provisions of Chapter 541 set forth what constitutes an unfair or deceptive insurance practice, to prevail on any Chapter 541 claim, a plaintiff must at least show that he "sustain[ed] actual damages from a defendant's unfair or deceptive insurance practice." *Old Am. Ins. Co. v. Lincoln Factoring, LLC*, 571 S.W.3d 271, 277 (Tex. App.—Fort Worth 2018, no pet.) (citations omitted).

Here, RealPage's Chapter 541 claims are all premised on National Union's alleged misrepresentation of the scope of the ARP.  Doc. 30, RealPage Reply, 20. Specifically, RealPage argues that "National Union knew the ARP applied only to recoveries of the loss paid by National

Union, but nevertheless claimed, as it does now, that the ARP applies to uncovered loss." Doc. 25, RealPage Resp., 20. And according to RealPage, National Union's "misrepresentation . . . may be considered the producing cause of RealPage's incurred attorneys' fees (which may be considered statutory damages)." *Id.* at 23.

RealPage has not alleged, much less come forward with evidence, that it sustained actual damages as a result of National Union's alleged intentional misrepresentation. The only damages claimed to be caused by National Union—RealPage's attorney's fees incurred in *this* litigation— are not "actual damages" needed to sustain RealPage's Chapter 541 claim. *Ortiz*, 589 S.W.3d at 135 ("To the extent [plaintiff] contends that the attorney's fees and costs he incurred in prosecuting this suit are part of the actual damages he is entitled to recover, we disagree. Texas law is clear that attorney's fees and costs incurred in the prosecution or defense of a claim, although compensatory in that they help make a claimant whole, are not damages." (citations omitted)); *McCall v. State Farm Lloyds*, 688 F. Supp. 3d 372, 379 (N.D. Tex. 2023) (Boyle, J); *Dunne v. Allstate Vehicle & Prop. Ins. Co.*, No. CV H-18-4519, 2020 WL 130101, at *2 (S.D. Tex. Jan. 10, 2020).

As RealPage points to no damages aside from the fact it has been forced to litigate this case, and because such damages, standing alone, are insufficient to support a claim under Chapter 541, the Court **GRANTS** National Union's Motion for Summary Judgment as to RealPage's Chapter 541 claims.

## IV.

## CONCLUSION

For these reasons, the Court **GRANTS IN PART** and **DENIES IN PART** RealPage's Motion for Summary Judgment and National Union's Motion for Summary Judgment. The **GRANTS** RealPage's Motion as to its declaratory judgment claim. The Court **DENIES** RealPage's

Motion as to National Union's breach of contract claim. The Court **GRANTS** National Union's Motion as to RealPage's Chapter 541 claims. The Court **DENIES** National Union's Motion as to RealPage's declaratory judgment claims and as to National Union's breach of contract claim. The Court **DIMSISSES WITH PREJUDICE** RealPage's claims under Chapter 541 of the Texas Insurance Code.

      SO ORDERED.

      SIGNED: September 5, 2024.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

- 25 -